# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW MEXICO UNITED FOOD AND COMMERCIAL WORKERS UNION'S AND EMPLOYERS' HEALTH AND WELFARE TRUST FUND, on behalf of itself and all others similarly situated,<br><br>            Plaintiff,<br><br>      v.<br><br>PURDUE PHARMA L.P., PURDUE PHARMA, INC., THE PURDUE FREDERICK COMPANY, INC. d/b/a THE PURDUE FREDERICK COMPANY, P.F. LABORATORIES, INC., ABBOTT LABORATORIES, ABBOTT LABORATORIES, INC., MICHAEL FRIEDMAN, HOWARD R. UDELL, PAUL D. GOLDENHEIM, JOHN DOE Nos. 1 through 20, and JANE DOE Nos. 1 through 20,<br><br>            Defendants. | Civil Action No. 07-cv-6916-JGK |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## THE PURDUE DEFENDANTS'
## MOTION FOR JUDGMENT ON THE PLEADINGS

SEEGER WEISS LLP
Christopher A. Seeger, Esq. (CS-4880)
David R. Buchanan, Esq.
One William Street
New York, NY  10004
Tel:  212-584-0700
Fax:  212-584-0799
*Plaintiff's Lead and Liaison Counsel*

Additional Counsel Listed on Signature Page

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................... 1

ARGUMENT ................................................................................................... 2

   I.   PLAINTIFF ADEQUATELY HAS PLED STANDING ...................... 2

      A.  Plaintiff Has Pled an Injury-In-Fact ....................................... 2

      B.  Plaintiff Has Pled Causation .................................................. 6

  II.  PLAINTIFF PROPERLY HAS ALLEGED DEFANDANTS'
       RICO VIOLATIONS .................................................................. 11

      A.  Plaintiff Has Pled RICO Standing ......................................... 12

           1.  Plaintiff Has Alleged a Direct Injury Proximately Caused
              by Defendants' Acts .............................................. 12

           2.  Plaintiff Has Alleged Reliance ............................... 15

      B.  Plaintiff Has Alleged a RICO Enterprise ............................... 17

      C.  Plaintiff Has Alleged a Violation of RICO § 1962(d) ........... 19

 III.  PLAINTIFF ADEQUATELY HAS PLED STATE LAW CONSUMER
       PROTECTION CLAIMS .............................................................. 19

      A.  Plaintiff Is a Buyer and Thus Has Standing Under the UPA ......... 20

      B.  Plaintiff Has Alleged a Causal Link Between Defendants'
         Conduct and Plaintiff's Injury Under the UPA ....................... 22

      C.  The Learned Intermediary Doctrine Does Not Preclude Recovery ........... 23

      D.  Plaintiff's Consumer Protection Claim Is Not Preempted ........... 25

 IV.  THE STATUTE OF LIMITATIONS DOES NOT BAR
       PLAINTIFF'S CLAIMS .............................................................. 30

  V.  PLAINTIFF HAS STATED A PROPER CLAIM
       FOR UNJUST ENRICHMENT ..................................................... 34

CONCLUSION ............................................................................................... 35

# TABLE OF AUTHORITIES

**Federal Cases**

*Adesina v. Aladan Corp.*, 438 F. Supp.2d 329 (S.D.N.Y. 2006) .................................. 27

*American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) .................................. 33

*Anza v. Ideal Steel Supply Corp.*, 126 S. Ct. 1991 (2006) .................................. 14-15

*At the Airport v. ISATA, LLC*, 438 F. Supp.2d 55 (E.D.N.Y. 2006) .................................. 16

*Baisch v. Gallina*, 346 F.3d 366 (2d Cir. 2003) .................................. 12

*Bale v. Dean Witter Reynolds, Inc.*, 627 F. Supp. 650 (D. Minn. 1986) .................................. 31

*Bank of China v. NBM LLC*, 359 F.3d 171 (2d Cir. 2004) .................................. 15

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) .................................. 9, 23

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005) .................................. 30

*Bell Atlantic v. Twombly*, 127 S. Ct. 1955 (2007) .................................. 19

*Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*,
  65 F.3d 1406 (7th Cir. 1995) .................................. 14

*Brooklyn Legal Services Corp. v. Legal Services Corp.*,
  462 F.3d 219 (2d Cir. 2006) .................................. 6

*Colacicco v. Apotex, Inc.*, 432 F. Supp.2d 514 (E.D. Pa. 2006) .................................. 25, 27

*DeFalco v. Bernas*, 244 F.3d 286 (2d Cir. 2001) .................................. 17

*Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003) .................................. *passim*

*Employers'-Teamsters Local Nos. 175 and 505 Pension Trust Fund v.*
  *Anchor Capital Advisors*, 498 F.3d 920 (9th Cir. 2007) .................................. 33

*Falise v. American Tobacco Co.*, 94 F. Supp.2d 316 (E.D.N.Y. 2000) .................................. 8

*First Capital Asset Mgmt, Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004) .................................. 19

*Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861 (2000) .................................. 28

*Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985) .................................. 21

*Heindel v. Pfizer, Inc.*, 381 F. Supp.2d 364 (D.N.J. 2004)................................................25

*Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992).......................14, 15

*In re Bextra and Celebrex Mktg. Sales Practices Prod. Liab. Litig.*,
    No. MDL 05-01699, 2007 WL 2028408 (N.D. Cal. Jul. 10, 2007)....................25

*In re Bextra and Celebrex Mktg. Sales Practices Prod. Liab. Litig.*,
    495 F. Supp.2d 1027 (N.D. Cal. 2007).................................................20-21

*In re Cardizem CD Antitrust Litig.*, 105 F. Supp.2d 618 (E.D. Mich. 2000)..................13

*In re Eli Lilly & Company, Prozac Prod. Liab. Litig.*,
    789 F. Supp. 1448 (S.D. Ind. 1992).....................................................31

*In re Guidant Corp. Implantable Defibrillator Prod. Liab. Litig.*,
    484 F. Supp.2d 973 (D. Minn. 2007).....................................................10

*In re Initial Public Offering Sec. Litig.*,
    214 F.R.D. 117 (S.D.N.Y. 2002)..........................................................33

*In re K-Dur Antitrust Litig.*, 338 F. Supp.2d 517 (D.N.J. 2004)..............................13

*In re Lupron Mktg. & Sales Practices Litig.*,
    295 F. Supp. 2d 148 (D. Mass 2003).................................................13, 15

*In re Meridia Prod. Liab. Litig.*,
    328 F. Supp.2d 791 (N.D. Ohio 2004)....................................................24

*In re Neurontin Mktg. and Sale Practices Litig.*,
    244 F.R.D. 89 (D. Mass. 2007)......................................................5, 7-10

*In re Neurontin Mktg., Sales Practices and Prod. Liab. Litig.*,
    433 F. Supp.2d 172 (D. Mass. 2006).................................................3, 4, 5

*In re Norplant Contraceptive Prods. Liab. Litig.*,
    955 F. Supp. 700 (E.D. Tex. 1997)......................................................25

*In re Rezulin Prods. Liab. Litig.*, No. 00-Civ-2843,
    2007 WL 4165703 (S.D.N.Y. Nov. 26, 2007)..........................................10

*In re Synthroid Mktg. Litig*, 264 F.3d 712 (7th Cir. 2001)..............................14

*In re Vioxx Prods. Liab. Litig.*, MDL No. 1657,
    2007 WL 1952964 (E.D. La. July 3, 2007).........................................27, 30

*In re Warfarin Sodium Antitrust Litig*, 212 F.R.D. 231 (D. Del. 2002) ............................ 14

*In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp.2d 230 (E.D.N.Y. 2007) ......................... 26

*In re Zyprexa Prod. Liab. Litig.*,
    493 F. Supp.2d 571 (E.D.N.Y. 2007) .............................................*passim*

*International Brotherhood of Teamsters, Local 734 Health and*
    *Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818 (7th Cir. 1999) ............... 13

*Jackson v. Pfizer, Inc.*, 432 F. Supp.2d 964 (D. Neb. 2006) ................................ 27

*Kartell v. Blue Shield of Massachusetts, Inc.*, 749 F.2d 922 (1st Cir. 1984) ............... 13

*Kirk v. Heppt*, 423 F. Supp.2d 147 (S.D.N.Y. 2006) .......................................... 17

*Korwek v. Hunt*, 827 F.2d 874 (2d Cir. 1987) .............................................. 33

*Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*,
    191 F.3d 229 (2d Cir. 1999) ...................................................... 13

*Laisure-Radke v. Par Pharm., Inc.*, 426 F. Supp.2d 1163 (W.D. Wash. 2006) ............... 27

*Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir. 2003) ................................ 12

*Lewis v. Rosenfeld*, 138 F. Supp.2d 466 (S.D.N.Y. 2001) ................................ 16

*McNellis v. Pfizer, Inc.*, No. Civ. 05-1286,
    2006 WL 2819046 (D.N.J. Sept. 29, 2006) ......................................... 27

*Motorola Credit Corp. v. Uzan*, 322 F.3d 130 (2d Cir. 2003) ............................ 12

*National Asbestos Workers Med. Fund v. Philip Morris, Inc.*,
    74 F. Supp.2d 238 (E.D.N.Y. 1999) ............................................... 13

*National Org. for Women v. Scheidler*, 510 U.S. 249 (1994) ............................ 12

*Pennsylvania Employee Benefits Trust Fund v. Zeneca, Inc.*,
    499 F.3d 239 (3d Cir. 2007) ................................................. 25, 26

*Perry v. Novartis Pharm. Corp.*, 456 F. Supp.2d 678 (E.D. Pa. 2006) ................... 27

*Plummer v. Lederle Labs.*, 819 F.2d 349 (2d Cir. 1987) ................................. 24

*Prohias v. Pfizer, Inc.*, 485 F. Supp.2d 1329 (S.D. Fla. 2007) ......................... 5, 6

*Prohias v. Pfizer, Inc.*, 490 F. Supp.2d 1228 (S.D. Fla. 2007) .................................. 6

*Reno v. Koray*, 515 U.S. 50 (1995) .................................. 27

*Reves v. Ernst & Young*, 507 U.S. 170 (1993) .................................. 12

*Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640 (7th Cir. 1995) .................................. 18

*Salmon v. Parke, Davis & Co.*, 520 F.2d 1359 (4th Cir. 1975) .................................. 24

*Schwab v. Philip Morris USA*, 449 F. Supp.2d 992 (E.D.N.Y. 2006) .................................. 8

*Sedima S.P.R.L. v. Imrex Co. Inc.*, 473 U.S. 479 (1985) .................................. 12

*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984) .................................. 30

*Sprietsma v. Mercury Marine*, 537 U.S. 51 (2002) .................................. 30

*The City of New York v. Cyco.net, Inc.*, 383 F. Supp.2d 526 (S.D.N.Y. 2005) .................................. 12

*United States v. Turkette*, 452 U.S. 576 (1981) .................................. 17

*Vladimir v. Cowperthwait*, No. 06 Civ. 5863(JGK),
    2007 WL 1964157 (S.D.N.Y. July 3, 2007) .................................. 18

*Williams v. Purdue Pharma Co.*, 297 F. Supp.2d 171 (D.D.C. 2003) .................................. 5

*Wooten v. Johnson & Johnson Prods., Inc.*,
    635 F. Supp. 799 (N.D. Ill. 1986) .................................. 25

**State Cases**

*First Nat'l Bank in Albuquerque v. Nor-Am Agric. Prods., Inc.*,
    537 P.2d 682 (N.M. App. 1975) .................................. 25

*Gagne v. Vaccaro*, 766 A.2d 416 (Conn. 2001) .................................. 35

*Granito v. International Bus. Machines*, No. X07CV020080440S,
    2003 WL 1963161, 34 Conn. L. Rptr. 485 (Conn. Super. Apr. 16, 2003) .................................. 34

*Hurley v. Heart Physicians, P.C.*, 898 A.2d 777 (Conn. 2006) .................................. 24

*International Union of Operating Engr's Local No. 68 Welfare Fund v.*
    *Merck & Co.*, 929 A.2d 1076 (N.J. 2007) .................................. 23

*Jones v. General Motors Corp.*, 953 P.2d 1104 (N.M. Ct. App. 1998) .................................. 23

*Lohman v. Daimler-Chrysler Corp.*, 166 P.3d 1091 (N.M. Ct. App. 2007) .......... 20, 21, 22

*Mahr v. G.D. Searle & Co.*, 72 Ill. App.3d 540 (1979) .......... 25

*Michael v. Warner/Chilcott*, 579 P.2d 183 (N.M. Ct. App. 1978) .......... 25

*Proctor v. Davis*, 682 N.E.2d 1203 (Ill. App. 1997) .......... 24

*Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*,
    113 P.3d 347 (N.M. Ct. App. 2005) .......... 20

*Serna v. Roche Labs.*, 684 P.2d 1187 (N.M. Ct. App. 1984) .......... 24

*Smoot v. Physicians Life Ins. Co.*, 87 P.3d 545 (N.M. Ct. App. 2003) .......... 22

*Stefan v. P.J. Kids, LLC*, No. X01CV040185513S,
    2005 WL 834208 (Conn. Super. Mar. 1, 2005) .......... 34, 35

*Stevens v. Parke, Davis & Co.*, 507 P.2d 653 (Cal. 1973) .......... 24, 25

*Stevenson v. Louis Dreyfus Corp.*, 811 P.2d 1308 (N.M. 1991) .......... 21

*United Coastal Indus., Inc. v. Clearheart Constr. Co.*,
    71 Conn. App. 506 (2002) .......... 34

*Zeigler v. Sony Corp.*, 849 A.2d 19 (Conn. Super. 2004) .......... 34

**Statutes and Rules**

21 C.F.R. § 1.21(a) .......... 27

21 C.F.R. § 314.125(b)(6) .......... 27

21 U.S.C. §§ 301-392 .......... 25

21 U.S.C. § 352 .......... 27, 30

65 Fed. Reg. 81082 .......... 27

71 Fed. Reg. 3922 .......... 26-27

N.M. STAT. ANN. § 57-12-1 .......... 19

N.M. STAT. ANN. § 57-12-10(B) (2005) .......... 21

N.M. STAT. ANN. §57-12-2 (A) .......... 21

**Treatises**

2A Moore's Federal Practice, at 9-29 (1991) .................................................................. 31

**Miscellaneous**

*Allied Services Division Welfare Fund, et al. v. Purdue Pharma,*
        No. 2001-L-1458 (Ill.) ............................................................................... 31, 33

*American Federation of State, County and Municipal Employees,*
        *District County 47 Health and Welfare Fund, et al. v.*
                *Purdue Pharma L.P., et al.,* No. 07-CV-8761-JGK (S.D.N.Y.) ............ 1, 34

GAO Report, "Prescription Drugs: OxyContin Abuse and Diversion and
        Efforts To Address the Problem," December 2003 ........................................ 29

**INTRODUCTION**

Plaintiff, New Mexico United Food and Commercial Workers Union's and Employers' Health and Welfare Trust Fund ("Plaintiff"), submits the instant Memorandum in Opposition[1] to the Purdue Defendants' Motion for Judgment on the Pleadings. As in most motions for judgment on the pleadings, the thrust of Defendants' argument is that Plaintiff failed to allege sufficient facts to support each cause of action asserted: the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the state consumer protection statutes and unjust enrichment. Defendants' argument fails for many reasons, as specifically set forth herein, but the touchstone is the nature of this case – it is a "guilty plea case." The Purdue Defendants would like to ignore this fact, neither acknowledging the plea in their Memorandum (save for a lone reference on page 29) nor attempting to explain why it should not be determinative of the survival of Plaintiff's claims on this Motion. For example, in Defendants' Memorandum ("Defs' Mem."), in support of their argument that Plaintiff's RICO claims should be dismissed, they implore the Court to consider that a claim for a RICO violation could "unfairly sully" their reputations and "stigmatize" them. *See* Defs' Mem. at 10. Defendants fail to acquiesce that their reputations already have been damaged by their indictment and guilty plea to felony "misbranding" and their stipulation to the facts that detailed their deceptive marketing scheme. *See* Complaint, ¶¶ 4, 53 and Defs' respective Answers, ¶¶ 4, 53.

Defendants also contend, for a variety of reasons which are refuted herein, that third party payors ("TPPs"), like Plaintiff and the Class it seeks to represent, were not damaged by the conduct to which the Purdue Defendants pled guilty and cannot recover therefor. This flies in

---

[1] Also, in support of its Opposition, Plaintiff incorporates by reference its memoranda submitted in opposition to the motions for judgment on the pleadings and to dismiss filed by Michael Friedman, Howard R. Udell and Paul D. Goldenheim ("Individual Defendants") and the Abbott Defendants, respectively, and the memorandum filed by the Plaintiffs in the consolidated action, *American Federation of State, County and Municipal Employees, District Council 47 Health and Welfare Fund, et al. v. Purdue Pharma L.P., et al.*, No. 07-CV-8761-JGK (S.D.N.Y.), in opposition to the Purdue Defendants' Motion for Judgment on the Pleadings filed in that case.

1

the face of representations made in the context of the plea where the issue of restitution was raised. While the criminal court elected to accept the plea without providing full restitution for all injured parties, the court recognized that the injured parties, including TPPs, could be compensated through civil proceedings. *See* Complaint, ¶ 66. Hence, this class action lawsuit on behalf of the injured TPPs should be allowed to proceed for the reasons set forth herein.

**ARGUMENT**

I.    **PLAINTIFF ADEQUATELY HAS PLED STANDING.**

Defendants assert that Plaintiff has failed adequately to plead standing under Article III, in that Plaintiff purportedly has failed to allege facts from which a trier of fact could conclude that Plaintiff suffered an injury-in-fact, which was causally related to Defendants' alleged misconduct. Defendants' argument ignores not only the unequivocal allegations of Plaintiff's Complaint, but also the weight of authority that has addressed the question of injury-in-fact and causation in TPP unlawful drug promotion claims. Multiple courts have recognized that when, as alleged here, pharmaceutical companies engage in a broad-reaching fraudulent scheme to over-promote their drugs for treatment of conditions for which they are not indicated or are no more efficacious than other cheaper alternatives, then TPPs have suffered cognizable economic injuries as a result of the misconduct.

   A.    **Plaintiff Has Pled an Injury-In-Fact**.

Plaintiff asserts that as a result of Defendants' fraudulent over-promotion and off-label promotion of OxyContin, Plaintiff and the Class members paid for numerous prescriptions for conditions for which the narcotic was neither indicated nor efficacious. Plaintiff does not allege that OxyContin was not efficacious for any patients, nor that Plaintiff and the Class members would not have paid for prescriptions for conditions respecting which it was efficacious. Rather, Plaintiff asserts that the Class members paid a much higher price, for many more prescriptions,

2

than they would have absent Defendants' fraudulent over-promotion.  Courts have routinely held

that such an over-payment by a TPP constitutes an injury-in-fact.  *See, e.g., Desiano v. Warner-*

*Lambert Co.*, 326 F.3d 339, 349-50 (2d Cir. 2003); *In re Zyprexa Prod. Liab. Litig.*, 493 F.

Supp.2d 571, 575 (E.D.N.Y. 2007); *In re Neurontin Mktg., Sales Practices and Prod. Liab.*

*Litig.*, 433 F. Supp.2d 172, 185-86 (D. Mass. 2006).

    In *Desiano*, the Second Circuit recognized that a TPP who has paid too much for

prescriptions as a result of defendants' misrepresentations about a drug has suffered a cognizable

injury-in-fact.  Defendants attempt to distinguish *Desiano* on the grounds that here Plaintiff

continued to carry OxyContin on its formulary after learning of Defendants' fraudulent

misrepresentations, whereas in *Desiano*, the drug Rezulin was removed from the market.  The

Defendants' argument goes directly to a factual matter, that at best is a matter of degree which

may be relevant to the extent of damages, but is not a complete defense such as to warrant

judgment on the pleadings.  Moreover, the distinction suggested by Defendants has twice been

rejected in cases involving similar facts.

    A standing argument identical to that raised by Defendants in this action was rejected in

*In re Zyprexa, supra*.  In *Zyprexa*, defendant Eli Lilly asserted that *Desiano* did not apply, since

plaintiffs continued to pay for prescriptions of *Zyprexa* after purportedly learning the truth about

the product.[2]  Judge Weinstein rejected this argument, noting that neither the fact that *Zyprexa*

was beneficial for some patients, nor that defendants continued to pay for *Zyprexa* prescriptions,

would act to bar plaintiffs from asserting that they were injured as a result of fraudulent

promotion of the drug for patients in whom its use was not indicated.

    The *Zyprexa* Court reasoned:

---

[2] Notably, the *Zyprexa* Court considered this issue on a motion for summary judgment, not a motion for judgment on the pleadings.

> There is little doubt about the usefulness of Zyprexa for both on-label and some
> off-label purposes. ... Its salutary effect is evidenced by the fact that there have
> been no changes in plaintiffs' formularies which continue to include Zyprexa
> without restrictions. Many treating physicians continue to rely on it after what is
> by now extensive revelation of information about Zyprexa's risks and benefits.
> Nevertheless, the utility of Zyprexa does not trump plaintiffs' legal claims for
> fraud and overpricing.

493 F. Supp.2d at 575.

The *Zyprexa* Court concluded that TPPs who charged that defendants' over-promotion

resulted in the TPPs over-paying for drugs sufficiently had stated a cognizable injury, even

where the drug remained on their formularies after they learned of the fraud. The court held:

> In attempting to distinguish *Desiano*, Lilly emphasizes the fact that third party
> payer plaintiffs continue to include Zyprexa in their approved formularies. This
> fact has evidentiary relevance to the central claim of overpayment due to
> fraudulently-inflated prices, but it is not decisive. Probative force of this and
> other evidence of fraud and overpricing – or their contrary – present jury
> questions. Based on expert reports and available modes of economic analysis, a
> trier could determine that Zyprexa would have – or would not have – been sold
> for a reasonably precise computable lesser amount than it was sold for were it not
> for Lilly's alleged fraud.

*Id.* at 577.

The court in *In re Neurontin* came to a similar conclusion. In *Neurontin*, plaintiffs

alleged that, as a result of defendants' fraudulent over-promotion of a drug for which it was not

proven efficacious, plaintiff TPPs paid too much for the drug and/or bought more of the drug

than they would have absent the unlawful promotion. As here, the defendant manufacturer

asserted that plaintiffs had failed to articulate an actionable injury. The *Neurontin* court rejected

defendants' argument, finding that the overpayment for unlawfully promoted drugs constituted a

cognizable economic injury. The *Neurontin* Court held:

> Plaintiffs argue... that they sustained an economic injury because Defendants'
> fraudulent activities caused Plaintiffs to pay for Neurontin prescriptions at
> excessive doses and instead of cheaper alternatives, *citing Desiano v. Warner-
> Lambert Co.*, 326 F.3d 339, 349-50 (2d Cir.2003). Unlike *Desiano*, nowhere in
> the [Complaint] do the Coordinated Plaintiffs make any allegations that cheaper

4

alternatives were available and that Plaintiffs are seeking any difference in price. *Cf. id.* at 349 (describing damages sought as "the excess money Plaintiffs paid").[3] With regard to excessive dosage, however, the [Complaint] does allege that Defendant knew the drug was not effective at the higher dosages it was touting. (FCAC ¶¶ 149-151.) As such, even without an allegation that the drug was ineffective overall, Plaintiffs have adequately made out a claim that they paid for too much Neurontin as a result of the alleged fraud.

*Neurontin*, 433 F. Supp.2d at 185-186.

Notably, the *Neurontin* Court reached this conclusion, even though the drug remained on the market, and presumably, on plaintiffs' formularies. When the claim is one for unlawful over-promotion, the fact that the drug remains on the TPP's formulary does not preclude a finding that a plaintiff TPP suffered economic injury in the form of prescription costs it would not otherwise have incurred.

In its ruling on class certification (denying class certification with leave to reassert certification as to certain claims), the *Neurontin* Court reiterated its finding that over-promotion for uses for which the drug was not efficacious could result in a cognizable injury sufficient to satisfy the injury-in-fact requirement for standing. *In re Neurontin Mktg. and Sale Practices Litig.*, 244 F.R.D. 89, 104 (D. Mass. 2007). The court noted, "For large TPPs that reimburse for numerous Neurontin prescriptions, **standing** and typicality could be met by a statistical likelihood of payment for a specific indication." *Id.* at 107 (emphasis added).

In support of their twice-rejected argument, Defendants have cited to cases involving *individual consumers*, which have held that individuals who took the drug and found it efficacious could not assert that they had suffered an injury due to a manufacturer's misrepresentations about a drug. *See e.g. Prohias v. Pfizer, Inc.*, 485 F. Supp.2d 1329 (S.D. Fla. 2007); *Williams v. Purdue Pharma Co.*, 297 F. Supp.2d 171 (D.D.C. 2003). However,

---

[3] In the instant case, the Complaint contains allegations that cheaper pain medications were available. *See* Complaint, ¶ 2 (respecting increase in market share, meaning that other competing, alternative drugs necessarily were within relevant market) and ¶¶ 4, 30, 49, 53, 57 (comparing OxyContin with other pain medications on market, including opioids). In a normal competitive market, all other things being equal, competitors compete on price.

Defendants' reliance on those individual consumer cases is misplaced. In a subsequent opinion, also cited by Defendants, the *Prohias* Court noted the difference between a consumer claim and a TPP claim, and allowed a TPP to pursue an over-payment claim, even though a "price-inflation" claim, based on the assertion that the purchaser did not get the benefit of the bargain, would not lie as to any individual who continued to take the drug after learning of its alleged inefficacy. *Prohias v. Pfizer*, 490 F. Supp.2d at 1228, 1232 n. 3 (S.D. Fla. 2007). Unlike an individual consumer, who would presumably stop taking the drug if ineffective for their individual treatment needs, TPPs would have a claim for payment for prescriptions as to the percentage of patients for whom it was not efficacious, even if it continued to pay for the drug for patients as to whom it was efficacious.[4] Thus, Plaintiff herein has alleged a cognizable injury-in-fact.

## B.    Plaintiff Has Pled Causation.

Defendants contend that Plaintiff has not alleged facts sufficient to establish the causation element of the standing inquiry because Plaintiff has alleged that Defendants' misrepresentations were directed to healthcare providers and consumers, rather than to Plaintiff and the Class members directly. As with many of Defendants' arguments, this assertion ignores the allegations of the Complaint. For purposes of a Rule 12 motion with respect to Article III standing, the Court must accept allegations in the complaint as true, and draw all reasonable inferences in favor of plaintiff. *Brooklyn Legal Services Corp. v. Legal Services Corp.*, 462 F.3d 219, 225 (2d Cir. 2006).

---

[4] Notably, the original *Prohias* decision dismissing the individual consumer claims because they continued to take the Lipitor after discovery of the alleged fraud, **did not** dismiss the TPP claim on the grounds that the TPP continued to include Lipitor on its formulary. Rather, the TPP's claim was dismissed because the court determined that it could not demonstrate that it had paid for any prescriptions for treatment of conditions for which it alleged Lipitor was not indicated or efficacious. 485 F. Supp.2d at 1339-40. Plaintiff herein submits that it will be able to demonstrate that it paid for such improper prescriptions of OxyContin as discussed *infra*.

Plaintiff has alleged that Defendants' misrepresentations were aimed not only at health care providers and physicians, but also "the medical community" and "members of the public, " *see* Complaint, ¶¶ 33, 36, which can plausibly be construed to include Plaintiff and the Class. Additionally, Plaintiff alleged that Defendants marketed OxyContin "with the intent... that hospitals and third party payors would place OxyContin on their formularies." Complaint, ¶29. Defendants assert that an allegation of intent is insufficient to establish causation. However, a plausible inference to be drawn from this allegation is that Defendants directed their unlawful marketing scheme to TPPs, the largest payors for prescription drugs, and that Plaintiff was affected by the scheme.

Even assuming *arguendo* that Plaintiff has not adequately alleged that Defendants delivered their unlawful marketing message directly to Plaintiff, this fact would not preclude a finding of causation. Courts have recognized that TPPs can introduce facts to demonstrate that misrepresentations directed to physicians and consumers had a direct causal effect on TPPs' payments for prescriptions. *See, e.g., In re Neurontin*, 244 F.R.D. at 107, and *In re Zyprexa*, 493 F. Supp.2d at 578.

The *Neurontin* Court found that the causative link between misrepresentations to physicians and consumers and overpayment by TPP plaintiffs was a factual question as to which plaintiffs would be allowed to present their case to a finder of fact. Indeed, the *Neurontin* Court found that the causative link could be proven on a class-wide basis by reliance upon econometric data demonstrating the link between misrepresentations to physicians and increased prescription costs incurred by plaintiffs. The *Neurontin* Court noted:

> [P]laintiffs rely on a proposed econometric analysis to distill, at the aggregate level, off-label prescriptions caused by defendants' marketing activities from those that plaintiffs concede would have been written regardless of any promotional activities on defendants' part. They rely on another expert in econometrics to monetize the damages attributable to the class.... Using these methods, plaintiffs contend that they can prove for each indication, over time, that

7

defendants' fraud was a substantial contributing factor for substantially all of the prescriptions written.

244 F.R.D. at 110. The *Neurontin* Court held that the TPP plaintiffs should be given the opportunity to rely on such a factual showing to prove the allegation that misrepresentations directed at doctors and consumers caused TPP plaintiffs to incur damages in the form of overpayments.

The *Zyprexa* Court reached a similar conclusion, holding that plaintiffs could demonstrate injury as a result of a fraudulent marketing scheme directed at the healthcare industry, much like that alleged herein, by statistical inference. The *Zyprexa* Court held:

> Statistical proof of reliance is appropriate in the RICO context where a "sophisticated, broad-based [scheme,] by [its] very nature ... likely to be designed to distort the entire body of public knowledge rather than to individually mislead millions of people[,]" is alleged. *See Schwab [v. Philip Morris USA]*, 449 F. Supp.2d [992,] 1047 [(E.D.N.Y. 2006)]; *id.* at 1115-17 (permitting generalized proof of reliance including "surveys, expert evidence on marketplace principles, and extrapolated and statistic analysis of individuals and groups in the class"). Here, plaintiffs allege that Lilly intentionally engaged in a broad-based plan to misrepresent to the medical and scientific communities the nature of Zyprexa's benefits and risks, and that the scheme was successful in distorting the general body of knowledge about Zyprexa. These allegations, and the factual and expert proof that plaintiffs rely on to prove them, meet the standard for reliance established in *Falise v. American Tobacco Co.*, 94 F. Supp.2d 316 (E.D.N.Y. 2000), and *Schwab*.

493 F. Supp.2d at 578.

In order to refute the clear causal connection between over-promotion to the healthcare community in general and over-payment for prescriptions by Plaintiff and the Class, Defendants attempt to foist upon Plaintiff the straw man of a "fraud on the market theory" or a "price inflation theory," which they then knock down as impermissible outside of the securities arena. Plaintiff has never alleged a fraud on the market theory, need not rely upon it to establish causation, and expressly disavows any reliance upon any such theory in this case. Fairly read, the Complaint alleges that if Defendants had not engaged in their widespread wrongful conduct,

8

some OxyContin scripts would have been written for equally effective, less expensive medications, while other scripts would likely not have been written at all. Plaintiff does not and need not resort to a "fraud on the market" theory to prove this allegation.

The "fraud on the market" theory uses a presumption of an efficient market, rather than proven fact, to establish that fraudulent statements had an effect on a group of plaintiffs.[5] The indulgences of such a presumption are not requested, nor are they necessary. Here, the Complaint alleges, and it will be proven as **fact**, not presumption, that every influential sector of the health community was subjected to Defendants' misrepresentations and omissions, and that the broad-based fraudulent conduct had the real-world, significant effect that was intended by the deceptive marketing practices. *See* Complaint, ¶72. Plaintiff need not resort to a "fraud-on-the-market" presumption to prove this allegation, and has not.

As the courts in *Neurontin* and *Zyprexa, supra,* concluded, there are ways by which plaintiffs can demonstrate the proximate effect of marketing directed toward the health care community and consumers without resort to a "fraud-on-the-market" presumption. Plaintiff will be able to demonstrate by statistical inference the effect of the fraudulent marketing schemes on physicians prescribing habits. Indeed, the meteoric growth in sales of a pain reliever that was no more effective, but considerably more dangerous and expensive, than opioids already on the market, alleged in the Complaint, demonstrates the efficacy of the sales pitch on Plaintiff's payments for prescriptions.[6] *See, e.g.,* Complaint, ¶28.

---

[5] In *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), the Supreme Court recognized that the stock market had "interposed" itself between buyers and sellers to set prices for securities in a way that differed from "face-to-face transactions" of the sort pled by Plaintiff herein. *Id.* at 244. In this case, prices were directly set by Defendants. Plaintiff, its agents and the doctors treating its insureds and beneficiaries interacted directly with Defendants and their agents. Here, quite different from a "fraud-on-the-market" claims, injury will be established by evidence, not presumption.
[6] The *Neurontin* Court noted that the increase in sales for that drug in various indications raised a strong inference as to the impact of defendants' misconduct on plaintiffs' prescription reimbursements that even a "lay judge" with no expertise in statistics could readily discern. 244 F.R.D. at 111.

Defendants' reliance on *In re Rezulin Prods. Liab. Litig.*, No. 00-Civ-2843, 2007 WL 4165703 (S.D.N.Y. Nov. 26, 2007) for the proposition that misrepresentations to health care professionals cannot be shown to have a direct effect on third party payors is misplaced. Most notably, *Rezulin* was decided on a motion for summary judgment, not a motion for judgment on the pleadings, and on grounds particular to the plaintiff in that case, the State of Louisiana.

In *Rezulin*, defendants refuted the Louisiana Attorney General's charge that defendants' fraudulent marketing practices influenced purchases of Rezulin, by introducing evidence that the State of Louisiana Medicaid system had a standing policy of reimbursing any drugs approved by the FDA, and hence exercised no discretion whatsoever in its payment for pharmaceutical products. Plaintiff attempted to refute this evidence with the generalized proposition that misrepresentations to doctors caused the price to be higher, but plaintiff did not introduce any evidence to demonstrate this alleged causal link, and hence, lost on summary judgment.[7]

The *Rezulin* Court found that plaintiff in that case had introduced no evidence to support the allegation of causal connection, and, unlike the Plaintiff herein, was relying on an impermissible "fraud on the market" presumption.[8] The *Rezulin* case did not hold that no third party payor can **ever** demonstrate a causal connection between misrepresentations to the healthcare community at large and the TPP's payments for unnecessary or over-priced prescriptions. The holdings in *Neurontin* and *Zyprexa* make clear that such a causal link can be demonstrated.[9]

---

[7] The Court denied plaintiff's request to withhold summary judgment until it could conduct discovery directed to this issue on the grounds that the case had been pending for more than two years during which time no discovery had been taken.

[8] Notably, the Louisiana Attorney General has appealed that decision to the Second Circuit, which appeal is currently pending.

[9] The only case cited by Defendants to grant a motion for judgment on the pleadings on the grounds that such a causal connection could not be proven was a district court decision in Minnesota. *See In re Guidant Corp. Implantable Defibrillators Prod. Liab. Litig.*, 484 F. Supp.2d 973 (D. Minn. 2007). That decision, which is not binding on this Court and is contrary to precedent in this Circuit, certainly represents the minority view. The *Guidant* holding is not only inconsistent with the well-reasoned opinions in *Neurontin* and *Zyprexa, supra*, but also

10

## II.  **PLAINTIFF PROPERLY HAS ALLEGED DEFENDANTS' RICO VIOLATIONS.**

Plaintiff alleges that over a period spanning at least 12 years, Defendants and their co-conspirators created and implemented a fraudulent scheme to promote and sell OxyContin by misrepresenting the drug's safety and efficacy, promoting OxyContin for uses for which it is not indicated and for patients who would be better served by other medications. Complaint, ¶1. Plaintiff alleges that the Purdue Defendants and the Individual Defendants joined with co-conspirator, Abbott, in the illegal scheme for which Purdue and the Individual Defendants pled guilty on a Criminal Information charging misbranding of OxyContin through false claims that OxyContin was less addictive, less subject to abuse and less likely to cause withdrawal than other pain medications. Complaint, ¶¶ 4, 49, 53, 57.[10]

Defendants' illegal scheme dramatically increased OxyContin's market share resulting in higher profits to Defendants "earned" from payments for OxyContin which were made by Plaintiff and the members of the putative Class. Complaint, ¶1. Plaintiff claims injury and damages in the amounts overpaid for OxyContin. Complaint, ¶72. Plaintiff alleges that not only did OxyContin cost more than other opioid pain relievers, but was priced higher than it would have been had the truth been known.[11] *Id.*

Defendants challenge Plaintiff's 1962(c) claim on two grounds: (1) that the Complaint does not allege direct injury to Plaintiff or reliance by Plaintiff, thus failing to allege proximate cause sufficiently to confer RICO standing; and (2) that the Complaint does not adequately plead "enterprise." Defs' Mem. at 3, 10. Contrary to Defendants' contentions, Plaintiff alleges

---

the opinion of the district court in the Medtronic MDL, which also found a causative link between misrepresentations to the healthcare community in general and injury to TPPs. *Id.* at 983 n. 5 (noting that district court in Medtronic MDL sustained TPPs' claims in substantially similar medical device litigation).

[10] *See also* footnote 3, *supra.*

[11] The Complaint alleges RICO violations substantially identical to the RICO claims sustained by the court in *Zyprexa, supra,* 493 F. Supp. 2d at 576-577 ("The injury [to plaintiff third party payor] is direct:  plaintiffs overpaid from their own funds for Zyprexa because of Lilly's fraud").

proximate cause and enterprise sufficiently so that the Complaint plausibly states claims under

1962(c) and (d).[12]

### A. **Plaintiff Has Pled RICO Standing.**

#### 1. *Plaintiff Has Alleged a Direct Injury Proximately Caused by Defendants' Acts.*

To satisfy the RICO standing requirements, a plaintiff must allege a violation of § 1962,

injury to plaintiff's business or property; and causation of the injury by defendant's violation of

RICO. *The City of New York v. Cyco.net, Inc.*, 383 F. Supp.2d 526, 546 (S.D.N.Y. 2005)

(*quoting Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003)). The causation

element of RICO standing "is satisfied if defendants' injurious conduct is both the factual and

proximate cause of the injury alleged."[13] *Baisch v. Gallina*, 346 F.3d 366, 372 (2d Cir. 2003)

(*quoting Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 120 (2d Cir. 2003)).

Defendant argues that Plaintiff's injuries were not proximately caused by the conduct

alleged because Plaintiff's injuries bear no relation, or at best an attenuated relation, to the

injurious conduct alleged. Defs' Mem. at 12. Defendants' argument relies on the allegation that

the fraudulent statements were made to non-parties, thus in Defendants' view, rendering

causation indirect. Defs' Mem. at 12-13. Defendants misstate the law of this Circuit and, more

importantly, ignore Plaintiff's allegations that the stream of communications in furtherance of

the fraud included communications to Plaintiff. Complaint, ¶93. Significantly, Defendants also

ignore Plaintiff's allegation that in implementing the fraudulent scheme, Defendants were

acutely aware that Plaintiff and the Class were dependent on the Defendants for information –

honest information – concerning the medical efficacy and risks of OxyContin. Complaint, ¶96.

---

[12] The Supreme Court has never stepped back from the foundational principle that RICO is to be applied liberally. *See, e.g., National Org. for Women v. Scheidler*, 510 U.S. 249 (1994); *Reves v. Ernst & Young*, 507 U.S. 170 (1993); and *Sedima S.P.R.L. v. Imrex Co. Inc.*, 473 U.S. 479 (1985).
[13] Factual or "but for" causation is discussed above in Plaintiff's response to Defendants' argument that Plaintiff does not have Article III standing.

Plaintiff's action is for economic injuries suffered when it paid for OxyContin. Complaint, ¶3. This Circuit has recognized that TPPs, like Plaintiff, are the parties which suffer the **economic injury** for the purchase of misbranded, misrepresented drugs. In *Desiano, supra,* the Second Circuit specifically held that it is the TPPs which suffer the direct economic injuries caused by drug manufacturers' illegal schemes to promote pharmaceuticals through misrepresentations and material omissions and that such injuries proximately were caused by the drug company's misrepresentations. 326 F.3d at 349. The *Desiano* Court found that the TPP's claims satisfied both prongs of the Second Circuit's proximate cause test – directness and forseeability. *Id.* at 350.

The court in *Desiano* distinguished TPPs' claims for economic injury arising from payment for a misbranded drug from the cigarette cases where TPPs alleged damages arising from payment for treatments for smoking-related illnesses of their members and beneficiaries. The cigarette cases have been uniformly dismissed on grounds that the injuries plaintiffs alleged were remote or derivative.[14]  *See, e.g., Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229, 239-240 (2d Cir. 1999).[15]  In *Desiano,* the Second Circuit recognized that the vast majority of the purchase price paid for pharmaceuticals is paid by TPPs, 326 F.3d at 350, joining other circuits that have held that TPPs' claims for damages from paying for pharmaceuticals allege direct injuries with respect to the pricing, marketing and promotion of the drugs. *See In re Lupron Mktg. & Sales Practices Litig.,* 295 F. Supp.2d 148, 175 (D. Mass. 2003).[16]

---

[14] *But see National Asbestos Workers Med. Fund v. Philip Morris, Inc.,* 74 F. Supp.2d 238 (E.D.N.Y. 1999) (allowing plaintiff's claim for subrogation to stand under RICO on 12(b)(6) motion in cigarette case).

[15] *Accord International Brotherhood of Teamsters, Local 734 Health and Welfare Trust Fund v. Philip Morris Inc.,* 196 F.3d 818, 826 (7th Cir. 1999) (dismissing claims for payment for smoker-related illness); *but see In re K-Dur Antitrust Litig.,* 338 F. Supp.2d 517, 545 (D.N.J. 2004) (denying motions to dismiss claims of third party payors and distinguishing tobacco cases).

[16] *See Kartell v. Blue Shield of Massachusetts, Inc.,* 749 F.2d 922, 926 (1st Cir. 1984) (third party payors are purchasers in the antitrust context); *accord, In re Cardizem CD Antitrust Litig.,* 105 F. Supp.2d 618, 625, 651 (E.D.

13

Defendants argue that *Desiano* does not control because *Desiano* did not involve a RICO claim.[17] But Defendants ignore that the Second Circuit analyzed the proximate cause issue before it in that case by applying the three-factor analysis the Supreme Court set out in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), the seminal case on RICO proximate case. *Desiano*, 326 F.3d at 350.

Plaintiff's claims as alleged here clearly satisfy each of the factors set out in *Holmes*:

- There will be no need here for any complicated apportionment of damages. The marketing scheme here was designed to induce Plaintiff to purchase OxyContin and Plaintiff **paid** for the drug;

- No risk of duplicative recoveries for the same injuries exists here. To the extent that patients have claims to recover for co-pays, they are separate claims; and

- There are **no more directly injured victims** who can be expected to seek vindication for the same injury because Plaintiff and the Class herein paid for the drug and seek through this Class Action suit to recover those payments.

*See Holmes*, 503 U.S. at 272-273. Defendants, relying on citations to boilerplate authorities, do not attempt to demonstrate how or why the Plaintiff's claims here do not meet the *Holmes* test, referring to only factor one of the *Holmes* test. Defs' Mem. at 11.

Moreover, Defendants' passing reference to the Supreme Court's recent decision in *Anza v. Ideal Steel Supply Corp.*, 126 S. Ct. 1991 (2006) does not advance Defendants' argument. Defs' Mem. at 11-12. In *Anza*, the Supreme Court carefully explained how each of the factors in

---

Mich. 2000); *see also In re Synthroid Mktg. Litig*, 264 F.3d 712 (7th Cir. 2001) (recognizing on objection to class settlement that patients typically do not pay full cost of drugs or purchase them directly); *In re Warfarin Sodium Antitrust Litig*, 212 F.R.D. 231, 259 (D. Del. 2002); *see also Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1414 (7th Cir. 1995) (Posner, J.) (conferring standing to TPP to sue medical clinic for overcharges because it, not patient, paid for health service).
[17] Defendants rely on the statement in *Desiano* that RICO requirements "can be more stringent." But Defendants do not explain what that "more stringent" application should be here. Defs' Mem. at 11.

*Holmes* was not met by the plaintiff's claim because the defendants' fraudulent acts were directed at a party outside the chain of causation for plaintiff's injuries. 126 S. Ct. at 1996-1997.

The Supreme Court's analysis in *Anza* clearly contemplates (as did the Second Circuit before *Anza*) that forseeability is a prong in a proximate cause test. The *Anza* decision focused on the occurrence of an independent, intervening cause between defendant's alleged unlawful acts and plaintiff's injury. *Id.* at 1997. Here, there is no such interruption in the chain of causation.

Plaintiff here, unlike the plaintiff in *Anza*, suffered a foreseeable injury resulting from Defendants' misrepresentations and omissions in the sale of OxyContin when it paid for the drug. It cannot seriously be maintained that Plaintiff's payments for OxyContin were unforeseen by Defendants. Defendants here, like the defendants in *Lupron, supra,* completely ignore forseeability. In *Lupron,* the district court rejected defendants' arguments that TPPs' claims for overpayment for pharmaceuticals were too remote under a *Holmes* analysis to state a direct injury, stating that defendants ignored the "corollary requirement that the intervening act [to break the chain of causation] be unforeseeable and completely independent of any act taken by the original actor." 295 F. Supp.2d at 175. *See also, Bank of China v. NBM LLC,* 359 F.3d 171 n.6 (2d Cir. 2004) (sustaining a RICO jury instruction on proximate cause that injury or damage "was either a direct result or a reasonably probable consequence of [defendant's] act").

Plaintiff here pleads a direct – not a remote injury. The Defendants know that, ultimately, TPPs bear the largest portion of the costs for OxyContin, which costs dictate Defendants' profits.

### 2.    *Plaintiff Has Alleged Reliance.*

Defendants argue the Plaintiff did not allege reliance. Defendants rely on citations to authority standing for the proposition that allegations of reasonable reliance are necessary to

state a claim under RICO with mail fraud or wire fraud as the predicate acts. Defs' Mem. at 13. This proposition is not in dispute here.

In *Desiano*, the Second Circuit held that a broad-based campaign of misrepresentation and failure to disclose side effects of a prescription drug by a pharmaceutical company gave rise to a direct claim by TPPs with respect to the non-disclosure. *Desiano*, 326 F.3d at 349. The Second Circuit tested proximate cause in the context of the New Jersey consumer fraud statute and did not require allegations of face-to-face, one-on-one misrepresentations from defendants to plaintiff to establish the causal nexus between defendants' wrongful acts and plaintiff's injury. *Id.* at 348-349. The same reasoning applies here.

Defendants ignore Plaintiff's allegation that Plaintiff relied on federal law obliging Defendants to provide fair and balanced information about their product. Complaint, ¶96. *See Lewis v. Rosenfeld*, 138 F. Supp.2d 466, 478 (S.D.N.Y. 2001) (defendants can be held liable for third-party statements where the third party is acting at the behest and with the knowledge and authority of defendants). Moreover, Defendants also ignore allegations that Plaintiff and the Class of TPPs it seeks to represent paid the largest portions of OxyContin costs that were billed (by mail or wire) and that were sent and received in furtherance of Defendants' fraudulent scheme. Complaint, ¶93(d). The fact that some of these communications may be "innocent" and contain no specific misrepresentations is irrelevant to Plaintiff's RICO claim where they are part of the stream of communications in the alleged chain of causation. *At the Airport v. ISATA, LLC*, 438 F. Supp.2d 55, 63 (E.D.N.Y. 2006). Notably, these billing documents are not the only communications Plaintiff alleges to sustain its claims of misrepresentation but are among the last in the stream of misinformation about OxyContin from Defendants inducing payments by

Plaintiff and the Class.[18]  Complaint, ¶93.  One need look no further than the guilty plea and the

facts stipulated to by Defendants thereunder for allegations of communications sufficient to

properly plead standing under RICO.  *Id.*, ¶49-56.

**B.    Plaintiff Has Alleged a RICO Enterprise.**

To establish a violation of § 1962(c), a plaintiff must show: "(1) conduct (2) of an

enterprise (3) through a pattern (4) of racketeering activity" "(5) having at least a minimal effect

on interstate commerce." *DeFalco v. Bernas*, 244 F.3d 286, 306, 309 (2d Cir. 2001).

Defendants argue incorrectly that Plaintiff fails to allege an enterprise as required to sustain a

claim under § 1962(c) because Plaintiff does not allege a common purpose or a common course

of conduct in the enterprise as required by *United States v. Turkette*, 452 U.S. 576, 583 (1981).

Defs' Mem. at 14.

Defendants' argument rests on their own mistaken presumption that Abbott is not

properly alleged to be a member of the Off-Label Promotion Enterprise.  According to

Defendants, once Abbott is "removed" as a member of the alleged enterprise, all that remains

will be Purdue, a corporation, and the Individual Defendants, Purdue's employees, who under

Second Circuit law would not be sufficiently distinct from the persons conducting the

enterprise's affairs for the 1962(c) claim to survive.  Defs' Mem. at 15.  But Abbott should not

be removed from the enterprise irrespective of Defendants' presumption.

Plaintiff alleged facts sufficient to demonstrate that Abbott was a member of the

enterprise and shared a common purpose and common goals with the other members of the

enterprise (Purdue and the Individual Defendants).  Complaint, ¶88.  *See also* Plaintiff's

Memorandum in Opposition to Abbott Defendants' Motion To Dismiss, incorporated herein by

reference.  Plaintiff alleges that Abbott entered into a **contract** with Purdue ("Co-Promotion

---

[18] The identification of additional communications distinguishes this Complaint from other cases where the invoices were the only communications alleged. *Kirk v. Heppt*, 423 F. Supp.2d 147, 150 (S.D.N.Y. 2006).

Agreement") on January 1, 1996 to provide promotional assistance in the marketing of OxyContin, *see* Complaint, ¶13, that the enormous increase in sales volume was "due primarily to Defendants' (Abbott's, Purdue's and the Individual Defendant's) aggressive, **nationwide and uniform** strategy aimed at physicians, hospitals, pharmacists and patients, *see id.*, ¶29 (emphasis supplied); and further, that the marketing strategy "misrepresented the appropriate uses for OxyContin and failed to disclose adequately the safety issues and possible adverse effects of OxyContin to such a degree that Purdue and the Individual Defendants were charged in a criminal information with "misbranding." *Id.*, ¶49.

Abbott's Co-Promotion Agreement with Purdue called for Abbott to perform promotional efforts consistently identified in the Complaint as **national** or **uniform**. *Id.*, ¶¶38, 39, 48 (nationwide strategy); *id.*, ¶¶33, 39, 40, 48 (uniform strategy)[19]. Abbott's specifically identified acts include sales presentations aimed at anesthesiologists, surgeons, hospitals, acute care facilities and ambulatory care facilities. *Id.*, ¶69. Abbott also provided incentives such as additional compensation or prizes to its sales force for sales of OxyContin, demonstrating its commitment to the aggressive promotion scheme. *Id.*, ¶ 69. Abbott's role in the enterprise is underscored by Plaintiff's allegations that from 1996 through at least 2002, the period covered by the government criminal action, Abbott provided not less than 300 sales representatives under the Co-Promotion Agreement dedicated to promoting OxyContin; and Abbott lent its name and logo to materials for OxyContin. *Id.*, ¶70-71.

Enterprise is pled under Rule 8. *See Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645 (7th Cir. 1995) (Rule 8(a) applies to the enterprise element of a RICO claim). Based on the allegations above detailed, Plaintiff states a **plausible** claim for violation of § 1962(c). *See Vladimir v. Cowperthwait*, No. 06 Civ. 5863(JGK), 2007 WL 1964157, at *1 (S.D.N.Y. July 3,

---

[19] Defendants completely ignore Plaintiff's allegations of uniformity.

2007) (*citing Bell Atlantic v. Twombly*, 127 S. Ct. 1955 (2007)). The plausible inference to be

drawn from the Complaint's detailed allegations of the national and uniform scheme employed

by Defendants through the Off-Label Promotion Enterprise is the inference of common purpose

and cooperation among all members of the enterprise. *First Capital Asset Mgmt, Inc. v.*

*Satinwood, Inc.*, 385 F.3d 159, 173-174 (2d Cir. 2004). It is **not** plausible to infer that Abbott

alone disclosed safety and efficacy problems with OxyContin when sending out its 300 sales

representatives to promote OxyContin under the Co-Promotion Agreement. Complaint, ¶70.

Defendants posit that none of Plaintiff's allegations regarding Abbott involve a

fraudulent or improper act with respect to OxyContin. Defs' Mem. at 16. This simply is not the

case – indeed, not only would the fraudulent marketing scheme to which Purdue and the

Individual Defendants pled guilty have been thwarted had Abbott not also been marketing

OxyContin for Purdue in the same manner, it is clear that Abbott conducted its marketing in

conjunction with Purdue. *See* Plaintiff's Memorandum in Opposition to Abbott's Motion To

Dismiss and Exhibit A thereto.

### C.   Plaintiff Has Alleged a Violation of RICO § 1962(d).

Defendants conclude that Plaintiff's claim under § 1962(d) for conspiracy must be

dismissed because, in their view, the elements of the substantive RICO claim are not pled. Defs'

Mem. at 19. But as has been demonstrated above, Defendants are wrong. Plaintiff's claim under

§ 1962(c) is well pled and should be sustained. Plaintiff alleges agreement, and acts in

furtherance of that agreement. Complaint, ¶¶68-71. Accordingly, Plaintiff's claim of conspiracy

to violate RICO under § 1962(d) also should be sustained.

## III.   PLAINTIFF ADEQUATELY HAS PLED STATE LAW CONSUMER
## PROTECTION CLAIMS.

In arguing that Plaintiff's consumer protection claims should be dismissed, Defendants

only address the New Mexico Unfair Practices Act, N.M. STAT. ANN. § 57-12-1, *et seq.*

("UPA"). Defs' Mem. at 19 n. 11. While Plaintiff sufficiently has stated claims on behalf of the

Class under the consumer protection statutes of the other jurisdictions alleged in the Complaint

as well, Plaintiff herein addresses Defendants' arguments regarding the UPA only.

### A.    Plaintiff Is a Buyer and Thus Has Standing Under the UPA.

Defendants wrongly contends that Plaintiff must be a "buyer" of a good, and argue that

Plaintiff is not such a "buyer" because its "business consists of fulfilling it contractual obligation

to reimburse its members for their purchases of prescription drugs." Defs' Mem. at 19-20

(emphasis deleted). Defendants argue that "what Plaintiff does bears no resemblance to what a

buyer does when he/she purchases a consumer product," and that Plaintiff does not "allege that it

takes 'title' or possession of any of the drugs its members purchase." *Id.* at 20.

As an initial matter, New Mexico law does not impose a requirement that a UPA plaintiff

be a "buyer" of a product, as narrowly characterized by Defendants. *See Lohman v. Daimler-*

*Chrysler Corp.*, 166 P.3d 1091, 1097-98 (N.M. Ct. App. 2007) (UPA does not require "a

transaction" between claimant and defendant; it "does not require the plaintiff to acquire goods

or services *from* the defendant) (emphasis in original). Rather, the language that Defendants rely

upon from *Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*, 113 P.3d 347

(N.M. Ct. App. 2005), *i.e.*, that "the UPA gives standing only to buyers of goods or services," *id.*

at 353, constitutes selectively quoted *dictum* that the New Mexico Court of Appeals clarified in

*Lohman.* In particular, *Lohman* stated that "[t]his Court [in *Santa Fe Custom Shutters & Doors,*

*Inc.*] merely observed that 'the UPA contemplates a plaintiff who seeks or acquires goods or

services *and* a defendant who provides goods or services.'" *Id.* at 1097-98 (citation omitted;

emphasis in original). *Lohman* further noted that "both the plain language of the act and the

underlying policies suggest that a commercial transaction between a claimant and a defendant

need not be alleged in order to sustain a UPA claim." *Id.* at 1098; *cf. In re Bextra & Celebrex*

*Mktg. Sales Practices & Prod. Liab. Litig.*, 495 F. Supp.2d 1027, 1033 (N.D. Cal. 2007) (noting

that TPP had standing where Michigan consumer protection act did not require transaction

between plaintiff and defendant; it "does not require the plaintiff to be the consumer who

purchased the goods") (citations omitted).[20]

Indeed, the UPA broadly allows claims to be brought by "[a]ny person who suffers any

loss of money or property . . . as a result of any" unfair or deceptive practice of another, N.M.

STAT. ANN. § 57-12-10(B) (2005), where the misrepresentation was "'made *in connection with*

the sale . . . of goods' generally." *Lohman*, 166 P.3d at 1097 (emphasis in original).[21]

Plaintiff easily meets the UPA's standing requirements.[22]  It is more than plausible from

the Complaint's allegations that, due to Defendants' misconduct, Plaintiff sought and placed

Oxycontin, a product marketed by Defendants, on its formulary for its beneficiaries.  *See, e.g.*,

Complaint, ¶ 29 ("Defendant developed this marketing and advertising strategy with the intent

that . . . third party payors would place Oxycontin on their formularies").  Further, Plaintiff

adequately alleges that it suffered financial losses.  *See* Complaint ¶ 1 (Defendants' scheme

designed to enable Defendants to reap unlawful profits "at the expense of . . . employers' health

and welfare funds, like NMUFCW, and others, who were forced to overpay substantial amounts

of money for Oxycontin"); *id.* ¶ 165 ("Plaintiff and the Class have suffered ascertainable loss and

[20] Besides arguing that Plaintiff lacks standing because it does not take "title" to, or possess, Oxycontin, Defendants also attempt to unduly limit the definition of a "buyer" to comprise solely those involved in determining whether a drug is medically appropriate. Defs' Mem. at 20. Defendants provide no legal authority for these propositions, and ignore the reality of TPP purchasing arrangements, not to mention those of other buyers in the broader economy who frequently utilize third parties in the purchasing process.

[21] As a Taft-Hartley Trust Fund, Plaintiff easily meets the "person" requirement of the UPA. N.M. STAT. ANN. § 57-12-10(B); *see also* N.M. STAT. ANN. §57-12-2 (A) (defining "person" to include a trust).  Moreover, to state a claim under the UPA, Plaintiff was required to allege (1) a false or misleading statement or representation; (2) knowingly made in connection with the sale, lease, rental, or loan of goods or services; (3) in the regular course of the defendant's business; and (4) of a type that may, tends to, or does deceive or mislead any person. *Lohman*, 166 P.3d at 1093 (citing *Stevenson v. Louis Dreyfus Corp.*, 811 P.2d 1308, 1311 (N.M. 1991)).  Defendants do not challenge the Complaint based on any of these elements.

[22] The factual allegations of the Complaint are to be accepted as true and all reasonable inferences are to drawn in Plaintiff's favor. *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

damages."). Plaintiff also alleges that its losses resulted from Defendants' misconduct. *See id.* ¶ 165 ("As a . . . result of Defendants' wrongful conduct, Plaintiff and the Class were damaged by paying for these prescriptions"); *see also id.* ¶ 1.

In any event, even assuming *arguendo* that Plaintiff was required to allege that it was a "buyer," it satisfies this requirement. *See, e.g.*, Complaint ¶ 2 (Plaintiff and the class "purchased, reimbursed and/or paid for OxyContin"); *id.* ¶ 5 ("Plaintiff, NMUFCW, has paid or reimbursed eligible trust participants' prescription drug benefits for OxyContin."); *id.* ¶ 165 ("Plaintiff and members of the class ... relied upon Defendants' misrepresentations and omissions in paying for OxyContin."). Plaintiff's Complaint thus adequately alleges standing under the UPA.

### B.  Plaintiff Has Alleged a Causal Link Between Defendants' Conduct and Plaintiff's Injury Under the UPA

Defendants also argue that Plaintiff fails to allege a causal link between Defendants' conduct and Plaintiff's injury under the UPA. Defs' Mem. at 21. Defendants contend that "Plaintiff has not alleged that Purdue made any misrepresentation to it or how any alleged misrepresentation caused it to make the decision to pay for Oxycontin." *Id.* This contention is unavailing because it misconstrues "causation" under the UPA and seeks to impose a "reliance" requirement.[23] New Mexico courts have held that "[c]ausation requires a nexus between a defendant's conduct and a plaintiff's loss," not a nexus between defendant's conduct and the purchase or sale. *Smoot v. Physicians Life Ins. Co.*, 87 P.3d 545, 550 (N.M. Ct. App. 2003) (citations omitted). Thus, there is "nothing in the language of . . . [the UPA] requiring proof of a link between conduct and purchase or sale. To the contrary, . . . the UPA does not require that the defendant's conduct actually deceive a consumer; it permits recovery even if the conduct only 'tends to deceive.'" *Id.* at 550 (citations omitted); *see also id.* at 551 (no requirement of reliance under UPA); *Lohman*, 166 P.3d at 1096 (UPA does not make "direct representation by

---

[23] *See supra* Section II(A)(2) for a discussion of reliance respecting Plaintiff's RICO claim.

the defendant to the plaintiff . . . a prerequisite"). Defendants pled guilty to felony misbranding with the "intent to defraud or mislead." Complaint, ¶49. As discussed above, Plaintiff adequately has alleged facts stating a causal nexus between the Defendants' conduct and Plaintiff's loss. *Id.*, ¶¶ 1, 29, 165.

Defendants further argue that Plaintiff relies on a "a fraud-on-the-market" theory of causation. Defs' Mem. at 21.[24] As discussed *supra*, this contention misconstrues the theory of Plaintiff's case. While the rationale behind the fraud-on-the-market theory in securities fraud cases is that buyers of publicly-traded securities rely on the integrity of an efficient market to process material information and set prices, *see generally Basic, supra,* 485 U.S. at 241-47, this is **not** a price inflation case. Prescription drugs do not trade like stocks. Plaintiff need not rely upon an efficient market to prove its damages. Plaintiff can and will demonstrate, as discussed *supra*, through an economic analysis, the causal link between Defendants' conduct and increased prescription costs incurred by Plaintiff and the Class. *See supra*, discussion under Section I respecting Plaintiff's standing.

## C.    The Learned Intermediary Doctrine Does Not Preclude Recovery.

This Court should deny Defendants' request for an unwarranted expansion of the Learned Intermediary Doctrine to invalidate liability for their UPA violations. Defendants cannot cite any New Mexico authorities that actually support their requested expansion of the Learned Intermediary Doctrine. *Jones v. General Motors Corp.*, 953 P.2d 1104 (N.M. Ct. App. 1998), one of the two New Mexico cases cited by Defendants, is plainly inapposite. *Jones* lends no support to Defendants' requested expansion as it involved the court's interpretation of the statutory definition of consumer in an automobile lemon law case. *Id.* at 1109. The second New

---

[24] Defendants' reliance on *International Union of Operating Engr's Local No. 68 Welfare Fund v. Merck & Co.*, 929 A.2d 1076, 1088 (N.J. 2007), is unavailing. *See* Defs' Mem. at 21. The New Jersey Supreme Court completely misconstrued the theory of the plaintiff's case, in that the plaintiff there never argued a fraud-on-the-market theory. At any rate, there can be no genuine dispute that the Complaint here does not allege any price inflation theory.

Mexico case cited by Defendants, *Serna v. Roche Labs.*, 684 P.2d 1187 (N.M. Ct. App. 1984),

does involve a question of a drug manufacturer's liability; however, Defendants have cited

nonprecedential case dictum regarding the construction of the Learned Intermediary Doctrine in

New Mexico. Defs' Mem. at 22. The *Serna* decision, in fact, turned on the plaintiff's failure to

submit evidence in opposition to summary judgment that would have created a factual question

as to the adequacy of the drug's warnings. 684 P.2d at 1187. Furthermore, *Serna* is

distinguishable also as it concerned a man receiving treatment for a prostate infection and

involved an adverse reaction to an antibiotic and did not concern a drug manufacturer's

widespread fraud and off-label promotion, as Plaintiff alleges herein against Defendants. *Id.* at

1187-1188. Defendants' citation to these two New Mexico cases fails to establish a basis for

expansion of the Learned Intermediary Doctrine to preclude UPA liability.

  Even if this Court should accept Defendants' argument for the expansion of the Learned

Intermediary Doctrine to exempt drug manufacturers from liability for UPA violations under

certain circumstances, the off-label promotion of a drug and deceptive marketing, the conduct in

which Defendants are alleged to have engaged in this case and to which they pled guilty, vitiates

the application of the doctrine and will not serve to exonerate Defendants. Conduct involving

over-promotion and off-label promotion of a drug is an established exception to the Learned

Intermediary Doctrine. *Salmon v. Parke, Davis & Co.*, 520 F.2d 1359 (4ᵗʰ Cir. 1975); *Hurley v.

Heart Physicians, P.C.,* 898 A.2d 777 (Conn. 2006); *Proctor v. Davis*, 682 N.E.2d 1203 (Ill.

App. 1997) (promoted and developed off-label use through financial and technical assistance to

doctors, then publicized case reports by those doctors); *Stevens v. Parke, Davis & Co.,* 507 P.2d

653 (Cal. 1973); *see, In re Meridia Prod. Liab. Litig.*, 328 F. Supp.2d 791, 811 (N.D. Ohio

2004); *cf. Plummer v. Lederle Labs.*, 819 F.2d 349 (2d Cir. 1987).    In the seminal cases of

*Stevens* and *Salmon*, the courts found that, where evidence exists showing defendant has over-

promoted its drug to the medical profession so as to nullify the warnings they had provided, the

Learned Intermediary Doctrine is rendered inapplicable. *See, e.g., Stevens,* 507 P.2d at 655.

And, New Mexico appellate courts have recognized the over-promotion exception to the Learned

Intermediary Doctrine, favorably citing *Stevens* in several cases. *Michael v. Warner/Chilcott,*

579 P.2d 183, 186 (N.M. Ct. App. 1978); *First Nat'l Bank in Albuquerque v. Nor-Am Agric.*

*Prods., Inc.,* 537 P.2d 682, 691  (N.M. Ct. App. 1975).[25]

    In any event, consideration of the application the Learned Intermediary Doctrine is

premature as the adequacy of prescription drug warnings, and the alleged misrepresentations in

the off-label promotion of OxyContin, which are inextricably entwined with the Learned

Intermediary Doctrine, present issues of fact for the jury to decide. *Michael, supra,* 579 P.2d at

187; *Wooten v. Johnson & Johnson Prods., Inc.,* 635 F. Supp. 799, 804 (N.D. Ill. 1986); *Mahr v.*

*G.D. Searle & Co.,* 72 Ill. App.3d 540, 643-644 (1979).  The dispositive consideration of the

applicability of the Learned Intermediary Doctrine and whether any exceptions are relevant to

the facts of Defendants' conduct in this case should be determined by a jury after hearing

evidence at trial.  This Court must reject Defendants' attempt to expand of the Learned

Intermediary Doctrine as unsupported by relevant case law and as procedurally premature.

    **D.**    **Plaintiff's Consumer Protection Claim Is Not Preempted.**

    In contending that Plaintiff's consumer protection claims are preempted by The Food,

Drug and Cosmetic Act, 21 U.S.C. §§ 301-392 ("FDCA"), and Food and Drug Administration

("FDA") Regulations, Defendants rely upon a Third Circuit case, *Pennsylvania Employee*

*Benefits Trust Fund v. Zeneca, Inc.,* 499 F.3d 239, 251 (3d Cir. 2007), and the FDA's comments

---

[25]The reasoning behind the decisions cited by Defendants — *Heindel v. Pfizer, Inc.,* 381 F. Supp.2d 364 (D.N.J. 2004), *Colacicco v. Apotex, Inc.,* 432 F. Supp.2d 514 (E.D. Pa. 2006), and *In re Norplant Contraceptive Prods. Liab. Litig.,* 955 F. Supp. 700 (E.D. Tex. 1997) — finding that the Learned Intermediary Doctrine preempted liability for consumer protection statute violations was recently considered and repudiated in *In re Bextra and Celebrex Mktg. Sales Practices Prod. Liab. Litig.,* No. MDL 05-01699, 2007 WL 2028408, at *4 (N.D. Cal. Jul. 10, 2007) ("this is not a market theory of causation; instead, it is a theory that plaintiffs were deceived by the [drug manufacturers'] misrepresentations").

on the implications (the "Preamble"), of the Final Rule, *Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products*, 71 Fed. Reg. 3922 (Jan. 24, 2006). *See id.* at 3933-35 for the Preamble (referred to by Defendants as a recently issued policy statement, *see* Defs' Mem. at 27). Plaintiff submits that the non-binding *Zeneca* case is distinguishable on its facts, and this Court should not be persuaded by the reasoning of the 2-1 majority *Zeneca* Court respecting preemption because the reasoning is flawed. Further, the FDA's comments respecting preemption should not be afforded deference.

Defendants rely heavily upon the decision of the Third Circuit in *Zeneca, supra*, devoting almost the entirety of their five-page discussion of the preemption issue to recitations of the pronouncements of that case. Numerous other courts, including those within this Circuit, have found that FDA preemption is not warranted in the context of prescription drug advertising and marketing. *See infra* n. 27.

There is clearly no preemption provision in the prescription drug provisions of the FDCA. Defendants' position, consistent with a few cases outside of this Circuit, is that the FDA's current view, as only recently espoused in the Preamble to the 2006 Final Rule – "FDA believes that under existing preemption principles, FDA approval of labeling under the act … preempts conflicting or contrary state law" – is entitled to deference. In reversing the district court, the Second Circuit in *Desiano, supra*, noted that "an agency cannot supply, on Congress's behalf, the clear legislative statement of intent required to overcome the presumption against preemption." 467 F.3d at 97 n.9.

Finding the reasoning of *Desiano* persuasive, the United States District Court for the Eastern District of New York in an earlier decision in the *Zyprexa* case previously referenced, *In re Zyprexa Prod. Liab. Litig.,* 489 F. Supp.2d 230 (E.D.N.Y. 2007) held that the defendant's

preemption arguments should be rejected.  The *Zyprexa* Court noted the following respecting

statements of the FDA:

> The FDA's position that the Preamble "represents the government's long standing
> views on preemption," 71 Fed. Reg. at 3934, is inconsistent with the fact that the
> FDA earlier echoed the many courts' decisions rejecting preemption.[26] ... The
> 2006 Preamble is, by regulation, an advisory opinion, binding only on the agency
> and changeable at any time without notice and comment .... The Supreme Court
> has ruled that internal agency guidelines which are not promulgated subject to
> notice and comment procedures are entitled only to "some deference."  *See Reno
> v. Koray*, 515 U.S. 50, 61 (1995). ... The need for a "clear statement from
> Congress" is imperative where, as in this case, a finding of preemption "will
> **foreclose a remedy that was traditionally available and for which federal law
> provides no substitute**." ... The FDA cannot be allowed to usher in such a
> sweeping change in substantive law through the **back door**.

*Id.* at 274-75 (emphasis added).[27]

In addition to the other courts which agree with Plaintiff's position that there should not

be FDA preemption of prescription drug marketing cases, the non-precedential decision of the

Third Circuit fails to bolster Defendants' position because *Zeneca* is distinguishable on the facts

from the instant case.  Citing to the statutory language concerning "misbranding," 21 U.S.C. §

352(a), and "false or misleading" labeling, 21 C.F.R. § 1.21(a) and 21 C.F.R. § 314.125(b)(6),

the Third Circuit's opinion was grounded on the fact that "to the extent that the advertising

statements regarding Nexium **were consistent with statements** used in the labeling approved by

the FDA, the FDA has determined that they are not false or misleading."  499 F.3d at 245.  In

agreeing with the district court, the Third Circuit noted that "the District Court further concluded

that the Nexium advertisements **that complied with the FDA-approved labeling** were not

---

[26]Indeed, the FDA's statements in the Preamble conflict with statements made in the original notice of proposed
rulemaking out of which the 2006 Final Rule grew.  *See* 65 Fed. Reg. 81082, 81103 (Dec. 22, 2000).  Even courts
which were persuaded by the FDA's current position have found it difficult to reconcile prior interpretations with
the FDA's current position.  *Colacicco v. Apotex, Inc.*, 432 F. Supp.2d 514, 531 (E.D. Pa. 2006).

[27] *See also In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 2007 WL 1952964 (E.D. La. July 3, 2007); *Perry v.
Novartis Pharm. Corp.*, 456 F. Supp.2d 678, 684 (E.D. Pa. 2006); *Adesina v. Aladan Corp.*, 438 F. Supp.2d 329,
337-38 (S.D.N.Y. 2006); *Jackson v. Pfizer, Inc.*, 432 F. Supp.2d 964, 968 (D. Neb. 2006); *McNellis v. Pfizer, Inc.*,
No. Civ. 05-1286, 2006 WL 2819046, at *10 (D.N.J. Sept. 29, 2006); *Laisure-Radke v. Par Pharm., Inc.*, 426 F.
Supp.2d 1163, 1172 (W.D. Wash. 2006).

actionable under the state consumer protection laws because those laws were preempted by federal law." *Id.* at 247 (emphasis added).[28] In discussing the legislative purpose behind the preemption concept, the Third Circuit noted that "the purpose of protecting prescription drug users in the FDCA would be frustrated if states were allowed to interpose consumer fraud laws that permitted plaintiffs to question the veracity of statements approved by the FDA." *Id.* at 251.

In the instant case, by contrast, the Purdue Defendants and the Individual Defendants pled guilty to felony and misdemeanor charges, respectively, concerning misbranding. Further, prior to the guilty pleas, the FDA, as well as other governmental entities, repeatedly chastised Defendants for misleading statements in advertising, including specifically for "promoting OxyContin for a much broader range of patients with pain than are appropriate for the drug." Complaint, ¶¶ 32, 45, 47, 62, 64. Plaintiff's claims are not based upon marketing tactics which were approved by the FDA through the FDA's approval of labeling and advertising language. Indeed, Plaintiff submits that Defendants' misleading marketing tactics instead were in line with the very advertising statements which the FDA ordered Purdue to stop making – that OxyContin was appropriate for use in patients with conditions for which OxyContin had not been approved for use by the FDA.

In both *Zeneca* and a case discussed therein, *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 865 (2000)(holding that National Traffic and Motor Vehicle Safety Act of 1966 and standard promulgated thereunder by Department of Transportation preempted state common law tort action "in which the plaintiff claims that the defendant auto manufacturer, who was **in compliance** with the standard, should nonetheless have equipped its 1987 automobile with

---

[28] "Although the FDA did not explicitly approve Zeneca's advertising, the FDA did approve Nexium's labeling, which included clinical studies that showed statistically significant healing rates for 40 mg of Nexium as compared to 20 mg of omeprazole." 499 F.3d at 249 n.9. Plaintiff in *Zeneca* had specifically claimed, contrary to the FDA's allowance of the 40 mg language in the labeling, that a "40 mg dose of Nexium was not needed in most patients and a fair comparison of 20 mg of Nexium to 20 mg of Prilosec would not have proven Nexium to be superior." *Id.* at 241-42.

28

airbags") (emphasis added), *see Zeneca*, 499 F.3d at 250, there was no allegation or evidence

that the defendants had failed to comply with agency decisions.    Where, as here, the Defendants

repeatedly were non-compliant with agency regulations, preemption should not serve to preclude

a lawsuit by a party clearly damaged by the defendant's non-compliance.

It should be recognized that government agencies are not always capable of following up

and policing habitual offenders, which is another reason why preemption should not apply,

particularly under the circumstances of this case.  In the report of the General Accounting Office

("GAO"), incorporated by reference in Plaintiff's Complaint, *see* Complaint,  ¶¶ 64,70, the GAO

noted the following:

> "In February 2001, Purdue submitted a second version of the videotape to FDA[29]
> …. FDA did not review this second version until October 2002 [20 months later],
> after we [the GAO] inquired about its content.  FDA told us it found that the
> second version of the video appeared to make unsubstantiated claims regarding
> OxyContin's effect on patients' quality of life and ability to perform daily
> activities and minimized the risks associated with the drug. … FDA stated that it
> did not review either of these videos for enforcement purposes because of **limited
> resources**. … FDA said that it receives numerous marketing and promotional
> materials for promoted prescription drugs and that while every effort is made to
> review the materials, it cannot guarantee that all materials are reviewed because
> of **limited resources** and **competing priorities**.

GAO Report entitled "Prescription Drugs: OxyContin Abuse and Diversion and Efforts To

Address the Problem," dated December 2003, at 28 (emphasis added), attached as Exhibit A

hereto.  Thus, under these specific circumstances, respecting these Defendants and OxyContin,

since the federal agency has not only recognized and attempted to correct Defendants' violations,

but, has been unable to keep up with its policing duties,[30] preemption is inappropriate.

In order that conduct by drug companies which the FDA determines to be in violation of

its regulations and determinations respecting the level of approval for drugs and appropriate

---

[29]Purdue never submitted the first version of this promotional videotape to the FDA for review.  *See* Complaint, ¶34.
[30] According to the GAO, the "FDA's original decision to label the drug as having less abuse potential than other
oxycodone products" was determined to be one of the factors that contributed to the abuse and diversion of
OxyContin.  "FDA officials acknowledged that the initial wording [before the black box warning] of OxyContin's
label was 'unfortunate' but was based on what was known about the product at that time."  *See* GAO Report at 29.

marketing for same does not go unchecked, civil lawsuits are needed to provide restitution for injured parties, particularly where the companies have pled guilty to fraudulent conduct, as here. Plaintiff refers to the well-reasoned dissent in *Zeneca*, wherein Judge Cowen noted that

> [g]iven that there are limitations to the FDA's oversight over prescription drug advertisements – both congressionally-imposed limitations, such as the lack of authority to require pre-approval, 21 U.S.C. § 352(n), and practical limitations attendant to the sheer volume of drug advertisements in the media … – the supplementation of state-law remedies would seem to aid the FDCA's objectives and purposes, not frustrate them.

499 F.3d at 258 (dissent). Citing to *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 251 (1984) and *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449-50 (2005), and recognizing the long history of state consumer protection statutes which provided compensation for injured parties and Congress's failure in the FDCA to express an intent to deprive injured parties of that compensation, Judge Cowen also concluded that "Congress's failure to provide a private remedy for persons injured by false and misleading advertisements further convinces me that the state law remedies are not preempted." 499 F.3d at 258-59 (dissent). *See Vioxx, supra,* 501 F. Supp.2d at 788 ("Far from standing 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' state-law claims against prescription drug manufacturers 'necessarily perform an important remedial role in compensating' injured individuals.") (quoting *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002)).

## IV.    THE STATUTE OF LIMITATIONS DOES NOT BAR PLAINTIFF'S CLAIMS.

Defendants have suggested to the Court that, on its face, Plaintiff's Complaint is time-barred by either the applicable New York or New Mexico statutes of limitations. While Plaintiff takes issue with Defendants' choice of law analysis with respect to statute of limitations, this Court need not address the choice of law issue at this time, as Plaintiff has pled claims which would not be time-barred under either the New York or New Mexico statute of limitations. Taking Plaintiff's allegations as true, as this Court must in considering a motion for judgment on

the pleadings, Plaintiff's claims only arose within the last year, well within the three or four, or

six year statutes cited by Defendants. Moreover, the filing of the class case, *Allied Services*

*Division Welfare Fund, et al. v. Purdue Pharma*, No. 2001-L-1458 (Ill.), in 2001, referenced in

Defendants' Memorandum, tolled the running of statutes of limitations for Plaintiff and the Class

from 2001 up to the voluntary dismissal of that action in December 2006. *See* Defs' Mem. at 30-

32.

      Throughout their Memorandum, in asserting that Plaintiff's claims are time-barred,

Defendants ignore the unequivocal allegations of Plaintiff's Complaint. Plaintiff has alleged that

it did not know and could not have known of Defendants' fraudulent misconduct until May of

2007, when Defendants entered guilty pleas in the Western District of Virginia following an

investigation into Defendants' misconduct by the U.S. Attorney General and Department of

Justice Office of Consumer Litigation. Complaint, ¶¶49, 61, 74, 76. Plaintiff has adopted by

reference, the guilty pleas of Defendants, in which Defendants admitted for the first time that

they engaged in broad-ranging fraudulent scheme to increase the market for the drug OxyContin.

The guilty pleas adopted by reference set forth in great detail a scheme, which Plaintiff alleges

continued up to the entry of the pleas themselves. *Id.*, ¶¶61, 74, 76.[31] These allegations alone

are sufficient to overcome Defendants' statute of limitations challenge.[32]

      Defendants make much of the fact that in entering their guilty pleas, they only admitted

to conduct which occurred through 2001. However, Plaintiff has alleged, and the details

---

[31] It bears noting that the guilty plea was entered after a lengthy and extensive U.S. Attorney investigation. Plaintiff can hardly be faulted for not discovering what took the Justice Department, with its considerable powers to conduct a criminal investigation and compel testimony, several years to uncover.

[32] Defendants suggest that Plaintiff has not alleged with adequate specificity the fraudulent acts that occurred after the events referenced in the plea agreements. Plaintiff has alleged that misrepresentations of the same nature as those set forth in great detail in the plea agreements continued up to the entry of the plea agreements. Complaint, ¶¶49, 50, 61-64, 74. When defendants are alleged to have engaged in a broad-reaching and continuing fraudulent scheme, as here, it is not necessary to detail each and every fraudulent communication. *Bale v. Dean Witter Reynolds, Inc.*, 627 F. Supp. 650, 652 (D. Minn. 1986). *See also In re Eli Lilly & Company, Prozac Prod. Liab. Litig.*, 789 F. Supp. 1448, 1456 (S.D. Ind. 1992) (citing 2A Moore's Federal Practice, at 9-29 (1991)).

31

submitted in conjunction with Defendants' guilty plea bolster the allegations, that Defendants

successfully concealed the activities of their misconduct. In their Memorandum, Defendants

admit to publicly denying the charges levied against them by JAMA and others in the years prior

to their guilty plea. Defs' Mem. at 30 n. 19. Presumably, until the time that they entered their

guilty pleas, Defendants likewise publicly denied their fraudulent misconduct.

Assuming that the conduct complained of only occurred from 1996-2001 (contrary to the

allegations of the Complaint which allege continuing misconduct), until Defendants entered their

guilty pleas, Plaintiff cannot be presumed to have known of the fraudulent nature of their

conduct, not when Defendants did not own up to their fraud until May of 2007. Defendants

would have this Court embrace the ultimate Catch-22. They rely heavily on cases that note

heightened pleading requirements for RICO actions due to the detrimental effect unfounded

fraud charges can have on a defendant's reputation, *see* Defs' Mem. at 3, but they would have

this Court dismiss out-of-hand any litigant who prudently waits until the outcome of a criminal

investigation prior to raising such allegations. Having denied their misconduct until entering a

guilty plea in 2007, Defendants cannot charge that Plaintiff is precluded from claiming it was

unaware of the fraudulent misconduct until that time.

Defendants suggest under no circumstances can Plaintiff invoke the discovery rule or the

doctrine of *contra non valentum*, because significant media attention was given to the addictive

nature of OxyContin, and many lawsuits were filed prior to the initiation of the instant suit filed

in response to Defendants' admissions of felonious conduct. While those facts may certainly be

offered by Defendants to rebut Plaintiff's allegations that it did not and could not have known of

the misconduct, those facts are insufficient to demonstrate, at this stage of the proceedings, that

Plaintiff's claims are time-barred on their face. At the appropriate time, either through summary

judgment or at trial, Defendants will have the opportunity to present facts regarding the

32

availability of public knowledge, at which time the finder of fact can determine whether Plaintiff

can demonstrate that it could not have known of the fraud which Defendants only publicly

acknowledged last year.

Defendants are correct in one respect, however. The filing of one earlier lawsuit is of

particular relevance to the statute of limitations issue – in that it acted to toll the statute of

limitations from 2001 to December 22, 2006. Defendants suggest that the filing of the *Allied

Services* lawsuit by another TPP in Illinois in 2001 necessarily precludes Plaintiff from invoking

the doctrine of *contra non valentum*. While this assertion is wrong – the filing of the earlier

action is not dispositive of Plaintiff's *contra non valentum* allegations – the filing of that class

action would toll the statute of limitations assuming that it began to run in 2001.

The *Allied Services* suit was filed as a nationwide class action, and remained pending as a

class action until it was voluntarily dismissed in December 2006 with no definitive ruling on

class certification ever having been reached.[33] Assuming *arguendo* that Plaintiff should have

known of Defendants' misconduct in 2001, the filing of the *Allied Services* class action tolled the

running of the statute of limitations as to the claims of TPPs who were members of the putative

class alleged. *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974).

Defendants may argue that the tolling of the statute of limitations does not apply to

subsequently filed class actions. *See, e.g., Korwek v. Hunt*, 827 F.2d 874, 878-79 (2d Cir. 1987).

However, the rule adopted in *Korwek*, that plaintiffs cannot "piggy-back" class actions to toll the

statute of limitations, only applies when there has been a definitive ruling on the

inappropriateness of class certification in the earlier class action. *Employers'-Teamsters Local

Nos. 175 and 505 Pension Trust Fund v. Anchor Capital Advisors*, 498 F.3d 920, 925 (9th Cir.

2007); *In re Initial Public Offering Sec. Litig.*, 214 F.R.D. 117, 123 n. 9 (S.D.N.Y. 2002).

---

[33] *See* December 22, 2006 Order dismissing suit with prejudice as to named plaintiff, attached hereto as Exhibit B.

Plaintiff's Complaint cannot be found on its face to be time-barred under a three-, four- or six-year statute of limitations, when the suit was filed in response to a guilty plea entered less than a year prior to the filing of the lawsuit. Moreover, even assuming that under no circumstances could Plaintiff demonstrate that the statute of limitations did not begin to run within three years of the commencement of this lawsuit, the statute nevertheless was tolled by the pendency of the *Allied Services* Class Action.

## V.    **PLAINTIFF HAS STATED A PROPER CLAIM FOR UNJUST ENRICHMENT.**

Defendants' contention that Plaintiff has not properly pled an unjust enrichment claim[34] because Plaintiff did not pay Defendants directly for the OxyContin hinges upon Connecticut law requiring that plaintiff **directly** confer the benefit upon defendant. Defs' Mem. at 34. Connecticut law does not so require.

The case cited by Defendants for this proposition, *Granito v. International Bus. Machines*, No. X07CV020080440S, 2003 WL 1963161, 34 Conn. L. Rptr. 485 (Conn. Super. Apr. 16, 2003), has been identified by subsequent cases as incorrectly stating Connecticut law respecting unjust enrichment. *See, e.g., Zeigler v. Sony Corp.*, 849 A.2d 19, 25 (Conn. Super. 2004) (recognizing that by requiring that parties have direct relationship, *Granito* "engraft[s] a requirement not imposed by our higher courts"). In *Stefan v. P.J. Kids, LLC*, No. X01CV040185513S, 2005 WL 834208 (Conn. Super. Mar. 1, 2005), the Connecticut Superior Court noted that *Granito* cited to *United Coastal Indus., Inc. v. Clearheart Constr. Co.*, 71 Conn. App. 506, 511 (2002) for the proposition that the benefit must be directly conferred upon defendant by plaintiff in order for an unjust enrichment claim to stand. But, the *Stefan* Court

---

[34] Defendants' argument that Plaintiff's unjust enrichment claim fails because Plaintiff continues to pay for OxyContin is addressed in Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Judgment on the Pleadings filed in the consolidated case, *AFSCME, et al. v. Purdue Pharma L.P., et al.*, 07-8761 (S.D.N.Y.) being filed contemporaneously herewith, which is incorporated by reference.

recognized that "United Coastal simply doesn't say that." 2005 WL 834208, at *3 n.7. In

denying the defendant's motion to strike the unjust enrichment count, the *Stefan* Court held:

> It is sufficient under [*United Coastal*] for the plaintiff to recover "if the defendant
> was benefited, did not pay for that benefit, and the failure of payment operated to
> plaintiff's detriment." … The defendant's flaw is it[']s imposing a requirement
> our law does not impose – and representing it as this state's law.

*Id.*

The law of Connecticut is that unjust enrichment is a common law doctrine that provides

restitution or the payment of money when justice so requires.  *Gagne v. Vaccaro*, 766 A.2d 416,

423-24 (Conn. 2001).   Plaintiff clearly has pled a claim for unjust enrichment sufficient under

Connecticut law to withstand a motion for judgment on the pleadings.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that Defendants' Motion for

Judgment on the Pleadings be denied.  In the alternative, Plaintiff requests that it be granted

leave to amend should the Court determine that its Complaint has not set forth sufficiently any of

Plaintiff's causes of action.

By:    SEEGER WEISS LLP


/s/ Christopher A. Seeger
Christopher A. Seeger, Esq. (CS-4880)
David R. Buchanan, Esq.
One William Street
New York, NY  10004
Tel: 212-584-0700
Fax: 212-584-0799
*Plaintiff's Lead and Liaison Counsel*

Jonathan Shub, Esq. (pro hac vice)
TerriAnne Benedetto, Esq. (pro hac vice)
SEEGER WEISS LLP
1515 Market Street
Suite 1380
Philadelphia, PA   19102
Tel:  215-564-2300
Fax:  215-851-8029
*Attorneys for Plaintiff*

James R. Dugan, II, Esq. (pro hac vice)
Douglas R. Plymale, Esq. (pro hac vice)
Stephen B. Murray, Jr., Esq.
Stephen B. Murray, Sr. Esq.
MURRAY LAW FIRM
650 Poydras Street, Suite 2150
New Orleans, LA   70130
Tel:  504-648-010
Fax:  504-648-0181
*Plaintiff's Lead Counsel*

Arnold Levin, Esq. (pro hac vice)
Fred S. Longer, Esq.
LEVIN, FISHBEIN, SEDRAN
  & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA   19106
Tel:  215-592-1500
Fax:  215-592-4663
*Attorneys for Plaintiff*

Arthur Sadin, Esq. (pro hac vice)
SADIN LAW FIRM, P.C.
121 Magnolia Street
Suite 102
Friendswood, TX   77546
Tel:  281-648-7711
Fax:  281-648-7799
*Attorneys for Plaintiff*

Shane Youtz, Esq. (pro hac vice)
YOUTZ & VALDEZ, P.C.
900 Gold Avenue, SW
Albequerque, NM   87102
Tel:  505-244-1200
Fax:  505-244-9700
*Attorneys for Plaintiff*