# EXHIBIT "A"

_OM_

## IN THE CIRCUIT COURT OF McDOWELL COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA *ex rel.*
DARRELL V. McGRAW, JR., ATTORNEY
GENERAL, *et al.,*

           Plaintiffs,

v.

PURDUE PHARMA L.P., *et al.*

           Defendants.

NOV 1 5 2004

Civil Action No. 01-C-137-S
(Hon. Booker T. Stephens, Chief Judge)

### ORDER DENYING
### ABBOTT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On Wednesday October 13, 2004 came the Plaintiffs, by counsel, and came defendants Purdue Pharma L.P., Purdue Pharma, Inc., and Purdue Frederick Company (collectively "Purdue"), by counsel, and came defendants Abbott Laboratories and Abbott Laboratories, Inc. (collectively "Abbott"), by counsel for a hearing on Abbott's Motion for Summary Judgment. For the reasons that follow, the Court **ORDERED** that the Motion for Summary Judgment be **DENIED**.

### GENUINE ISSUES OF MATERIAL FACT

After a review of the moving papers, responses and replies, all evidence submitted both in support of and in opposition to Abbott's Motion for Summary Judgment, and oral argument, the Court concludes the Plaintiffs have presented evidence showing genuine issues of material fact precluding summary judgment. The genuine issues of material fact include the following:

1.     The Plaintiffs' evidence of the history of OxyContin and its marketing, and of troubles it brought to the State of West Virginia is discussed in this Court's Order denying Purdue Pharma's ("Purdue") Motion for Summary Judgment. The Findings and Conclusions of the

**CMHT**
**ATTORNEY COPY**

407

EXHIBIT
i 9

Court in that Order are incorporated into this Order.

2.    Plaintiffs have presented evidence sufficient for a jury to conclude Purdue joined forces with the larger company, Abbott. Plaintiffs evidence shows that Purdue and Abbott together developed a "synergy" that allowed them to share in the fruits of each other's activities. Purdue and Abbott co-promoted OxyContin from 1996 to 2003.

3.    Plaintiffs have presented evidence sufficient for a jury to conclude that in 1995, before Abbott decided to co-promote the product, Abbott conducted a commercial review that suggested OxyContin was not appropriate for the surgeons Abbott called upon, *i.e.*, surgeons who treat acute, post-operative pain. Plaintiffs' Ex. 1 (Report: "Controlled - Release Oxycodone Commercial Review" at ABBOTT1005809 (OXY005747).

4.    Plaintiffs have presented evidence sufficient for a jury to conclude Abbott determined a relationship with Purdue could be of strategic importance. *Id.* at ABBOTT1005812.

5.    Plaintiffs have presented evidence sufficient for a jury to conclude Abbott signed a "Co-Promotion Agreement" that gave "commissions" to Abbott based upon the profits made from selected healthcare providers, called "Abbott Physicians." Plaintiffs' Ex. 2 (Co-Promotion Agreement between Purdue-Pharma and Abbott at ABBOTT1002859).

6.    Plaintiffs have presented evidence sufficient for a jury to conclude the co-promotion agreement starts with "whereas" clauses certifying that both parties were joining together to co-promote OxyContin throughout the "Territory" [defined as the United States], and shared a common interest in promoting sales of OxyContin. *Id.*

7.    Plaintiffs have presented evidence sufficient for a jury to conclude that, under the agreement, Abbott earned "commissions" constituting a percentage of the profits, arrived at using a formula involving Purdue's nationwide gross sales and subtracting out certain costs, *Id.* at

2

ABBOTT1002861.

8.    Plaintiffs have presented evidence sufficient for a jury to conclude Abbott received a
percentage of "net sales," defined as "gross sales" of OxyContin minus "fixed deductions
and variable deductions." *Id.* The agreement defined "gross sales" as the "sum of (1) sales
of OxyContin in the U.S., and (2) prescription sales (the dollar value arrived at by
multiplying data on OxyContin prescriptions written by "Abbott Physicians."). *Id.* at
ABBOTT1002875. "Abbott Physicians" constituted a list of specialties related mostly to
hospital-based healthcare providers, including anesthesiologists, surgeons, and emergency
medicine. *Id.* at ABBOTT1002904. The "fixed" and "variable" deductions related to
subtractions Purdue made to offset their mundane costs for OxyContin distribution, such as
shipping, warehousing, insuring, etc., *id.* at ABBOTT1002861, and also an acknowledgment
to certain rebates HMO's, pharmacy benefit managers ("PBM's"), and hospitals may pay the
parties. *Id.* at ABBOTT1002862. Abbott would get 25% of all "net sales" up to
$10,000,000, and 30% of all net sales over that. *Id.* at ABBOTT1002872. Thus, Abbott
received either 25% or 30% of "net sales" - or profits - Purdue made off of a cross-section
of medical specialties where Abbott was better known than Purdue.

9.    The co-promotion agreement also imposed some obligations on the parties. Purdue and
Abbott were to consult "from time to time" on OxyContin promotion. *Id.* at
ABBOTT1002865. Plaintiffs' point to the testimony of Abbott Director of Hospital Sales,
Gerald Eichhorn, stating that such joint meetings were called, "business reviews" were held
quarterly. Ex. 3 (February 27, 2003 Dep. of G. Eichhorn at 24-25). Abbott and Purdue
alternated hosting the joint meetings at their respective headquarters in Illinois and

3

409

Connecticut. *Id.* at 25-26. Mr. Eichhorn testified that, at the joint meetings:

> "We would bring information that would review some of the current trends in the marketplace, discuss some of the promotional materials, just an overall business update. We would typically focus on our areas of responsibility and talk a little bit about market trends or competitive trends for our surgeons and anesthesia slash pain specialists that were our call points.
>
> Purdue would bring similar information that showed some of the promotional materials that we or that they had in development, information on trends for some of their market specialties. Oftentimes, much of the conversation centered around brainstorming of the product."

*Id.* at 28-29.

10.  Plaintiffs have presented evidence sufficient for a jury to conclude that, at the joint meetings, Purdue and Abbott jointly examined market research and data, and considered future OxyContin promotional materials. *Id.* Co-promotion Agreement at ABBOTT1002868.

11.  The co-promotion agreement also required that Abbott maintain at least "300 Abbott representatives and twenty (2) hospital integrated systems executives" to promote OxyContin. Co-Promotion Agreement at ABBOTT1002867. Purdue was to provide training materials for Abbott personnel. *Id.* Purdue was also required to "conduct clinical studies with respect to outpatient surgery and post surgical pain." *Id.* at ABBOTT1002880. Plaintiffs have presented evidence sufficient for a jury to conclude Purdue conducted such clinical studies, with Abbott personnel assisting in gathering up investigators from among their surgical customers. Plaintiffs' Ex. 4 (November 13, 1997 Memo to sales force re: Update on the Relaunch of OxyContin Post-PCA Study at ABBOTT1005921 (OXY05741).

12.  The Co-Promotion Agreement required Purdue indemnify Abbott in case of litigation,

4

Agreement at ABBOTT1002891, which it has. Plaintiffs' Ex. 5 (Siegel, "No Escaping OxyContin Fee Frenzy," September 27, 2004 as seen at www.law.com on October 4, 2004 (reciting how Connecticut court ruled that insurance company for Purdue is required to pay for Abbott's expenses as well; such payments were not "damages" exhausting the policy)).

13. After the agreement expired, Abbott was to continue to get "residual payments" for the promotional impact of their work. *Id.* at ABBOTT1002873. Abbott and Purdue later formalized the residual payment to 6% of "net sales" from 2003-2006, "in consideration of Abbott's efforts in developing product of good will, during the term of [the co-promotion]. Dep. of Eichhorn at 99.

14. The agreement also contained a "relationship" agreement whereby the parties declared themselves "independent contractors." Co-promotion Agreement at ABBOTT1002885. The long statement continued on, restricting the parties ability to make representations, or assume obligations for each other, beyond the scope of the agreement:

> "Neither party nor any employee of such party is an employee, officer, agent, partner, business representative of, or legal representative of, or joint venturer with the other party. Neither party has authority to assume any obligation on behalf of the other party and shall not hold out to third parties that it has any authority to do so unless otherwise specified herein. Neither party shall take any action that might mislead or confuse third parties in this regard. Unless otherwise provided herein, each party shall be responsible for its own expenses and shall not incur expenses for the other party's account unless expressly authorized to do so by the other party."

*Id.*

15. Plaintiffs have presented evidence sufficient for a jury to conclude Abbott's training materials were substantially the same as Purdue's training materials. Plaintiffs have

5

411

presented evidence sufficient for a jury to conclude Abbott taught its sales representatives that OxyContin provided a slower peak in oxycodone blood concentration, "a lower peak concentration" and a slower concentration decrease than a comparable dose of immediate-release oxycodone. Plaintiffs' Ex. 6 (OxyContin Tablets Product Knowledge - Module 3 at ABBOTT1005653, 56 (OXY05791)). Like Purdue's training manual, the Abbott version highlights the "delayed absorption" language from the OxyContin label, and noted, "slower absorption may lessen abuse risk." *Id.* at 48. Similarly, the Abbott training book described the statement regarding "iatrogenic addiction" not as a warning about a risk, but a "remind[er] to the physician that addiction as a result of legitimate medical use is very uncommon, and not to mistake tolerance, physical dependence, or attempts by the patient to obtain adequate analgesia as signs of addiction." *Id.*

16.   Plaintiffs have presented evidence sufficient for a jury to conclude Abbott, like Purdue, taught detailers that OxyContin's formulation diminished side effects and lowered oxycodone's abuse or addiction potential.     Plaintiffs' Ex.    7 ("OxyContin Objections,"pointing out "delayed absorption" language ABBOTT1007226 (OXY08560); Ex. 8 (July 18, 1999 handout by K. Kettle, stating short-acting Schedule III opioids have a higher abuse potential at ABBOTT1006191 (OXY05731).

17.   Plaintiffs have presented evidence sufficient for a jury to conclude Abbott trained its sales forces that the lack of a high peak also lowers the incidence of side effects associated with OxyContin, and also lowers its abuse potential. Plaintiffs' Ex. 9 ("The Pain Game" Jeopardy" at ABBOTT1006275 (OXY05728), noting the "peaks and valleys" of IR opioids, "could result in addiction.").

6

412

18.  Plaintiffs have presented evidence sufficient for a jury to conclude Abbott equipped sales representatives with an OxyContin Visual Aid. Plaintiffs' Ex. 10 ("24 Hours of Pain Relief THE HARD WAY" at ABBOTT1000378 (OXY00239)). The piece used a log graph depicting blood plasma concentration over time; the result was that the plasma levels looked flatter than they actually appear. The piece also asserted that "100% of all clinical patients were dosed q12h in clinical trials;" *Id.* at ABBOTT1000379; Plaintiffs have presented evidence sufficient for a jury to conclude the foregoing was not quite true. *See* Ex. 11 (July 25, 1995 letter from Reder to Brookoff at 8113405635 (OXY04676), directing clinical investigator to stop dosing OxyContin on eight-hour intervals).

19.  Plaintiffs have presented evidence sufficient for a jury to conclude Abbott told detailers that the slower elimination half-life of OxyContin compared to other IR opioids decreased its abuse potential. *See, e.g.*, Plaintiffs' Ex. 12 ("The Kingdom of Abbott Pain Management Sends the Royal Crusaders its Most Noble and August Greetings!,"at ABBOTT1004435, 439 (OXY05994), stating among other things, "Is Surgeon A concerned about the euphoria Patient B is experiencing from Vicodin? Tell your doctor that, with its longer half-life, OxyContin has fewer such effects."). Plaintiffs have presented evidence sufficient for a jury to conclude no studies or scientific data support this claim, and the person who made the statement, Gerald Eichhorn, Marketing Manager for Abbott Pain Management, concedes he does not know if it is accurate. Plaintiffs' Ex. 3 (Dep. of Eichhorn at 228-229, 241-243).

20.  In another memo sent out by Mr. Eichhorn, among the "ideas for increasing script share," from surgeons, he suggested: "[In] triplicate states attempt to address issue from start of call, by mentioning a new CII drug with less abuse/addiction potential available. Ask surgeon

7

what patients are in moderate to severe pain where they would want to prescribe a better

analgesic (OxyContin)." Plaintiffs' Ex. 13 (September 15, 1999 Letter re: OxyContin "Nifty

Fifty" Conference Call Summary at ABBOTT1004148 (OXY05911). Mr. Eichhorn also

gave sales representatives a "tip" that

> "the sustained analgesia that OxyContin provides helps minimize the risk of
> patient dependence because patients don't have to keep dosing themselves to
> achieve and maintain pain relief more than twice daily."

Ex. 14 ("One-Eyed Jack Jubilation." at ABBOTT1008362 (OXY08682)).

21.    Plaintiffs have presented evidence sufficient for a jury to conclude Abbott taught its sales

representatives that OxyContin was "less habit forming" than other opioids, that "less than

1% become addicted." Plaintiffs' Ex. 15 (Care of the Patient with Pain training materials at

ABBOTT1006198 (OXY05701)).

22.    Plaintiffs have presented evidence sufficient for a jury to conclude that, after the launch of

OxyContin, Abbott determined OxyContin was not being prescribed as much as it wanted

it to be prescribed for post-operative use. Ex. 16 (Memo May, 15, 1997 memo re Post-PCA

study at ABBOTT1005980 (OXY05739), stating, "the use of OxyContin for acute pain has

not been as strong as we hoped.").

23.    The OxyContin label contained a precaution recommending the product not be used during

the first 12-24 hours after surgery. Plaintiffs have presented evidence sufficient for a jury

to conclude Purdue and Abbott pursued post-operative studies aimed at a "supplemental new

drug application" that would remove the restriction on post-operative use. Plaintiffs' Ex. 17

(Phase IV OxyContin Tablets Team Meeting Minutes, February 12, 1999 at 8600242677

(OXY06210)).

8

24.  Plaintiffs have presented evidence sufficient for a jury to conclude Purdue and Abbott pursued the foregoing change even amid growing reports of widespread OxyContin abuse, until the FDA rejected it.

25.  Plaintiffs have presented evidence sufficient for a jury to conclude that early on in their co-promotion venture, Purdue complained Abbott was not doing enough to push OxyContin sales. *See, e.g.*, Plaintiffs' Ex. 18 (July 2, 1997 memo from Friedman to Distribution re Abbott at 7000830688 (OXY09702), noting "in recent months [Purdue has] been pressuring Abbott to increase their activity directed towards surgeons."). Abbott responded to Purdue that they were in fact, increasing their "promotional blitz." *Id.* at 7000830691.

26.  Plaintiffs have presented evidence sufficient for a jury to conclude Abbott sales representatives met and worked with Purdue sales representatives to promote the product. *See, e.g.*, Plaintiffs' Ex. 19 ( Perioperative Specialist Monthly Significant Events Report for Jennifer Little at ABBOTT1000038 (OXY101231), noting she was "meeting with each of my Purdue reps (I have about 6 to work with) and organizing activities that will get us in front of the people that prescribe OxyContin in the hospital."); Ex. 20 (Perioperative Specialist Monthly Significant Events Report for Jennifer Little at ABBOTT1000043 (OXY101235), stating, she's been "working with her Purdue reps religiously"); Ex. 21 (Perioperative Specialist Monthly Significant Events Report for Timothy Maddamma at ABBOTT1000076 (OXY101247), stating he met several times with his "Purdue counterparts and their new DM.  We seem to get along very well."), Ex. 22 (Perioperative Specialist Monthly Significant Events Report for Timothy Maddamma at ABBOTT1000090 (OXY101250), noting he was working on a "joint program with one of my Purdue

9

counterparts on the new Pain guidelines and switching from PCA to (OxyContin)."), Ex. 23

(September 8, 2004, Dep. of L. Rosencrance at 52, 56).

27.    Mr. Rosencrance testified he and Abbott would benefit whether or not his detailing resulted

in more scripts from a doctors:

"Q.    Under follow-up plan where it says continue with Purdue, do you know what
       you meant by that?
A.     Yeah. We tried to schedule something with Billie Jo and I, but she was so
       strong with
       Dr. Ozturk that it never came to fruition.
Q.     Meaning that --
A.     It was unnecessary for me to be tagging along with Billie Jo.
Q.     I understand. Now, if Dr. Ozturk were to prescribe OxyContin® would you
       get any credit for it?
A.     Yes. He was writer of mine, so I would get, I'm sure however they did the
       math between Purdue and Abbott that somehow I was incented to increase his
       script writing. Whether it was my fault or Billie Jo's, I'm sure I benefitted a
       little bit from it."

*Id.* at 65-66.

28.    Plaintiffs have presented evidence that Abbott, like Purdue, offered non-medically related

gifts, including free phone cards as part of its efforts to push OxyContin. Ex. 24 (Cover

letter for enclosed phone cards for ISPM (Institute for Surgical Pain Management)); *see also*

Dep. of Rosencrance at 116 (acknowledging distributing the cards).

29.    Plaintiffs have presented evidence sufficient for a jury to conclude that Purdue and Abbott

provided their sales representatives with the same reprints to give to doctors as part of their

joint effort to push OxyContin sales. Abbott detailers used the piece written by Purdue

speaker, Dawn Marcus. Ex. 25 (Memo re: new OxyContin paincare promotional materials

at ABBOTT1008472 (OXY08687). The Marcus article advocated using long-acting opioids

for the treatment of chronic pain, and stated, without reference, that "While studies report

drug abuse/dependence/addiction is 3 to 19 percent of chronic pain patients, true addiction

10

416

(psychologic dependency) is uncommon with the use of long-acting opioids for chronic

pain." Ex. 26 (Marcus, "Treatment of Nonmalignant Chronic Pain," reprinted from

American Family Physician, Vol. 61, No. 5 (March 2000) at ABBOTT1003561

OXY05883)).

30.     Plaintiffs have presented evidence sufficient for a jury to conclude that, as reports of

OxyContin abuse rose, OxyContin sales for Abbott suffered. Ex. 27 (Perioperative Specialist

Monthly Significant Events Report for Lee Rosencrance at ABBOTT1000063

(OXY101245)).  Plaintiffs have presented evidence that Abbott instructed its detailers how

to handle complaints about abuse, and instructed them not to raise the topic of abuse or

diversion unless the prescriber did, Ex. 28 (Memo, Openings, Probes, and Bridges- Abbott

PainCare Abuse and Diversion Training at ABBOTT1004748 (OXY06021)), and Abbott

directed the sales representative to state that the abuse was not happening in the "true pain

patient"-- although there was no source for this data. *Id.*

31.     Plaintiffs have presented evidence sufficient for a jury to conclude that shows millions of

dollars in earnings from OxyContin sales was made by Abbott from its joint efforts with

Purdue.  Ex. 30.

## CONCLUSIONS

32.     In *Williams v. Precision Coil, Inc.* 194 W. Va. 52, 59, 459 S.E.2d 329, 336 (1995), the

Supreme Court of Appeals held as follows:

> "The circuit court's function at the summary judgment stage is not "to
> weigh the evidence and determine the truth of the matter but to determine
> whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*,
> 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986).
> Consequently, we must draw any permissible inference from the underlying

11

417

facts in the most favorable light to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L.Ed.2d 538, 553 (1986); *Masinter v. WEBCO Co.,* 164 W. Va. 241, 262 S.E.2d 433 (1980); *Andrick,* 187 W. Va. at 708, 421 S.E.2d at 249. In assessing the factual record, we must grant the nonmoving party the benefit of inferences, as "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson,* 477 U.S. at 255, 106 S. Ct. at 2513, 91 L.Ed.2d at 216. Summary judgment should be denied "even where there is no dispute as to the evidentiary facts in the case but only as to the conclusions to be drawn therefrom." *Pierce v. Ford Motor Co.,* 190 F.2d 910, 915 (4th Cir.), *cert. denied,* 342 U.S. 887, 72 S. Ct. 178, 96 L.Ed. 666 (1951). Similarly, when a party can show that demeanor evidence legally could affect the result, summary judgment should be denied."

33.    The Court concludes Plaintiffs have presented evidence sufficient for a jury to find the existence of direct liability by Abbott for misrepresenting OxyContin's attributes to healthcare providers. Although Abbott argues there is no basis for a jury to hold it directly liable, the Court concludes Plaintiffs presented evidence sufficient for a jury to conclude Abbott used the same sales strategies and techniques and deceptive conduct as Purdue. Plaintiffs have submitted evidence showing Abbott representatives were centrally trained to depict OxyContin as less addictive than other marketed opioids, and Abbott representatives made such misrepresentations in West Virginia.

34.    As a matter of law, a defendant may be held to be directly responsible for the wrongful conduct of others which it encouraged, directed, participated in, relied upon, or ratified. *See, e.g. Rose ex rel. Rose v. St Paul Fire and Marine Ins. Co.,* 599 S.E.2d 673, 680 (W. Va. 2004) (finding insurance company directly liable for attorney misconduct if it knowingly encouraged, directed, participated in, relied upon, or ratified that misconduct.).

35.    Plaintiffs have presented evidence sufficient for a jury to conclude that Abbott and Purdue

12

418

joined to create a "synergy," designed to promote OxyContin on the same strategy as that implemented by Purdue. Purdue provided training materials to Abbott, which Abbott slightly modified. *Compare* Ex. 34, ("Chapter 6. OxyContin Product Knowledge" at 8600209134, 139, 174 (OXY01780), asserting formulation may lower OxyContin's abuse potential, and that the label "reminds" physicians that "addiction is uncommon,") with Ex. 3 (OxyContin Tablets Product Knowledge - Module 3 at ABBOTT1005653, 48, 56 (OXY05791), stating same.). Plaintiffs presented evidence that Abbott's "King of Pain" taught his "royal crusaders" pseudoscience about OxyContin "minimizing the risks of dependence," and lowering euphoria, Ex. 14 ("One-Eyed Jack Jubilation" at ABBOTT1008362 (OXY08682). Plaintiffs point to evidence that Abbott had no basis to make these statements. Ex. 3 (Dep. of Eichhorn at 228-229, 241-243).

36.   The Court concludes Plaintiffs have presented evidence sufficient for a jury to conclude that Abbott engaged in the same type of conduct of Purdue in West Virginia: that is, that a jury could conclude Abbott made unsubstantiated assertions about the abuse and addiction potential of OxyContin. Ex. 23 at 124-25, 130-32, 65-66; Ex. 28. Therefore, as a matter of law, the Court concludes a verdict against Purdue may subject Abbott to joint and several liability.

37.   The Court concludes Plaintiffs presented evidence sufficient for a jury to conclude Abbott and Purdue exchanged property, skill, and expertise in promoting OxyContin, and Purdue gave Abbott a percentage of profits, creating a joint venture.

38.   The Court concludes that, under West Virginia law, whether or not Abbott and Purdue engaged in a joint venture is a factual question to be decided by the jury.

13

419

39. The Court concludes, as a matter of law, the jury may consider the actions of Abbott and Purdue, and is not limited to considering only a statement disavowing a joint venture defendants included in their agreement, when determining whether a joint venture existed.

40. Plaintiffs presented evidence sufficient for a jury to conclude that their expert, Mr. Selby, has reviewed sufficient documents and has the expertise necessary to express his opinion that Abbott and Purdue engaged in a joint venture. Therefore, because the evidence of record is sufficient for a jury to conclude a joint venture existed, Abbott's motion for summary judgment must be denied.

41. The definition of a joint venture was articulated by the West Virginia Supreme Court in Syllabus Point 2 of *Price v. Halstead*, 177 W. Va. 592, 355 S.E.2d 380 (1987):

> "A joint venture or, as it is sometimes referred to, a joint adventure, is an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge. It arises out of a contractual relationship between the parties. The contract may be oral or written, express or implied."

42. The Court concludes Plaintiffs presented evidence sufficient for a jury to conclude that Abbott and Purdue meet the definition of joint venture. The evidence supporting this conclusion includes the following: pursuant to the "Co-Promotion Agreement," Abbott and Purdue decided to combine their "property, money, effects, skill, and knowledge" to "carry out a single business enterprise for profit," which, in this case, was the co-promotion of the sales of OxyContin. The co-promotion agreement paid Abbott an inaptly named "commission" which was really just a percentage of profits Purdue made off of all sales to "Abbott Physicians" *plus* a "multiplier" applied to prescription data for those physicians. Ex. 2 ("Co-Promotion Agreement at ABBOTT1002859, 861, 872, 875, 904). The agreement

14

420

required the parties to meet to discuss promotional materials. *Id.* at ABBOTT1002865. The

parties set up quarterly "business reviews," where, according to Eichhorn, the parties pooled

their skill, knowledge and expertise to track trends and "brainstorm" on ideas to support

OxyContin promotion. Ex. 3 (Dep. of Eichhorn at 24-29.) Consistent with the co-promotion

agreement, Abbott assisted Purdue in conducting clinical trials to support promoting

OxyContin for post-operative pain.   Agreement at ABBOTT1002880, *see also* Ex. 4

(November 13, 1997 Memo to sales force re: Update on the Relaunch of OxyContin

Post-PCA Study at ABBOTT1005921 (OXY05741). Purdue agreed to cover Abbott's legal

bills, Agreement at ABBOTT1002891, and has.  Moreover, Purdue agreed to pay Abbott

residual payments even after the termination of the agreement, as a means of recognizing the

"goodwill" created by Abbott's efforts, even though Abbott ceased actively promoting

OxyContin.  Dep. of Eichhorn at 99.  Abbott's compensation does not resemble a

"commission" like that made by "independent contractors" or salesmen: such persons usually

do not receive compensation for residual goodwill.  Also, Abbott and Purdue sales force

members worked together to arrange luncheons, coordinate calls, and discuss detailing West

Virginia physicians. See Ex.'s 19-22 (notes of Abbott sales representatives), discussed,

*supra*. The evidence shows the joint venture between Abbott and Purdue "arises out of a

contractual relationship," as evidenced by the "Co-Promotion Agreement."

43.    Abbott argues this Court is bound by the "choice of law" provision in the "Co-Promotion

Agreement," that provides that the "laws of the State of Connecticut shall govern the

interpretation, performance and enforcement of this Agreement." Ex. 2 (Agreement at

ABBOTT1002902.)   The Court concludes that, if the present case involved a lawsuit

15

between Abbott and Purdue, then a contractual dispute may be governed by the law of Connecticut and may be bound by that choice of law provision. However, Plaintiffs are not parties to that contract, Plaintiffs have not asserted any claim based upon that contract, and Plaintiffs never agreed to be bound by the law of Connecticut in their claims against Abbott and Purdue.

44.     As a matter of law, the Court concludes choice of law provisions in contracts are not applicable to persons who are not parties to the contract, particularly where the claims asserted do not arise from the contract. *See U.S. Metalsource Corp. v. W & B Associates, Inc.*, 1997 WL 159595 (S.D.N.Y. 1997); *Anglo American Insurance Group v. CalFed Inc.*, 940 F. Supp. 554 (S.D.N.Y. 1996); *American Specialty Systems, Inc. v. Chicago Metallic Corp*, 2002 WL 406965 (N.D. Ill. 2002); *Maremont Corp. v. Cheshire*, 288 Ill. App.3d 721, 681 N.E.2d 548, 224 Ill. Dec. 233 (1997). The Court concludes Plaintiffs' joint venture claim is based upon West Virginia law, and the "choice of law" provisions of the co-promotion agreement does not apply to Plaintiffs.

45.     Abbott asserts Plaintiffs have failed to state a claim for joint venture under West Virginia law because there is no written agreement to share profits. Plaintiffs presented evidence sufficient for a jury to conclude that Abbott received a portion of "net sales," and "residual payments" based upon a percentage of net sales after conclusion of the agreement. The Court concludes the lack of a specific agreement for dividing profits between joint venturers is not dispositive of Plaintiffs' claim. In *Sipple v. Starr*, 205 W. Va. 717, 520 S.E.2d 884 (1999), the Supreme Court of Appeals held:

"The evidence suggests that PPI provided property, in the form of

16

422

signs, gas pumps, and associated equipment, as well as its skill and knowledge in the sale of gasoline, to the operation of the Rocket Mart. Starr, of course, provided the location, the store, and the personnel necessary to make sales of gasoline to the public. Although Starr did not pay directly to PPI some fractional share of every sale of beer or groceries, PPI still could be said to have profited from those sales. It is possible that a jury could find that, the more customers attracted to the Rocket Mart to buy non-gas products, the more potential customers for PPI gasoline, and the converse as well. We feel a jury should be able to consider whether the arrangement produced mutual benefit for both Starr and PPI."

46. Plaintiffs have submitted evidence sufficient for a jury to conclude there was an agreement that Purdue would share 25% or 20% of all "net sales" made off from doctors Abbott historically detailed, and who Abbott would continue to support. From this evidence, a jury reasonably may determine that the formula by which Abbott was compensated constituted a very detailed written agreement dividing the profits. Plaintiffs presented evidence sufficient for a jury to conclude that both Abbott and Purdue benefitted from the sales of OxyContin, and Abbott received a higher share of "net sales" depending upon the volume of sales. Therefore, a jury should be permitted to consider these facts, along with the other relevant evidence, and decide whether Abbott and Purdue engaged in a joint venture to promote OxyContin.

47. The Court concludes third parties who seek to recover under a joint venture theory are not bound by the purported intent of the joint venturers to be independent contractors. The Court concludes, as a matter of law, that it is the actions of the joint venturers, and not their purported intent, that informs a jury's decision of whether or not a joint venture existed.

48. In *George v. Capital South Mortgage Investments, Inc.*, 265 Kan. 431, 454, 961 S.E.2d 32, 47 (1998), the Kansas Supreme Court approved the following joint venture instruction:

17

423

"The intent to form such a (joint venture) relationship must exist; a joint venture cannot arise by operation of law. However, as to third persons, the legal, and not the actual, intent of the parties controls, and the parties may be estopped in favor of third persons from denying that they are joint venturers, even though they never intended to become such."

See also *King v. Modern Music Co.*, 22 P.3d 947, 956 (Okla. Civ. App. 2001)("As to third parties, it is the intent to do those things which constitutes a joint venture that usually determines whether the relation exists."); *Martin v. Chapel, Wilkinson, Riggs, and Abney*, 637 P.2d 81 (Okla. 1981)("As to third parties, it is the intent to do those things which constitutes a joint venture that usually determines whether the relation exists."); *Bolivar v. R & H Oil and Gas, Inc.*, 789 F. Supp. 1374, 1379 (S.D. Miss. 1991) ("[A]s to third persons the objective manifestations of the putative joint venturers govern in determining whether a joint venture in fact exists."); *Shell Oil Co. v. Prestidge*, 249 F.2d 413, 417 (9th Cir. 1957)([A]s to third persons, it is the legal and not the actual intent that controls."); *Hill v. Zimmerer*, 839 P.2d 977, 982 (Wyo. 1992)("As to third persons, however, the law will impose joint adventurer status upon individuals or entities conducting their affairs as though they are joint adventurers, regardless of their actual intent."); *April Enterprises, Inc. v. KTTV*, 147 Cal. App.3d 805, 820, 195 Cal. Rptr. 421, 428 (1983) ("Respondents' next argument, that the contract's labeling of appellant as an independent contractor forecloses a finding of joint venture, fails since the conduct of the parties may create a joint venture despite an express declaration to the contrary."); 46 Am. Jur. 2d *Joint Ventures* §13 (1994).

49.    In *Bowers v. Wurzburg*, 207 W. Va. 28, 37, 528 S.E.2d 475, 484 (1999), the West Virginia Supreme Court explained:

"[W]e note that the question of whether or not a joint venture exists is to be

18

424

> answered by the jury. "A plaintiff has a right to a jury trial upon the factual issues to determine whether a joint venture existed." *Lasry v. Lederman,* 147 Cal. App.2d 480, 305 P.2d 663 (1957); "Whether a relation of joint venture exists is primarily a question of fact for the trial court to determine from the facts and the inferences to be drawn therefrom." *Rhodes v. Sunshine Mining Co.,* 113 Idaho 162, 742 P.2d 417 (1987); *see also, Bahrs v. RMBR Wheels, Inc.,* 6 Neb. App. 354, 574 N.W.2d 524 (1998); *Johnco, Inc. v. Jameson Interests,* 741 So.2d 867 (La. App. 1999)."

*See also Armor v. Lantz,* 207 W. Va. 672, 678, 535 S.E.2d 737, 743 (2000) ("Whether or not a joint venture exists is normally a question to be answered by the trier of fact."); *Harmon v. Elkay Mining Co.,* 201 W. Va. 747, 500 S.E.2d 860 (1997) ( holding summary judgment on joint venture claim involving two trucking companies reversed); *Thomas v. Gray Lumber Co.,* 199 W. Va. 556, 486 S.E.2d 142 (1997) (reversing summary judgment reversed because factual issues existed on joint venture claim involving various individuals and companies involved in house sale). The Court concludes the evidence of the compensation plan agreed to between Abbott and Purdue is sufficiently consistent with *Armor* and the case law cited therein on the need for a joint venture to share in the profits of the business enterprise.

50.    The Court concludes Plaintiffs have developed sufficient evidence of Defendants' actions for a jury to decide whether or not Abbott and Purdue actually engaged in a joint venture. The foregoing is true regardless of whether or not a joint venture was Defendants' intent or the language of Article 7 of the Co-Promotion Agreement.

51.    Plaintiffs presented evidence that Mr. Selby, their expert, is an experienced certified public accountant who has extensive litigation experience providing expert economic testimony in a wide variety of areas, Ex. 35 (Dep. of D. Selby), including experience with business organizations of all types and their attributes. The Court concludes that defining a joint

19

venture is well within the range of Mr. Selby's experience. *Id.* at 317.

52. Plaintiffs have presented evidence sufficient for a jury to conclude their expert, Mr. Selby, reviewed relevant documents and depositions, extensive documentation and facts in forming his opinion that a joint venture between Abbott and Purdue existed. Ex. 36. (Exhibit 20 to Selby Deposition). Mr. Selby found that Abbott and Purdue were "sharing the results of sales. They are sharing cost functions. They are sharing research. They are sharing methodologies." Selby Dep. at 413. Based upon his review, Mr. Selby expressed his opinion that, "it is reasonable to conclude that it was a joint venture." *Id.* at 312. The Court concludes that based upon his educational and professional background and experience, Mr. Selby is competent to review these materials, to identify the attributes of the relationship between Abbott and Purdue that are consistent with a joint venture, and to express opinions based upon these facts.

53. The Court further concludes that Mr. Selby's expert testimony may "assist the trier of fact to understand the evidence or to determine a fact in issue", and that Mr. Selby is qualified to provide expert testimony on whether or not Abbott and Purdue engaged in a joint venture. Rule 702, *W.Va.R.Evid.*

54. The Court concludes, as a matter of law, that the determination and calculation of damages is an issue for the trier of fact.

55. Abbott argues Plaintiffs' damages are not sufficiently certain and definite. The Supreme Court of Appeals has held trial courts may not usurp the function of the jury by weighing the evidence and rejecting plaintiffs' claims of damage on summary judgment. *Taylor v. Culloden Public Service District,* 214 W. Va. 639, 591 S.E.2d 197, 207-208 (2003) (reversing

20

426

summary judgment in a public nuisance case).

56.    The Court concludes that, under the evidence submitted by Plaintiffs, Abbott's assertion of the "Learned Intermediary" doctrine is unavailing. Abbott cites *Pumphrey v. C.R. Bard, Inc.* 906 F. Supp. 334, 338 (N.D. W. Va. 1995), for the proposition that West Virginia "recognizes the physician's role as the 'learned intermediary.'" The Court finds *Pumphrey* inapposite because the issue there was a claim for failure to warn, a claim different and distinguishable from the Plaintiffs' claims in the case at bar.

57.    The Court concludes also that even assuming, *arguendo,* that West Virginia would adopt the learned intermediary doctrine, that doctrine does not apply to the case at bar. The learned intermediary doctrine is "the principle that a prescription-drug manufacturer fulfills its duty to warn of a drug's potentially harmful effects by informing the prescribing physician, rather than the end user, of those effects." Black's Law Dictionary, 898 (7th ed. 1999). The evidence submitted by Plaintiffs shows they are neither end users of the product nor are they asserting that the damages in this case arise from failure to warn the end users of potentially harmful effects. Rather, Plaintiffs claim Defendants engaged in a misleading and deceptive marketing strategy designed and implemented to create and develop a market for OxyContin. Plaintiffs have submitted evidence sufficient for a jury to conclude that, as a result of the Defendants' actions, Plaintiffs incurred substantial cost for the direct payment of OxyContin prescriptions as well as for the societal damages arising from a continuing public nuisance.

58.    Abbott asserts Plaintiffs failed to mitigate their damages. The Court finds, as a matter of law, that mitigation of damages ordinarily involves genuine issues of material fact, rendering this defense an inappropriate issue to be resolved by summary judgment. The issue of mitigation of damages "is a classic jury question." *Seymour v. Pendleton Community Care,*

21

427

209 W. Va. 468, 475, 549 S.E.2d 662, 669 (2001) (Starcher, J., concurring). Abbott has not

cited a West Virginia case where mitigation of damages was resolved by summary judgment.

59.    The Court finds that, as a general rule, a party must

> "use reasonable care to mitigate the damages; but such person is only
> required to protect himself from the injurious consequence of the wrongful
> act by the exercise of ordinary effort and care and moderate expense."

*Oresta v. Romano Bros., Inc.*, 137 W. Va. 633, 650, 73 S.E.2d 622, 632 (1952).

60.    The Court concludes, as a matter of law, the burden of proving failure to mitigate damages

is on Abbot and Purdue. Plaintiffs contend as soon as the problems with OxyContin became

known to Plaintiffs, procedures were implemented to mitigate their damages. Plaintiffs have

presented evidence sufficient for a jury to conclude Purdue tried to prevent the

implementation of such procedures. Thus, the Court concludes Plaintiffs have presented

evidence sufficient for a jury to conclude that they did mitigate their damages

61.    The Court concludes from an application of the evidence submitted by Plaintiffs to the law

of joint venture, that the evidence is sufficient for a jury to conclude both venturers are liable

for the damage caused by either, *Armor, supra*, 207 W. Va. at 678, 535 S.E.2d at 743.

62.    Plaintiffs also presented evidence sufficient for a jury to conclude that Purdue and Abbott

were direct joint tortfeasors in implementing the deceptive marketing strategy for OxyContin

in West Virginia and elsewhere, and accordingly the Court concludes, as a matter of law,

defendants are liable under the rules of joint liability.

63.    The Court concludes Abbott failed to meet its burden for summary judgment regarding

Plaintiffs' consumer protection and public nuisance claims for the same reasons, stated in

this Court's Orders Denying Purdue's Motions to Dismiss and for Summary Judgment

Purdue's on those claims.

22

428

64.    For all of the foregoing reasons, the Court concludes the evidence submitted by Plaintiffs is

sufficient to defeat Abbott's Motion for Summary Judgment, and therefore the Court

**ORDERS** Abbott's Motion for Summary Judgment be **DENIED**.

The Clerk is directed to send certified copies of this Order to counsel of record.

ENTERED: November 5th 2004

Hon. Booker T. Stephens, Chief Judge

A TRUE COPY TESTE
MICHAEL D. BROOKS CLERK
BY
DEPUTY CLERK

23

429