## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| NEW MEXICO UNITED FOOD AND COMMERCIAL WORKERS UNION'S AND EMPLOYERS' HEALTH AND WELFARE TRUST FUND, on behalf of itself and all others similarly situated, | ** ** ** ** ** | |
| Plaintiff, | ** | **Civil Action No. 07-cv-6916-JGK** |
| | ** | |
| v. | ** | |
| | ** | |
| PURDUE PHARMA L.P., et al., | ** | |
| | ** | |
| Defendants. | ** | |

## THE PURDUE DEFENDANTS' REPLY BRIEF
## IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE PLEADINGS

Donald I Strauber
Mary T. Yelenick
Phoebe A. Wilkinson
Gretchen N. Werwaiss
Chadbourne & Parke LLP
30 Rockefeller Plaza
New York, NY  10112
Telephone: (212) 408-5100
Facsimile: (212) 541-5369

*COUNSEL FOR*
*THE PURDUE DEFENDANTS*

Chilton D. Varner
Stephen B. Devereaux
King & Spalding LLP
1180 Peachtree Street, NE
Atlanta, GA  30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

Patrick S. Davies
Joshua D. Greenberg
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Tel: (202) 662-6000
Fax: (202) 662-6291

*OF COUNSEL FOR*
*THE PURDUE DEFENDANTS*

<u>**TABLE OF CONTENTS**</u>

INTRODUCTION ................................................................................................. 1

ARGUMENT ...................................................................................................... 1

    I.    Plaintiff Has Not Met Its Burden Under Article III. ............................... 1

          A.    Plaintiff Cannot Establish an Injury-in-Fact Because it Pays for OxyContin on the Same Terms as Before It Learned of the Alleged Misrepresentations. ................................................................... 2

          B.    Plaintiff Cannot Establish Causation Based on Speculation and Statistics. 4

    II.    Plaintiff's Claims are Barred by the Statute of Limitations. .................................. 7

    III.    Plaintiff's RICO Claims Cannot Proceed. ............................................. 9

          A.    Plaintiff Wrongly Attempts to Remedy Its Failure to Allege a Direct Injury or Reliance by Distorting the Complaint and Desiano ...................... 9

          B.    Plaintiff Wrongly Attempts to Manufacture a RICO Enterprise By Distorting the Case Law and Rewriting Its Conclusory Allegations. ........ 11

    IV.    Plaintiff's State Law Claims Fail. ..................................................... 12

CONCLUSION ................................................................................................. 15

# TABLE OF AUTHORITIES

**CASES**

*Achtman v. Kirby, McInerney & Squire, LLP*,
   464 F.3d 328, 337 (2d Cir. 2006)............................................................................10

*American Pipe & Construction Co. v. Utah*,
   414 U.S. 538 (1974)............................................................................................7-8

*Anza v. Ideal Steel Corp.*,
   126 S. Ct. 1991 (2006)...................................................................................... 10-11

*Barela v. Showa Denko K.K.*,
   No. CIV. 93-1469, 1996 WL 316544, *2-4 (D.N.M. Feb. 28, 1996).......................7

*Central States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco
   Managed Care, L.L.C.*,
   433 F.3d 181, 198 (2d Cir. 2005).............................................................................1

*Cimino v. Raymark Indus., Inc.*,
   151 F.3d 297 (5th Cir. 1998) ...................................................................................7

*DaimlerChrysler Corp. v. Cuno*,
   126 S. Ct. 1854, 1864 (2006)...................................................................................1

*DeFalco v. Bernas*,
   244 F.3d 286, 306 (2d Cir. 2001)...........................................................................12

*Desiano v. Warner-Lambert Co.*,
   326 F.3d 339, 349 n.9 (2d Cir. 2003)...............................................................*Passim*

*Desiano v. Warner-Lambert Co.*,
   467 F.3d 85, 97 n.9 (2d Cir. 2006)..........................................................................13

*Dusek v. Pfizer, Inc.*,
   No. Civ.A H-02-3559, 2004 WL 2191804 (S.D. Tex. Feb. 20 2004) .....................13

*First Capital Asset Management, Inc. v. Satinwood*,
   385 F.3d 159, 175 (2d Cir. 2004)...................................................................... 11-12

*Foister v. Purdue Pharma, L.P.*,
   295 F. Supp. 2d 693, 705 (E.D. Ky. 2003) ..............................................................6

*Garcia v. Wyeth-Ayerst Labs.*,
   385 F.3d 961, 963-64 (6th Cir. 2004) ....................................................................13

*Hunter v. Am. Gen. Life & Accident Ins. Co.*,
   384 F. Supp. 2d 888 (D.S.C. 2005)........................................................................8

*In re Neurontin Marketing and Sales Practices Litigation*,
   433 F. Supp. 2d 172, 185-86 (D. Mass 2006)......................................................4

*In re Neurontin Mktg. & Sale Practices Litig.*,
   244 F.R.D. 89, 114 (D. Mass. 2007).....................................................................5

*In re Vioxx Prods. Liab. Litig.*,
   522 F. Supp. 2d 799, 809 (E.D. La. 2007)............................................................8

*In re Westinghouse Secs. Litig.*,
   982 F. Supp. 1031, 1034 (W.D. Pa. 1997)............................................................8

*In re Zyprexa Prod. Liab. Litig.*,
   493 F. Supp. 2d 571, 575 (E.D.N.Y. 2007) .........................................................4

*Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*,
   929 A.2d 1076, 1088 (N.J. 2007)..........................................................................5

*Kourkoumelis v. Arnel*,
   655 N.Y.S.2d 653, 654 (N.Y. App. Div. 1997) ...................................................8

*Lerner v. Fleet Bank, N.A.*,
   459 F.3d 273, 290 (2d Cir. 2006)........................................................................10

*Lohman v. Daimler Chrysler Corp.*,
   166 P.3d 1091, 1097-98 (N.M. Ct. App. 2007) .............................................14-15

*Luce v. Edelstein*,
   802 F.2d 49, 54 (2d Cir. 1986)............................................................................12

*Miller v. City of N.Y.*,
   No. 05 CV 6024(SJ)(RML), 2007 WL 1062505, at *4 (E.D.N.Y. Mar. 30, 2007)................12

*Nanodetex Corp. v. Sandia Corp.*,
   No. 05-1041, 2007 WL 4356154 (D.N.M. July 26, 2007) ...................................14

*New Mexico Fund v. Purdue*,
   No. 06CV0354 (S.D.N.Y. Jan. 17, 2006) .............................................................8

*Pennsylvania Employees Benefit Trust Fund v. Zeneca, Inc.*,
   499 F.3d 239 (3d Cir. 2007)...........................................................................12-13

*Portwood v. Ford Motor Co.*,
   701 N.E.2d 1102, 1103-05 (Ill. 1998)...................................................................7

*Prohias v. Pfizer, Inc.*,
    485 F. Supp. 2d 1329, 1336 (S.D. Fla. 2007) ....................................................... 2-3

*Prohias v. Pfizer, Inc.*,
    490 F. Supp. 2d 1228, 1232 n.3 (S.D. Fla. 2007) .................................................. 3-4

*Ravitch v. Pricewaterhouse*,
    793 A.2d 939, 945 (Pa. Ct. App. 2002) ................................................................7

*Richmond v. Nationwide Cassel L.P.*,
    52 F.3d 640, 646 (7th Cir. 1995) .........................................................................11

*Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*,
    113 P.3d 347 (N.M. App. 2005) ..........................................................................14

*Shah v. Meeker*,
    435 F.3d 244 (2d Cir. 2006)...................................................................................9

*Thompson v. County of Franklin*,
    15 F.3d 245, 246, 249 (2d Cir. 1994).....................................................................1

*Thornton v. State Farm Mut. Auto. Ins. Co.*,
    No. 1:06-cv-00018, 2006 WL 3359448, at *7-8 (N.D. Ohio Nov. 17, 2006) ..........7

*Wexner v. First Manhattan Co.*,
    902 F.2d 169, 172 (2d Cir. 1990)........................................................................11

**STATUTES**

N.M. Stat Ann. § 37-1-14 ...........................................................................................8

N.M. Stat. Ann. § 57-12-4 ..........................................................................................13

## INTRODUCTION

A recurrent theme of Plaintiff's opposition is that it has somehow satisfied its pleading burden merely because this a "guilty plea case." (Opp. at 1.) Indeed, Plaintiff claims that it has standing (*id.* at 5 n.3); that its claims are not tolled (*id.* at 31); that its claims are not preempted (*id.* at 28); and that it adequately pled its causes of action (*id.* at 11, 19, 24) -- all by virtue of the plea agreement. As shown below, Plaintiff's burden is not so easily met.

## ARGUMENT

### I.    Plaintiff Has Not Met Its Burden Under Article III.

Because Plaintiff is "the party invoking federal jurisdiction," it "bears the burden of establishing that [it] has suffered a concrete injury" caused by "'the challenged action of the defendant[s], and not . . . the result [of] the independent action of some third part[ies] not before the court.'" *Central States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Further, on "a motion to dismiss," "[s]tanding . . . 'cannot be inferred argumentatively from averments in the pleadings . . . but rather must affirmatively appear'" in the pleadings. *Thompson v. County of Franklin*, 15 F.3d 245, 246, 249 (2d Cir. 1994) (quoting *248 FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)). Thus, Plaintiff "cannot rely on . . . '[s]peculative inferences . . . to connect [its alleged] injury to the challenged actions of [Purdue].'" *DaimlerChrysler Corp. v. Cuno*, 126 S. Ct. 1854, 1864 (2006) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976)). Application of these principles makes clear that Plaintiff has failed to carry its burden on either the injury or causation element, and therefore lacks Article III standing.

### A.    Plaintiff Cannot Establish an Injury-in-Fact Because it Pays for OxyContin on the Same Terms as Before It Learned of the Alleged Misrepresentations.

Plaintiff concedes that it "continue[s] to pay for" OxyContin "to the present." (Compl. ¶¶ 3, 77.) By making no allegation (or argument) to the contrary, Plaintiff further concedes that it has *not* "changed the medication's formulary status or otherwise discouraged its members from using the medication since learning the 'truth' about the alleged misrepresentations." (Mem. at 2.) These concessions belie Plaintiff's assertion of a "factual" dispute (Opp. at 3) and are fatal to its attempt to establish a cognizable injury-in-fact. That Plaintiff has not changed its policy for reimbursing OxyContin prescriptions shows that none of the alleged misrepresentations had any effect on it. Because Plaintiff "continue[s] to pay for [OxyContin] with knowledge as to its alleged limitations," it "cannot claim to have suffered any damage from the allegedly misleading statements." *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329, 1336 (S.D. Fla. 2007).

Acknowledging that its claims are based on the assertion that it "paid a much higher price" for "many more prescriptions" of OxyContin as a result of the alleged misrepresentations, Plaintiff suggests that *Desiano* "held" that such an assertion "constitutes an injury-in-fact" under the circumstances here. (Opp. at 2-3.) But unlike Plaintiff, the TPPs in *Desiano* alleged that:

- "had they not been deceived" by the alleged misrepresentations, "they would have taken steps so as not to purchase [the drug] at the prices set by [the manufacturer]," *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 349 n.9 (2d Cir. 2003);

- such steps would have included "set[ting] a high[er] copay obligation" for the drug, "otherwise dissuad[ing] doctors from prescribing it," or even "exclud[ing] it altogether from their [formularies]," *id.*; and

- "they would not have bought Defendants' product, rather than available cheaper alternatives, had they not been misled by Defendants' misrepresentations," *id.* at 349.

Plaintiff does not make *any* similar allegation here.

Plaintiff incorrectly insists that "the Complaint contains allegations that cheaper pain medications were available." (Opp. at 5 n.3.) But none of the paragraphs it cites and no other

part of the Complaint make *any* allegation as to the *price* of another drug – let alone that another drug was "cheaper" than OxyContin or that Plaintiff would have paid for another drug but for the alleged misrepresentations. Accordingly, this is not a case where the TPP plaintiff "need not speculate as to the price of the good at issue in a different world, but rather can simply look to the price of the substitute good." *Prohias*, 485 F. Supp. 2d at 1338 n.3.

Unlike *Desiano*, Plaintiff's claims boil down to an assertion that it paid "artificially high costs" for OxyContin prescriptions due to the alleged misrepresentations. (Compl. ¶ 75; *see also* Compl. ¶ 38 (Purdue's alleged misrepresentations enabled it to "charge more for OxyContin than it otherwise would have been able to charge").) This assertion is just like the "price inflation" claim rejected in the *Prohias* opinions cited by Purdue. (Mem. at 6-7.) The Complaint thus belies Plaintiff's attempt to disclaim reliance on a "fraud-on-the-market" theory. (Opp. at 8.)

Plaintiff erroneously asserts that the *Prohias* court "allowed a TPP to pursue an over-payment claim, even though a 'price-inflation' claim." (Opp. at 6.) To the contrary, the *Prohias* court held that "[a TPP] cannot seek recovery of any alleged overpayments based on a 'price inflation' theory," for the same reasons it had previously held that individual consumers cannot do so. *Prohias v. Pfizer, Inc.*, 490 F. Supp. 2d 1228, 1232 n.3 (S.D. Fla. 2007). The *Prohias* court allowed a TPP's claim to proceed only because, as in *Desiano*, the TPP "allege[d] that if not for [the manufacturer's] deceptive advertising campaign, it would have excluded [the drug] from approved formulary schedules, set a lower value in the formulary, or set a higher co-pay obligation." *Id.* at 1232. Given those allegations, the TPP's "control over the price it pays by setting co-payments and formulary values" distinguished its overpayment claim from "an

ordinary consumer's claim." *Id.* at 1232 n.3. Because Plaintiff makes no such allegation here, its "price inflation" claim cannot be distinguished from one brought by an individual consumer.[1]

Nor should this Court follow Judge Weinstein's unique opinion allowing overpayment claims to proceed where "there have been no changes in [the TPPs'] formularies which continue to include [the drug] without restrictions." *In re Zyprexa Prod. Liab. Litig.*, 493 F. Supp. 2d 571, 575 (E.D.N.Y. 2007).[2] Judge Weinstein's reasoning gives an unwarranted windfall to TPPs like Plaintiff that seek to recover allegedly fraud-induced "overpayments" even though they *knowingly choose to continue making the same "overpayments"* after learning the "truth."[3]

**B.    Plaintiff Cannot Establish Causation Based on Speculation and Statistics.**

Plaintiff cannot establish causation merely by noting that it has alleged that Defendants made misrepresentations to "'the medical community' and 'members of the public' . . . includ[ing] Plaintiff and the Class" and that "Defendants directed their unlawful marketing scheme to TPPs." (Opp. at 7 (quoting Compl. ¶¶ 33, 36).) These allegations involve misrepresentations by sales representatives *at doctors' offices and pharmacies* and in a website purportedly *aimed at consumers* (Compl. ¶¶ 33, 36), none of which can plausibly be inferred to have reached Plaintiff.

---

[1] Plaintiff also errs in claiming support from *In re Neurontin Marketing and Sales Practices Litigation*, 433 F. Supp. 2d 172, 185-86 (D. Mass 2006). (Opp. at 5.) That opinion *did not even consider* whether the TPPs in that case continued giving the drug at issue the same formulary status that they gave it before the alleged misrepresentations came to light.

[2] Judge Weinstein enabled the TPPs' claims to proceed without considering whether they were based on a "fraud on the market" theory. *Zyprexa*, 493 F. Supp. 2d at 576-77.

[3] Similarly, Plaintiff's suggestion that it has standing to seek recovery of payments for prescriptions that were neither "indicated" nor "efficacious" lacks merit. (Opp. at 2, 6.) Since learning of the alleged misrepresentations, Plaintiff has done nothing to ensure that it pays only for prescriptions that are indicated and effective. It therefore cannot claim damages as to any previous prescriptions that were neither.

Nor can Plaintiff establish causation "by reliance on economic data" or "statistical inference." (Opp. at 7-8.) To begin with, that Plaintiff argues it can prove causation in this way further confirms that it is proceeding under a "fraud-on-the-market" theory. The same counsel representing Plaintiff here unsuccessfully made the same argument before the New Jersey Supreme Court, which concluded that the TPPs attempt to prove damages via econometric analysis there "amount[ed] to a fraud-on-the-market theory." *Int'l Union of Operating Eng'rs Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 929 A.2d 1076, 1088 (N.J. 2007). Here, moreover, Plaintiff *has continued its preexisting policy for reimbursing OxyContin prescriptions* since learning that the medication is purportedly "no more effective, but considerably more dangerous and expensive, than [other] opioids." (Opp. at 9.) The fact that the alleged misrepresentations had no effect on the payments Plaintiff has deemed appropriate itself should put to rest any suggestion that statistics can show that misstatements caused Plaintiff to pay for OxyContin.[4]

Further, if the mere promise of a future statistical analysis were enough to survive a motion to dismiss, *any* "overpayment" claim by a TPP could get past the pleadings stage. The Court may reject Plaintiff's reliance on statistics, however, without having to decide whether econometrics is a legitimate proxy for causation in the more common cases where the alleged overpayments may arguably be calculated simply based on the discrete "off-label" conditions for which the prescriptions were written (*e.g.*, headaches). *See, e.g., In re Neurontin Mktg. & Sale Practices Litig.*, 244 F.R.D. 89, 114 (D. Mass. 2007). Because OxyContin is a uniquely effective medication that happens also to be subject to abuse and diversion and because Plaintiff does not

---

[4] Like its injury-in-fact argument, Plaintiff's causation argument wrongly asserts that, but for the alleged misrepresentations, "some OxyContin scripts would have been written for equally effective, less expensive medications." (Opp. at 9.) As explained above, *see supra* at 2-3, the Complaint does not support this assertion.

contend that it was written for easily identifiable "off-label" indications, the purported chain of causation here contains additional, complex variables that defy statistical analysis.

For *each* prescription as to which it seeks to recover an alleged overpayment, Plaintiff must establish that: (1) a sales representative made a misrepresentation to the doctor who wrote the prescription; (2) the doctor wrote the prescription for one of Plaintiff's members in reliance on that misrepresentation (as opposed to the facts that OxyContin is designed to provide pain relief for 12 hours or that it contains no acetaminophen); (3) but for the misrepresentation, the doctor would **not** have prescribed OxyContin; and (4) Plaintiff reimbursed the prescription in question. *But that is just the beginning.* Plaintiff also must account for the possibilities that the member deceived the doctor or altered the prescription, that the doctor was engaged in criminal conduct, or that the doctor departed from the standard of care in writing the prescription, any of which would break the chain of causation. *See, e.g., Foister v. Purdue Pharma, L.P.*, 295 F. Supp. 2d 693, 705 (E.D. Ky. 2003) ("the seven plaintiffs that procured and used OxyContin illegally may not recover in this action"). Further, Plaintiff must show that the misrepresentation did not *prevent* the doctor from prescribing an *equally or more expensive* medication (*e.g.*, Duragesic) or treatment (*e.g.*, surgery). Finally, Plaintiff must show that any prescriptions induced by the alleged misrepresentations had the aggregate effect of "artificially inflating" the price for which it reimbursed OxyContin prescriptions. To make that showing, Plaintiff would have to rule out the many other plausible factors affecting the medication's price (*e.g.*, competitive pressure, negotiated discounts/rebates, supply, legitimate demand, etc.).

In sum, the chain of causation between the alleged misconduct and any "harm" suffered by Plaintiff is too fragmented and filled with potential intervening causes to satisfy Article III.[5]

---

[5] Moreover, any econometric "methodology" purporting to establish causation here would be irreconcilable with the rules of evidence and Purdue's due process right to show, on a prescription-by-

## II.    Plaintiff's Claims are Barred by the Statute of Limitations.

Plaintiff incorrectly argues that *Allied Services*, a putative nationwide class action complaint filed in Illinois state court in Madison County, Illinois, tolls the statute of limitations for each of its claims.  (Opp. at 33-34.)  This argument fails because tolling under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), cannot extend from a putative class action lawsuit filed in Illinois state court to a lawsuit filed in New York federal court.  *See, e.g.*, *Thornton v. State Farm Mut. Auto. Ins. Co.*, No. 1:06-cv-00018, 2006 WL 3359448, at *7-8 (N.D. Ohio Nov. 17, 2006) (class action filed in Illinois state court could not toll claims filed in Ohio federal court).  Plaintiff's claims are governed by the shorter of the New Mexico and New York statutes of limitations.  (Ds.' Mem. at 28.)  Although neither State's highest court has considered the issue, a New Mexico federal court predicted that the New Mexico Supreme Court would not apply *American Pipe* to a lawsuit filed outside its judicial system.[6]  *See Barela v. Showa Denko K.K.*, No. CIV. 93-1469, 1996 WL 316544, *2-4 (D.N.M. Feb. 28, 1996) ("This Court has been presented no reason to believe that New Mexico would" toll the statute "during the pendency of a class action brought outside its judicial system").

Under these circumstances, it would be inappropriate for a federal court to expand state class action tolling law in the manner Plaintiff seeks.  *See In re Agent Orange Prod. Liab. Litig. v. Dow Chemical Co.*, 818 F.2d 210, 213 (2d Cir. 1987) (declining to apply *American Pipe* to

---

prescription basis, that something other than its alleged misconduct caused Plaintiff's alleged harm.  *See Cimino v. Raymark Indus., Inc.*, 151 F.3d 297 (5th Cir. 1998) (reversing verdicts in 157 "representative" trials on the ground that the need for individualized proof of causation and damages precluded the district court's use of statistics to arrive at verdicts).

[6] Purdue was unable to locate any case that has recognized "cross-jurisdictional" tolling of the kind contemplated by Plaintiff (crossing *both* state and federal jurisdictional lines).  On the other hand, every reported case that has considered the issue has declined to do so.  *See, e.g., Ravitch v. Pricewaterhouse*, 793 A.2d 939, 945 (Pa. Ct. App. 2002); *Portwood v. Ford Motor Co.*, 701 N.E.2d 1102, 1103-05 (Ill. 1998).

Hawaiian limitations period where there was no indication that a Hawaii court would do so, and affirming dismissal of plaintiffs' claims as time-barred); *In re Vioxx Prods. Liab. Litig.*, 522 F. Supp. 2d 799, 809 (E.D. La. 2007) (declining to adopt cross-jurisdictional tolling under the laws of several jurisdictions "[a]bsent clear guidance" from their courts). Thus, rather than tolling the statute of limitations, the filing of *Allied Signal* demarcates the moment when Plaintiff was on inquiry notice of its claims against Purdue.[7]

Unable to take refuge under *American Pipe*, Plaintiff argues that its "claims only arose within the last year" because "it did not know and could not have known of Defendants' fraudulent misconduct until May 2007." (Opp. at 31.) In other words, Plaintiff claims that it could not have been aware of its claims arising from alleged misconduct occurring from 1996 to 2001 until Purdue reached a public agreement with the government in 2007. This argument is completely without merit. To begin, this very Plaintiff filed an essentially identical lawsuit against Purdue in *2006, more than a year before the pleas were announced*. *See New Mexico Fund v. Purdue*, No. 06CV0354 (S.D.N.Y. Jan. 17, 2006).[8]

Moreover, the discovery rule does not apply to toll the three-year statute of limitations applicable to Plaintiff's consumer fraud claim. (*See* Mem. at 29.) Any consumer fraud claim premised on conduct occurring before August 1, 2004 is therefore barred as a matter of law.

---

[7] Applying *American Pipe* here would also be inappropriate because doing so would allow Plaintiff's counsel to "game the system" and waste judicial resources. Where, as here, the plaintiff "is represented by the same counsel" who filed a prior lawsuit involving the "same claims" and "made a conscious, tactical decision to abandon [those] claims," courts consistently refuse to interpret *American Pipe* to allow lawyers to get a second bite at the apple "through the expedient of [finding] a new, named plaintiff." *In re Westinghouse Secs. Litig.*, 982 F. Supp. 1031, 1034 (W.D. Pa. 1997); *Hunter v. Am. Gen. Life & Accident Ins. Co.*, 384 F. Supp. 2d 888 (D.S.C. 2005).

[8] The filing of the 2006 suit has no effect on the limitations period under New York or New Mexico law because Plaintiff filed the instant case more than six months after it voluntarily dismissed the 2006 suit. *See* N.Y. CPLR § 205(a); *Kourkoumelis v. Arnel*, 655 N.Y.S.2d 653, 654 (N.Y. App. Div. 1997); N.M. Stat Ann. § 37-1-14.

Further, Plaintiff's denial that it was on inquiry notice of its claims years before it filed this lawsuit contradicts *Shah v. Meeker*, 435 F.3d 244 (2d Cir. 2006). In *Shah*, the plaintiff filed a lawsuit in 2003, after the Attorney General announced a settlement involving the defendants. The defendants argued that the plaintiff's claims were time-barred because press reports from 1998 to 2001 put the plaintiff on inquiry notice. The Second Circuit agreed and dismissed the case on the ground that one article in 2001 started the clock on the plaintiff's claims. *Id.* at 249.

Here, Purdue has cited not just one news report, but *thousands* of news reports published from 2001 to 2003, as well as the widely publicized addition in 2001 of a "black box warning" to the OxyContin labeling. (Mem. at 30-31 & n.20.) Purdue further showed that hundreds of other plaintiffs (including two third-party payors, Allied Services and West Virginia) filed claims involving substantially similar allegations to those here based on the same information that was available to Plaintiff. Finally, Plaintiff has failed to explain why it could not investigate and file its claims when the same counsel who represents it here filed an essentially identical lawsuit against Purdue on behalf of another union fund *in 2001*.[9]

## III. Plaintiff's RICO Claims Cannot Proceed.

### A. Plaintiff Wrongly Attempts to Remedy Its Failure to Allege a Direct Injury or Reliance by Distorting the Complaint and *Desiano*.

With respect to both the direct injury and reliance elements, Plaintiff asserts that the

---

[9] Plaintiff's last-ditch argument that Purdue "fraudulently concealed" the claims at issue here is a nonstarter for several reasons: (i) this argument cannot be reconciled with Plaintiff's filing of virtually identical claims more than a year before the pleas were announced, (ii) Plaintiff wrongly confuses alleged fraudulent conduct giving rise to a claim with alleged conduct designed to conceal the existence of a claim, (iii) Plaintiff has not pled fraudulent concealment with anything approaching the particularity required by Rule 9(b) (*see* Mem. at 31), and (iv) most fundamentally, there can be no fraudulent concealment where, as here, other third-party payors and hundreds of individuals brought the claims years ago. *See Shah*, 435 F.3d at 958-59 (prior litigation, congressional inquires, and "substantial media coverage" relating to the subject matter of plaintiff's claims belied its argument that it could not have discovered its cause of action until government agency filed civil enforcement action against the defendant).

Complaint alleges "communications to Plaintiff" and that the proximate cause analysis here mirrors that in *Desiano*. (Opp. at 12-17.) Each assertion is incorrect.

Plaintiff does not allege that any specific communication was made to it. Instead, it alleges that Defendants made "communications with patients and Class Members, including Plaintiff" (Compl. ¶ 93) and that it "depend[ed] on the honesty" of Defendants' representations about OxyContin (Compl. ¶ 96). Such "[c]onclusory allegations" cannot satisfy even the notice pleading standard of FRCP 8(a), *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006), let alone the requirements of FRCP 9(b), *see Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006). Nor can Plaintiff survive dismissal based on "the guilty plea and the facts stipulated to by Defendants thereunder" (Opp. at 17); no plea-related document suggests that any misleading communication was even directed toward – let alone received by – Plaintiff.

Plaintiff further errs in claiming support from *Desiano*. Unlike Plaintiff here, the TPPs in *Desiano* "allege[d] an injury *direct to themselves*" caused by "the deception *practiced on them*" when the manufacturer "misrepresented its product *to [them]*." 326 F.3d at 349-50 & n.9 (emphases added). Thus, in sharp contrast to Plaintiff here, the TPPs in *Desiano* were "direct victims of [the alleged] fraudulent marketing." *Id.* at 351.

In addition, Plaintiff misconstrues *Anza v. Ideal Steel Corp.*, 126 S. Ct. 1991 (2006). (Opp. at 14-15.) *Anza* does not suggest that the "foreseeability" of an alleged injury can overcome an attenuated, indirect chain of causation such as that alleged here by Plaintiff. To the contrary, *Anza* said that "[t]here is no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly." 126 S. Ct. at 1998. *Anza* also belies Plaintiff's contention that it may establish causation via a complex econometric analysis that seeks to measure the hypothetical price of OxyContin absent the alleged misrepresentations.

10

*See Anza*, 126 S. Ct. at 1998 ("[t]he element of proximate causation recognized in *Holmes* is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation").

### B.   Plaintiff Wrongly Attempts to Manufacture a RICO Enterprise By Distorting the Case Law and Rewriting Its Conclusory Allegations.

Purdue's Motion demonstrated that Plaintiff "does not adequately allege an enterprise" under *First Capital Asset Management, Inc. v. Satinwood*, 385 F.3d 159, 175 (2d Cir. 2004); (Mem. at 15-16). Inexplicably, Plaintiff claims *support* from *Satinwood* (Opp. at 19), which rejected an attempt – indistinguishable from Plaintiff's attempt here – to manufacture a RICO enterprise by "the conclusory naming of a string of entities." 385 F.3d at 175. Nor can Plaintiff evade dismissal by observing that "[e]nterprise is pled under Rule 8." (Opp. at 18.) The case it cites for this proposition held that the "naming of a string of entities does not allege adequately an enterprise" under Rule 8. *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 646 (7th Cir. 1995). More importantly, the Second Circuit's ruling in *Satinwood* applied FRCP 8(a); the opinion does not mention FRCP 9(b) or any other heightened pleading requirement.

Nor can Plaintiff create a RICO enterprise by insisting that "Abbott's Co-Promotion Agreement with Purdue called for Abbott to perform promotional efforts consistently identified in the Complaint as national or uniform." (Opp. at 18.) None of the paragraphs of the Complaint cited by Plaintiff makes any such allegation. The only paragraph in the Complaint that even arguably does so alleges "*upon information and belief*" that "the Abbott Defendants utilized the same deceptive and aggressive marketing tactics as those utilized by Purdue." (Compl. ¶ 67 (emphasis added).) Because this allegation is "upon information and belief," Plaintiff's failure to adduce specific facts to support it violates "even a relaxed pleading standard." *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990).

Moreover, to establish that Abbott is part of the purported RICO enterprise, Plaintiff must do more than make a generalized allegation of coordinated misrepresentations:  It must allege specific misrepresentations *by Abbott*.  *See DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001) ("The requirements of section 1962(c) must be established as to each individual defendant."). But Plaintiff alleges no such misrepresentation – let alone the particulars of any such misrepresentation.  *See Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986) ("With regard to connecting particular representations to particular defendants, the complaint alleges numerous representations attributed only to the 'defendants.' . . . Such allegations, which fail to specify the time, place, speaker, and sometimes even the content of the alleged misrepresentations, lack the 'particulars' required by Rule 9(b)."); *Miller v. City of N.Y.*, No. 05 CV 6024(SJ)(RML), 2007 WL 1062505, at *4 (E.D.N.Y. Mar. 30, 2007) ("Plaintiff merely accuses handfuls of defendants of engaging in an alleged enterprise without identifying each defendants role in and relationship to the enterprise. Therefore, Plaintiff fails to meet the requirement under Rule 9(b) that allegations of fraud must connect to each individual defendant.").[10]

## IV.     Plaintiff's State Law Claims Fail.

Plaintiff has failed to refute Purdue's showing that its state-law claims fail for several reasons.  ***First***, Plaintiff's claims are preempted.  Unable to offer any persuasive reason not to follow *Pennsylvania Employees Benefit Trust Fund v. Zeneca, Inc.*, 499 F.3d 239 (3d Cir. 2007), *reh'g en banc denied*, Plaintiff erroneously calls it a "non-precedential decision" (Opp. at 27) – overlooking that *Zeneca* is a published opinion that is binding law in the Third Circuit.  Plaintiff further errs in asserting that *Zeneca* should not be followed because the FDA cannot determine

---

[10] The West Virginia state trial court order discussed in Plaintiff's opposition to Abbott's motion to dismiss (Opp. at 17, 19) is irrelevant.  Shortly after entering the order, the West Virginia court directed that it "be removed from the Court file," explaining that it was "inadvertently and mistakenly entered by the Court."  (Ex. A (the Court "hereby rescinds the filing and entry of" its "Order denying Abbott's motion for summary judgment")).

that its regulations preempt state law. (Opp. at 26-27.) Plaintiff ignores that the issue here is *conflict* preemption (Mem. at 23-24), so there is no requirement that Congress or the FDA make any determination regarding preemption, *see Zeneca*, 499 F.3d at 247.[11]

Plaintiff is similarly incorrect in arguing that *Zeneca* applies only to marketing that is consistent with the FDA-approved labeling. (Opp. at 27-28.) *Zeneca* denied as **futile** a motion to amend the complaint to add allegations that the statements at issue had been rejected by the FDA and therefore constituted misbranding. The court did so because the FDA has "**exclusive authority** to regulate prescription drug advertising and thus the advertisements in question simply were "**not subject to state consumer fraud laws**." (Mem. at 26-27 (quoting *Zeneca*, 499 F.3d at 253-53) (emphasis added).) Whether the alleged misrepresentations here are inconsistent with the OxyContin labeling or otherwise violate the FDCA or FDA regulations is thus irrelevant to whether the UPA claims are preempted.[12]

Finally, none of the cases Plaintiff cites even addresses the question decided in *Zeneca*: whether general state consumer fraud laws like the UPA that purport to govern all types of advertising can be reconciled with the specific federal regulatory scheme governing prescription drug marketing.[13] On this issue, *Zeneca* stands alone and should be followed here.

---

[11] Having removed the marketing of prescription drugs from the FTC's general jurisdiction and transferred it to an agency specifically created to regulate these products (the FDA) (*see* Mem. at 26), it is inconceivable that Congress intended for the fifty states, invoking **"baby FTC"** acts like the UPA, to be free to create a patchwork regulatory scheme of conflicting requirements. For its part, the New Mexico Legislature has stated that its "intent" is that "in construing Section 3 of the [UPA] the courts to the extent possible will be guided by the interpretations given by the federal trade commission and the federal courts." N.M. Stat. Ann. § 57-12-4. Thus, as a matter of both federal and *state* law, Plaintiff is barred from invoking the UPA to do what is outside the FTC's jurisdiction.

[12] Plaintiff's argument that the FDA is "unable to keep up with its policing duties" (Opp. at 29) is equally unavailing. *See Dusek v. Pfizer, Inc.*, No. Civ.A H-02-3559, 2004 WL 2191804 (S.D. Tex. Feb. 20 2004) (litigation is "not the proper vehicle to remedy these deficiencies in the FDA's performance").

[13] Plaintiff 's reliance on *Desiano v. Warner-Lambert Co.*, 467 F.3d 85, 97 n.9 (2d Cir. 2006), is misplaced because that case not only involved a unique Michigan statute, but conflicts with a ruling by the Sixth Circuit – which is presumptively more knowledgeable about Michigan law – in *Garcia v.*

**Second**, in order to have standing under the UPA, Plaintiff must establish that it was a buyer of a consumer good or service. (Mem. at 19-20.) Purdue cited two cases that say just that: *Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*, 113 P.3d 347 (N.M. App. 2005), and *Nanodetex Corp. v. Sandia Corp.*, No. 05-1041, 2007 WL 4356154 (D.N.M. July 26, 2007). Nevertheless, Plaintiff insists that "New Mexico law does not impose a requirement that a UPA plaintiff be a 'buyer.'" (Opp. at 20.) As "support," Plaintiff cites *Lohman v. Daimler Chrysler Corp.*, 166 P.3d 1091, 1097-98 (N.M. Ct. App. 2007), which it says limited *Santa Fe* and authorizes sophisticated entities like itself to bring UPA claims even where they never acquired a consumer good or service from the defendant. Plaintiff has badly misread *Lohman*.

To start with, whether the plaintiffs were buyers under the UPA *was not even at issue* in *Lohman* because the plaintiffs there were exactly the type of consumers the UPA was enacted to protect: individual buyers of a consumer product (automobiles). *Lohman* thus stands for the unexceptional proposition that a consumer may sue the manufacturer of a consumer product under the UPA even if he or she did not acquire the product directly from the manufacturer. *Id.* at 1098. Moreover, far from "clarifying" or limiting the holdings of the two cases cited by Purdue, *Lohman* provides further confirmation that UPA standing is limited to buyers of consumer goods and services. *See id.* ("'the UPA contemplates a plaintiff who seeks or *acquires* goods or services'") (quoting *Santa Fe*, 113 P.3d at 352) (emphasis added).[14] Plaintiff cannot overcome this hurdle because, unlike the plaintiffs who bought the automobiles at issue in

---

*Wyeth-Ayerst Labs.*, 385 F.3d 961, 963-64 (6th Cir. 2004). The U.S. Supreme Court recently granted certiorari in *Desiano* to resolve the conflict.

[14] Ironically, Purdue's reliance on the *Santa Fee* was endorsed by **Plaintiff** in the brief it filed in opposition to the Abbott Defendants' Motion to Dismiss. There, Plaintiff unambiguously *concedes* that it must be a buyer to bring a claim under the UPA. (*See* Pl.'s Opp. To Abbott Defs.' Mot. To Dismiss at 20 (citing *Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.*, 113 P.3d 347 (N.M. App. 2005)).)

*Lohman*, it did not "acquire" or "buy" OxyContin under any commonly accepted definition of those terms.  Nor does the sophisticated process Plaintiff undergoes in deciding whether and how to cover a prescription drug resemble the consumer transactions the UPA is meant to protect.

*Third*, Plaintiff misunderstands Purdue's argument that the learned intermediary doctrine bars its UPA claim.  Purdue has invoked the doctrine not in an attempt to defeat proximate causation, but instead to show that Plaintiff's UPA claim is "inherently inconsistent with" the doctrine.  *Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514, 552 (E.D. Pa. 2006).  Both the states (by adopting the learned intermediary doctrine) and the federal government (through the FDCA) have long directed drug makers to provide warning information directly to doctors because doctors are in the best position understand and apply it to their patients.  *See* 71 Fed. Reg. 3922, 3961 (item 112), 3968 (Jan. 24, 2006) ("Requiring that language used in prescription drug labeling be tailored to a lay audience would result in a loss of clarity and precision needed to effectively communicate to practitioners.").  Application of the UPA to prescription drugs would subvert this regulatory paradigm by compelling manufacturers to provide warnings directly to consumers.  Plaintiff, however, makes no attempt to resolve this conflict.[15]

## CONCLUSION

For the foregoing reasons and those set forth in Purdue's opening memorandum, Purdue respectfully requests that the Court grant its motion and dismiss the Complaint with prejudice.

s/Donald I Strauber

Donald I Strauber
Mary T. Yelenick
Phoebe A. Wilkinson
Gretchen N. Werwaiss
Chadbourne & Parke LLP

---

[15] As for unjust enrichment, Plaintiff adopts plaintiffs' argument in the *AFSCME* case.  (Opp. at 34 n.34 (citing *AFSCME* Opp. at 18).)  Purdue incorporates its reply from that case.  (*See* Reply at. 10-12).

30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 408-5100
Facsimile: (212) 541-5369

*COUNSEL FOR*
*THE PURDUE DEFENDANTS*

Chilton D. Varner
Stephen B. Devereaux
King & Spalding LLP
1180 Peachtree Street, NE
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

Patrick S. Davies
Joshua D. Greenberg
Covington & Burling LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Tel: 202.662.6000
Fax: 202.662.6291

*OF COUNSEL FOR*
*THE PURDUE DEFENDANTS*