# Exhibit A

06-1665-cv(L)
City of New York v. Smokes-Spirits.com, Inc.

UNITED STATES COURT OF APPEALS
For the Second Circuit

_____

August Term, 2007

(Argued: January 7, 2008                    Decided: September 2, 2008)

Docket Nos. 06-1665-cv(L), 06-1693-cv(CON), 06-1694-cv(CON), 06-1695-cv(CON)

_____

City of New York,

*Plaintiff-Appellant,*

—v.—

Smokes-Spirits.Com, Inc., Michael Klee, www.smokincheap.com, C4LESS, LLC, John Does 1-100, Vincent Klee III, Jeff Marc LeBlanc, National Wholesale, LLC and Natalie Saalfeld,

*Defendants-Appellees,*

- and -

Joyce E. Houle, doing business as Indiancreektobacco.com, Kerry Varline, doing business as Keweenaw Bay Outfitters & Trading Post, Laurie patterson, Cigarette Outlet, Inc., Walid Enterprises, Inc., A.E. Sales LLC, Marilyn Samuelson, Allen Edmo, Tonna Edmo, Allen Smith, VJ Inc., A1 Enterprises, Inc., David Ray, doing business as Discount Cigarettes, Gerald A. Fow, doing business as Dannystobacco.com, Esmokes, Inc., ESM Holdings, Inc., PA Resources, Inc., doing business as Tobacco123.com, Wayne Stull, Paul Rainburd, doing business as Silver Cloud Smoke Shop, Terry Kilgore, Gary E. Kirschner and Scott Welker,

*Defendants.*

_____

1

———————

CITY OF NEW YORK,

*Plaintiff-Appellant,*

- v.-

SCOTT HERRING, DOING BUSINESS AS NCCIGARETTES.COM, JEFF REINHARDT, XFIRE SOFTWARE LLC AND NCCIGARETTES.COM,

*Defendants-Appellees,*

-AND-

JOYCE E. HOULE, DOING BUSINESS AS INDIANCREEKTOBACCO.COM, KERRY VARLINE, DOING BUSINESS AS KEWEENAW BAY OUTFITTERS & TRADING POST, JERRY MAGNANT, DOING BUSINESS AS KEWEENAW BAY OUTFITTERS & TRADING POST, LAURIE PATTERSON, CIGARETTE OUTLET, INC., WALID ENTERPRISES, INC., A.E. SALES LLC, MARILYN SAMUELSON, ALLEN EDMO, TONNA EDMO, ALLEN SMITH, VJ INC., A1 ENTERPRISES, INC., DAVID RAY, DOING BUSINESS AS DISCOUNT CIGARETTES, GERALD A. FOW, DOING BUSINESS AS DANNYSTOBACCO.COM,

*Defendants.*

———————

CITY OF NEW YORK,

*Plaintiff-Appellant,*

-v.-

THERESA JUSTICE, DOING BUSINESS AS EZTOBACCO.COM AND THERESA TRIVETT,

*Defendants-Appellees,*

-AND-

ESMOKES, INC., ESM HOLDINGS, INC., PA RESOURCES, INC., DOING BUSINESS AS TOBACCO123.COM, WAYNE STULL, PAUL RAINBURD, DOING BUSINESS AS SILVER CLOUD SMOKE SHOP, TERRY KILGORE, GARY E. KIRSCHNER AND SCOTT WELKER,

*Defendants.*

———————

2

————————

CITY OF NEW YORK,

*Plaintiff-Appellant,*

-v.-

NEXICON, INC., f/k/a CYCO. NET, INC., RICHARD A. URREA, FRED TEUTENBERG, BRENT WOLFORD, DANIEL R. URREA, HEMI GROUP, LLC., BRIAN PEREYRA, D.C., INC., MICHAEL E. SMITH d/b/a PAYLESSCIGS, DOMAINS FOR SALE, HOORAY'S INC., STEPHEN F. KNOPP, BURT NEWMAN, DMITRIY ZILBERMAN, S4L DISTRIBUTING, INC., WILLIAM C. BAKER III, DOUBLE B DISTRIBUTING, d/b/a DISCOUNT TOBACCO STORE, KAI GACHUPIN, DIRTCHEAPCIGS.COM, INC, AND WILLIAM J. BEVINS,

*Defendants-Appellees.*

————————

B e f o r e :

WINTER, STRAUB and SOTOMAYOR, *Circuit Judges.*

————————

Plaintiff-Appellant City of New York ("City") appeals from judgments of the United States District Court for the Southern District of New York (Deborah A. Batts, *Judge*), dismissing the City's civil Racketeer Influenced and Corrupt Organizations Act ("RICO") claims, and New York State law claims of common law fraud, violations of General Business Law ("GBL") § 349, and common law public nuisance for failure to state a claim. Because we hold that the City has standing to sue under RICO where it has alleged a direct injury of lost taxes inflicted on it by reason of defendant cigarette retailers' commission of mail and wire fraud through sale of cigarettes to New York City residents without complying with the Jenkins Act, and has, with certain exceptions, adequately alleged its RICO claims, we VACATE the District Court's judgments and REMAND these cases for further proceedings; we AFFIRM the dismissal of the City's claim of common law fraud in all cases and the GBL § 349 claim in one of the consolidated cases; and we SEVER and retain jurisdiction over the GBL § 349 claims in two of the consolidated cases and all the public nuisance claims, and CERTIFY to the New York Court of Appeals a question regarding whether the City has standing to sue under GBL § 349 and a question regarding whether the City may assert a common law public nuisance claim that is predicated on N.Y. Public Health Law § 1399-ll.

Judge WINTER dissents in part and concurs in part in a separate opinion.

3

1
2 _____
3 ELIZABETH S. NATRELLA, of counsel (Leonard Koerner, Eric Proshansky, *of counsel*; Michael
4 A. Cardozo, Corporation Counsel of the City of New York, *on the brief*) New York, NY, for
5 Plaintiff-Appellant.
6
7 MICHAEL B. POWERS, Phillips Lytle, LLP, Buffalo, NY (Preston L. Zarlock, Michael S.
8 Cerrone, William H. Baaki, Phillips Lytle, LLP, Buffalo, NY, *on the brief*; Rachel L.
9 Mitchell, Gowanda, NY, *on the brief*), for Defendant-Appellant Smokes & Spirits, LLC.[1]
10
11 RANDOLPH H. BARNHOUSE, Luebben Johnson & Barnhouse LLP, Albuquerque, NM, for
12 Defendants-Appellants Hemi Group, LLC and Kai Gachupin.
13
14 DAVID K. HEASLEY, Silverbery Goldman & Bikoff LLP (Toby M.J. Butterfield, Cowan
15 DeBaets, Abrahams & Sheppard LLP, New York, NY, *on the brief*; James L. Bikoff,
16 Silverbery Goldman & Bikoff LLP, Washington DC, *of counsel*), for Defendants-Appellants
17 Scott Herring, Teresa Trivett, and Nexicon, Inc., et al.[2]
18
19 _____
20 STRAUB, *Circuit Judge*:
21
22        In these four consolidated cases, the Plaintiff-Appellant City of New York ("City")

23 appeals from the judgments of the United States District Court for the Southern District of New

24 York (Deborah A. Batts, *Judge*), dismissing its civil claims under the Racketeer Influenced and

25 Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"); claims of common law fraud;

26 claims under New York's consumer protection statute, as codified at § 349 of the New York

27 General Business Law ("GBL § 349"); and claims of common law public nuisance.[3]  We vacate

---

[1]     Smokes & Spirits, LLC claims on appeal that it was improperly named as Smokes-Spirits.Com, Inc. in the pleadings and appeal papers.  We will use the name in the pleadings to refer to Smokes & Spirits, LLC throughout.

[2]     Because Teresa Trivett's name is spelled Theresa Trivett in the pleadings, we will use Theresa Trivett to refer to her.

[3]     The four consolidated cases are: *City of New York v. Smokes-Spirits.com, Inc., et al.* ("*Smokes-Spirits*"), No. 04 civ. 6616 (S.D.N.Y filed Aug. 16, 2004), *appeal docketed*, No. 06-1665-cv (2d Cir. Apr. 6, 2006); *City of New York v. A.E. Sales, LLC, Herring, doing business*

1  and remand in part with respect to the RICO claims; affirm in part with respect to the state law

2  claims; and sever and retain jurisdiction over other of the state law claims and certify two

3  questions to the New York Court of Appeals.

**FACTS AND PROCEDURAL HISTORY**

6      This case concerns allegations that out-of-state cigarette retailers are liable for failing to

7  report purchases by New York City residents to New York State.  In our review, we take as true

8  the facts as alleged in the complaints and as supplemented by the City's RICO Statements,

9  submitted pursuant to the District Court's rules.  *See McLaughlin v. Anderson*, 962 F.2d 187, 189

10 (2d Cir. 1992).

11      New York State imposes a tax on all cigarettes used or sold in the State.  *See* N.Y. Tax

12 Law §§ 471, 471-a.  New York State law also authorizes the City of New York to impose its own

13 tax on cigarettes.  *See* N.Y. Unconsol. Law § 9436(1).  Pursuant to this authority, the City

14 imposes a tax on all cigarettes possessed in the City for sale or use.[4]  *See* N.Y.C. Admin. Code §

---

*as Nccigarettes.com, et al. ("NCCigarettes")*, No. 03 civ. 7715 (S.D.N.Y. filed Sept. 30, 2003), *appeal docketed*, No. 06-1693-cv (2d Cir. Apr. 7, 2006); *City of New York v. Esmokes, Inc., Theresa Justice, doing business as eztobacco.com and Theresa Trivett, et al., ("EZTobacco")*, No. 03 civ. 10091 (S.D.N.Y. filed Dec. 19, 2003), *appeal docketed*, No. 06-1694-cv (2d Cir. Apr. 7, 2006); *City of New York v. Nexicon, Inc., et al. ("Nexicon")*, No. 03 civ. 383 (S.D.N.Y. filed Jan. 17, 2003), *appeal docketed*, No. 06-1695-cv (2d Cir. Apr. 7, 2006).

        On appeal, in *Smokes-Spirits*, Smokes-Spirits.com and Michael Klee are the only remaining defendants. In *NCCigarettes*, Scott Herring doing business as NCCigarettes.com, Jeff Reinhardt, and Xfire Software LLC are the only remaining defendants. In *EZTobacco*, Theresa Trivett doing business as EZTobacco.com is the only remaining defendant.  In *Nexicon*, Nexicon, Inc. formerly known as Cyco.net, Inc., Richard A. Urrea, Daniel R. Urrea, Hemi Group, LLC, and Kai Gachupin are the only remaining defendants.

        [4]      The City charges $1.50 per cigarette pack possessed for use in the City.  The State also charged $1.50 per pack used in New York State.  On April 11, 2008, the New York State legislature approved a $1.25 increase in the state cigarette tax, effective on June 3, 2008, making the total tax due on cigarettes used in New York the highest in the country.  *See* New York State, Department of Health, Press Release, *State Cigarette Tax Increase of $1.25 Protects Public*

1    11-1302.  In-state, these taxes are collected through the sale of tax stamps to in-state vendors.

2    *See* N.Y. Tax Law § 471.  Out-of-state cigarette sellers, however, are not responsible for

3    collecting or paying New York State and City sales taxes on cigarettes.

4         Due to interstate taxing discrepancies, cigarettes can be sold for apparently lower prices

5    outside New York State.  In part to offset the loss of state taxes caused by the interstate taxing

6    discrepancies, Congress, in 1949, enacted the Jenkins Act, 15 U.S.C. §§ 375-78, to require

7    out-of-state cigarette sellers to file a report with the tobacco tax administrator of each state into

8    which the seller ships cigarettes to non-distributors, identifying the name, address, and quantity

9    of cigarettes purchased by the non-distributor state residents.  15 U.S.C. § 376; *see also* S. Rep.

10   No. 84-1147 (1955), *reprinted in* 1955 U.S.C.C.A.N. 2883, 2883-84 (explaining that the Jenkins

11   Act "was enacted for three major reasons: (1) The large and increasing loss of revenue to the

12   States caused by the evasion of sales and use taxes on cigarettes shipped in interstate commerce

13   to consumers; (2) The discrimination caused by this evasion against sellers of cigarettes in States

14   having a higher tax than the tax of the seller States; and (3) The fact that this evasion was

15   accomplished through the use of the United States mail." (quoting from the report of the

16   Committee on Ways and Means)).  As amended in 1955, the Jenkins Act also requires the seller

17   of cigarettes in interstate commerce to register with the tobacco tax officials of states where she

18   advertises or into which she ships cigarettes.  15 U.S.C. § 376(a).[5]  The information provided by

---

*Health* (April 11, 2008), http://www.health.state.ny.us/press/ (Click on Press Releases, 2008 Press Releases, April 11, 2008) (last visited September 2, 2008).

[5]    As amended, the Jenkins Act provides: "Any person who sells or transfers for profit cigarettes in interstate commerce, whereby such cigarettes are shipped into a State taxing the sale or use of cigarettes, to other than a distributor licensed by or located in such State, or who advertises or offers cigarettes for such a sale or transfer and shipment, shall--

(1) first file with the tobacco tax administrator of the State into which such shipment is

1    out-of-state cigarette sellers to state taxing authorities under the Jenkins Act provides states the

2    information necessary to collect the payment of cigarette taxes directly from the purchasers.

3           As pled by the City, although the Jenkins Act requires out-of-state cigarette merchants to

4    report only to *state* taxing authorities, New York State and New York City have entered into

5    various agreements for the administration and collection of cigarette taxes.[6]  In light of the

6    agreements, the City alleges that "with respect to the collection of cigarette taxes, New York City

7    will be 'fully and promptly' informed by the New York State Department of Taxation and

8    Finance of any information relevant to the collection of cigarette taxes, including Jenkins Act

9    reports."

10          The City thus alleges that defendants (1) advertise their cigarettes over the Internet to its

---

made or in which such advertisement or offer is disseminated a statement setting forth his name
and trade name (if any), and the address of his principal place of business and of any other place
of business; and

    (2) not later than the 10th day of each calendar month, file with the tobacco tax
administrator of the State into which such shipment is made, a memorandum or a copy of the
invoice covering each and every shipment of cigarettes made during the previous calendar month
into such State; the memorandum or invoice in each case to include the name and address of the
person to whom the shipment was made, the brand, and the quantity thereof." 15 U.S.C. § 376(a).

[6]    The latest such agreement, dated June 28, 2002, provides:

It is agreed that Taxation [the New York State Department of Taxation and
Finance] and Finance [the New York City Department of Finance] shall cooperate
fully with each other and keep each other fully and promptly informed with
reference to any person or transaction subject to both State and City cigarette
taxes as follows:

(1) Information obtained which may result in additional cigarette tax revenue to
the State or City provided that the disclosure of that information is permissible
under existing laws and agreements; . . .

(3) All violations of Article 20 of the Tax Law or Chapter 13 of Title 11 of the
[Administrative Code of the City of New York] and all facts or information
tending to indicate any such violation.

1    residents, (2) ship the orders by common carrier or the United States Postal Service into New

2    York City, and (3) do not comply with the Jenkins Act registration or reporting requirements.

3    According to the allegations, defendants' failure to comply with the Jenkins Act is an essential

4    part of their business model because the savings that customers obtain from buying the cigarettes

5    online are almost entirely due to the fact that the New York State and City taxes are not being

6    charged or paid.  As alleged, all of the defendants fail to inform customers of the use tax

7    obligations, and most of the defendants, to varying degrees, make false representations to

8    customers concerning the tax.[7]  Specifically, in *Smokes-Spirits* and *EZTobacco*, the City alleges

9    that defendants instruct their employees to inform inquiring customers that defendants are

10    prohibited from disseminating customer information to taxing authorities.  In *Nexicon*, the City

11    contends that defendants affirmatively advertise their cigarettes as "tax-free" and assure

12    customers that sales would not be reported to the New York State tax authorities.  The City also

13    alleges that *Nexicon* defendants attempt to prevent the City from accessing their sales records in

14    order to maintain their customers' trust.

15          The City claims that it has lost "tens[,] if not hundreds[,] of millions of dollars a year in

16    cigarette excise tax revenue" due to the combination of defendants' withholding of sales

17    information, failure to register as cigarette sellers, and the individual taxpayers' failure to

18    voluntarily pay use taxes to the City.[8]  As relief, the City seeks to: (1) recover from defendants

---

[7]    The City's complaint in *NCCigarettes* alleges only that defendants fail to disclose the customers' tax obligations.

[8]    In the City's RICO Statements, the City cites to a report from Prudential Financial Research to show that countrywide estimated losses to the states from Internet cigarette sales would reach $889.9 million in 2005.  In addition, between September 2006 and September 2007, the City claims that it recovered $3,281,679 through various efforts.  *See* New York City Department of Finance, Cigarette Tax Enforcement,

1    three times the amount of the tax revenue lost as a result of defendants' violations; (2) require

2    defendants prospectively to comply with the Jenkins Act; (3) require defendants to inform their

3    customers that taxes are owed on purchases from defendants' websites and to inform customers

4    that defendants file Jenkins Act reports; and (4) pay attorneys' fees.

5    **I.    Allegations Specific to the RICO Claims**
6
7        As explained further below, RICO makes it "unlawful for any person employed by or

8    associated with any enterprise engaged in, or the activities of which affect, interstate or foreign

9    commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's

10    affairs through a pattern of racketeering activity . . . ."  18 U.S.C. § 1962(c).  The City alleges

11    that defendants engage in such a "pattern of racketeering" by committing mail or wire fraud each

12    time they use, or cause to be used, the mails or wires to effect a sale of cigarettes to New York

13    City residents without complying with the Jenkins Act's reporting requirements to the State.[9]

14        The alleged RICO enterprises in the cases before us generally take one of two forms.

15    Under the first, a defendant corporate entity is alleged to be a passive enterprise with its

16    defendant officer(s) and/or director(s) acting as the RICO "person[s]" who conduct the affairs of

17    the enterprise in violation of the statute.  The second set is comprised of association-in-fact

18    enterprises,[10] where the association consists of a defendant entity and a third party, and the RICO

---

http://www.nyc.gov/html/dof/html/services/services_fraud_cigarettes.shtml (last visited
September 2, 2008).

        [9]    The RICO statute defines a "pattern of racketeering activity" as "at least two acts
of racketeering activity . . . ."  18 U.S.C. § 1961(5).  "Mail fraud and wire fraud are forms of
'racketeering activity' for purposes of RICO." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451,
454 (2006) (citing § 1961(1)(B)).

        [10]    As discussed further below, a RICO enterprise based on an association-in-fact
theory is "a group of persons associated together for a common purpose of engaging in a course

1    "person[s]" consist of the defendant entity and, in general, the officers and/or directors of the

2    entities comprising the enterprise.[11]  The City's case-specific enterprise allegations regarding the

3    remaining defendants are as follows:

4         In *Smokes-Spirits*, the remaining alleged enterprise is defendant Smokes-Spirits.com, a

5    passive vehicle, and the person associated with it is defendant Michael Klee, an officer or

6    employee of Smokes-Spirits.com.  In *EZTobacco*, the remaining alleged enterprise is EZ

7    Tobacco Enterprise ("EZTobacco Enterprise"), consisting solely of Electronic Computer

8    Consulting, LLC, and the persons associated with it are defendant Theresa Trivett, doing

9    business as EZ-Tobacco.com, and others unknown.

10        *Nexicon* involves two different groups of remaining defendants, and, for each, the City

11   alleges the two alternative enterprise forms outlined above.  With respect to the first group of

12   defendants, the primary enterprise consists of defendant Nexicon, Inc. ("Nexicon"), and the

13   persons associated with it are defendants Richard Urrea, President of Nexicon; defendant Daniel

14   Urrea, Chief Financial Officer of Nexicon; non-party Brent Wolford, technical consultant to

15   American Indian CigCo, LLC ("American Indian CigCo"), a New Mexico limited liability

16   corporation; and non-party Chuck Arning, who allegedly participated in concealing Nexicon's

17   cigarette sales from the City.  Alternatively, the City alleges an association-in-fact enterprise

18   consisting of Nexicon and American Indian CigCo.  Since purchasing Nexicon's internet

---

of conduct," the existence of which "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."  *United States v. Turkette*, 452 U.S. 576, 583 (1981).

[11]    The District Court and the parties refer to the alternative enterprise forms, respectively, as "Enterprise 1" and "Enterprise 2."

1  cigarette business, American Indian CigCo owns or controls the websites previously controlled

2  by Nexicon, and is alleged to have assisted Nexicon in concealing cigarette sales previously

3  made by Nexicon to New York City residents.  The City alleges that the two companies, Nexicon

4  and American Indian CigCo, have entered into profit-sharing and employment agreements.  The

5  RICO persons associated with this alleged association-in-fact enterprise are Nexicon, Richard

6  Urrea, Daniel Urrea, and Wolford, Arning, and non-party Paul Rainbird, owner of American

7  Indian CigCo.

8         With respect to the second remaining group of defendants in *Nexicon*, the City alleges

9  that defendant Hemi Group, LLC ("Hemi Group"), incorporated in New Mexico, is an enterprise

10  and that the person associated with it is defendant Kai Gachupin, owner or officer of Hemi

11  Group.  The City also alleges an alternative association-in-fact enterprise consisting of Hemi

12  Group and A1 Enterprises, Inc. ("A1 Enterprises"), a New Mexico corporation, which sells

13  cigarettes over the Internet.  According to the allegations, "A1 Enterprises works with the Hemi

14  Group to conceal from New York City cigarette sales made by Hemi Group to New York City

15  residents."  The persons alleged to be associated with the Hemi Group association-in-fact

16  enterprise are Gachupin and Hemi Group.

17         In *NCCigarettes*, the remaining alleged primary enterprise is NCCigarettes.com, and the

18  persons associated with it are defendant Scott Herring, defendant Xfire Software LLC ("Xfire"),

19  an internet service provider, and defendant Jeff Reinhardt, manager, Chief Executive Officer, and

20  sole owner of Xfire.  The City also appears to have alleged an alternative association-in-fact

21  enterprise, consisting of Herring, Reinhardt, Xfire and NCCigarettes.com.  The persons

11

1    associated with this alleged enterprise are Herring, Reinhardt, and Xfire.[12]

2    **II.    Allegations Specific to the City's State Law Claims**
3
4    In addition to RICO claims, the City asserts diversity-based state law claims against

5    defendants for: (1) common law fraud; (2) violations of GBL § 349, a consumer protection

6    statute; and (3) common law public nuisance.

7    The City alleges common law fraud in each of the four cases.  It claims that defendants

8    have a statutory duty to provide Jenkins Act reports to the State and to designate all packages

9    they ship into New York as containing cigarettes.  In all four cases, the City alleges that

10   defendants intentionally fail to provide the required notice when they ship cigarettes into the City

11   in order to defraud the City of tax revenues.  Additionally, in *Smokes-Spirits*, the City alleges that

12   defendants "materially mislead customers by stating cigarette prices to customers that omit the

13   amounts that customers will have to pay to New York City and New York State in taxes."  In

14   *Nexicon* and *EZTobacco*, the City's common law fraud claims also incorporate allegations that

15   defendants' "statements that their cigarettes are 'tax-free' and/or that defendants are not required

16   to file Jenkins Act reports are materially deceptive and misleading to New York City

---

[12]    As for the alternative enterprise apparently alleged in *NCCigarettes*, the City alleges that "Xfire provides essential services to NCCigarettes.com while having actual knowledge that NCCigarettes.com sells cigarettes to New York City residents and conceals the cigarette sales from the New York State tax authorities by refusing to file Jenkins Act reports documenting the sales."  In addition, it is alleged that "[w]ithout the services supplied by Jeff Reinhardt and Xfire Software LLC, the NCCigarettes.com could not sell cigarettes to residents of New York City" and "Jeff Reinhardt and Xfire Software LLC have actual knowledge that the NCCigarettes.com is engaging in mail and wire fraud and that NCCigarettes.com is using Xfire Software LLC's facilities, equipment and services for the purpose of defrauding the City of tax revenue."  The City also alleges that "Jeff Reinhardt and Xfire Software LLC have admitted that they intend to continue assisting the NCCigarettes.com in implementing its mail and wire fraud scheme because of the fees obtained by providing Internet services to NCCigarettes.com."

1    consumers."

2         The City alleges claims under GBL § 349 in *Nexicon*, *Smokes-Spirits*, and *EZTobacco*,

3    essentially based on the same allegations as outlined for the fraud claims.

4         Finally, the City makes a public nuisance claim in *NCCigarettes* and *EZTobacco*.  The

5    public nuisance claims are predicated on New York State's Public Health Law § 1399-ll, which,

6    subject to certain exceptions, bans the shipment of cigarettes via a common carrier to New York

7    State residents.  As the City alleges, in enacting that statute, the legislature "declared the

8    shipment of cigarettes sold via the Internet to residents of [New York] State to be a 'serious

9    threat to public health, safety, and welfare, to the funding of health care, and to the economy of

10    the state.'" *See* N.Y. Pub. Health Law § 1399-ll, ch. 262, § 1.  Thus, it is alleged, defendants

11    "contribute to a public nuisance, and unreasonably and substantially interfere with rights

12    common to the general public" by shipping cigarettes sold over the Internet into New York City.

13    **III.**    **District Court's Dismissals**

15        **A.**    **Disposition of the City's State Law Claims**

17         In January and February 2005, the District Court dismissed all of the City's state law

18    claims for substantially the same reasons in each case in which the claims were alleged.  *See*

19    *Nexicon*, No. 03 Civ. 383, 383 F. Supp. 2d 526 (S.D.N.Y. Jan. 27, 2005); *Smokes-Spirits*, No. 04

20    Civ. 6616 (S.D.N.Y. Feb. 8, 2005); *NCCigarettes*, No. 03 Civ. 7715, 2005 U.S. Dist. LEXIS

21    2794 (S.D.N.Y. Feb. 9, 2005); *EZTobacco*, No. 03 Civ. 10091, 2005 U.S. Dist. LEXIS 2202

22    (S.D.N.Y. Feb. 16, 2005).[13]

---

[13]    The District Court dismissed the claims in *Nexicon* first, and then dismissed the claims in the three related cases on collateral estoppel grounds.

13

1    The District Court dismissed the common law fraud claims on the grounds that the City

2    had not alleged that *it* relied on any of the allegedly fraudulent statements or omissions, and that

3    any third-party reliance—either on the part of the consumers or the State—was not sufficient to

4    state a claim. *See Nexicon*, 383 F. Supp. 2d at 565.

5    The District Court dismissed the City's GBL § 349 claims on the ground that the failure

6    to file Jenkins Act reports could not, as a matter of law, mislead consumers. *See id.* at 562-63.

7    The District Court then found that the City had failed to allege a consumer injury or harm to the

8    public interest even as to those defendants alleged by the City to have made material

9    misrepresentations directed at consumers, in the form of statements that defendants' cigarettes

10    are tax free or that defendants did not have to file Jenkins Act reports. The District Court

11    dismissed the argument that lost tax revenues injure all citizens on the ground that such an injury

12    was too indirect. *See id.* at 564.

13    The District Court also dismissed the public nuisance claims, finding that the number of

14    cigarette sales over the Internet was "small . . . compared to brick and mortar sales" and that

15    plaintiffs had not alleged a harm that "endangers[] the public at large." *NCCigarettes*, 2005 U.S.

16    Dist. LEXIS 2794, at *9-10. The District Court found that it was "unclear" that the number of

17    people who purchase cigarettes over the Internet "qualifies as a considerable number of people"

18    and concluded that the City's allegation that "Internet sales of cigarettes were predicted to

19    account for 5.9% of industry volume in 2005" did not "comport with the required considerable

20    number of persons." *Id.* at *7 (internal quotation marks omitted).[14]

---

[14]    In *EZTobacco*, the District Court adopted and incorporated the analysis from
*NCCigarettes* regarding the public nuisance claim and dismissed it based on collateral estoppel.

14

1    **B.    Disposition of the City's RICO Claims**

2
3    At the same time that it dismissed the state law claims in 2005, the District Court also

4    dismissed the City's RICO claims, with leave to amend, for failure to plead "distinctness" in the

5    enterprise allegations.[15]  *See Nexicon*, 383 F. Supp. 2d at 551.  In March 2006, after the City

6    amended its complaints and RICO Statements, the District Court again dismissed the complaints,

7    this time with prejudice, for failure to state a claim.  *See Nexicon*, No. 03 Civ. 383, 2006 U.S.

8    Dist. LEXIS 10295 (S.D.N.Y. Mar. 15, 2006); *Smokes-Spirits*, No. 04 Civ. 6616, 2006 U.S. Dist.

9    LEXIS 11954 (S.D.N.Y. Mar. 21, 2006); *NCCigarettes*, No. 03 Civ. 7715, 2006 U.S.

10    LEXIS 11922, (S.D.N.Y. Mar. 22, 2006); *EZTobacco*, No. 03 Civ. 10091, 2006 U.S. Dist.

11    LEXIS 11953 (S.D.N.Y. Mar. 22, 2006).[16]

12    The District Court held that while the structure of the alleged primary enterprises was

13    legally viable, the alleged RICO persons (employees and/or officers of the businesses) did not

14    have individual duties to file Jenkins Act reports, and thus could not have committed the alleged

15    predicate racketeering acts.  The court explained:

16    [T]he language of the Jenkins Act prohibits "persons" from transferring cigarettes
17    for profit in interstate commerce.  The statute defines "person" as including:
18    "corporations, companies, associations, firms, partnerships, societies, and joint
19    stock companies, as well as individuals." 15 U.S.C. § 375(1).  Employing basic
20    statutory construction analysis, it is clear that companies are the primary entities
21    responsible for filing Jenkins Act reports.  The catch-all phrase "as well as
22    individuals" suggests a separate class of people who may be liable under the

---

[15]    As explained further below, under the so-called "distinctness" requirement, to
state a valid claim under RICO, a plaintiff must "allege . . . the existence of two distinct entities:
(1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a
different name."  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).

[16]    As with the decisions in 2005, the District Court dismissed the *Nexicon* case first,
and then dismissed the remaining three related cases on collateral estoppel grounds.

15

1         Jenkins Act, but does not by any means connote officers or directors of the
2         business entities listed before the phrase.  Accordingly, as only the Defendant
3         companies are responsible for filing the reports, and only they can be accused of
4         fraudulently concealing such reports by not filing them, only the Defendant
5         companies may be considered as having committed predicate acts.  Thus, only
6         they may properly be considered "persons" under the definition of the Jenkins Act
7         and under RICO.  Given the unique facts of the instant case, where a company is
8         statutorily required to perform a function that it fails to do, resulting in fraud . . .
9         the "persons" for purposes of RICO cannot be the officers of the companies, but
10        must be the companies themselves.

11

12  *Nexicon*, 2006 U.S. Dist. LEXIS 10295, at *25-26.  Accordingly, with respect to the alleged

13  primary enterprises, the District Court found that the City failed to state a claim.  *Id.* at *26.

14        With respect to the alternatively pled association-in-fact enterprises, the District Court

15  explained that, under well settled law, an enterprise cannot consist solely of employees

16  associating with their corporate employer, and that the City apparently tried to circumvent this

17  rule by "tacking on" other companies with which each corporate defendant associated.  The

18  problem with this approach, the court found, was that while the City had alleged technically

19  legitimate enterprises, (1) the City had failed to sufficiently allege that the tacked-on members of

20  the enterprise shared a "common purpose" with the defendant corporations,[17] (2) the City failed

21  to allege a nexus between the RICO predicate acts and the association-in-fact enterprises; and (3)

22  the City failed to "explain each participant's role in the alleged course of fraudulent conduct."

23  *Nexicon*, 2006 U.S. Dist. LEXIS 10295, at *28-29.  In sum, the District Court found that while

24  the City alleged that defendants have relationships with the third-party companies, the City "has

25  not shown how the various components of the enterprise engaged in a fraudulent course of

---

[17]     The purportedly "tacked-on" persons are American Indian CigCo for the Nexicon association-in-fact enterprise; A1 Enterprises for the Hemi Group association-in-fact enterprise; and Xfire and Reinhardt for the NCCigarettes association-in-fact enterprise, to the extent such enterprise was alleged.

1    conduct together." *Id.* at *30.

2                                    **DISCUSSION**

3

4          "We review the district court's decision de novo, reading all well-pleaded allegations in

5    the [City's] favor." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir.

6    2008).[18]

7    **I.    The City's Civil RICO Claims**

8

9          Pursuant to § 1962(c), RICO's substantive provision, it is "unlawful for any person

10   employed by or associated with any enterprise engaged in, or the activities of which affect,

11   interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of

12   such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

13   Thus, in order to establish a RICO violation under § 1962(c), a plaintiff (or prosecutor) must

14   allege and prove four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of

15   racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).  These

16   requirements apply whether the RICO claim is civil or criminal in nature.

17          In civil cases, however, RICO plaintiffs must also satisfy the requirements of 18 U.S.C. §

18   1964(c).  Section 1964(c) provides that "[a]ny person injured in his business or property by

19   reason of a violation of section 1962" has the right to "recover threefold the damages he sustains

20   . . . ." 18 U.S.C. § 1964(c).  Thus, under § 1964(c), a civil RICO claimant must show: (1) a

21   substantive RICO violation under § 1962; (2) injury to the plaintiff's "business or property," and

22   (3) that such injury was "by reason of" the substantive RICO violation.  *See Lerner v. Fleet Bank,*

_____

[18]    The general allegations in the four complaints and RICO Statements are essentially identical.  Thus, unless otherwise noted, we generally refer to the allegations in *Nexicon* in our discussion.

1    *N.A.*, 318 F.3d 113, 120 (2d Cir.), *cert. denied*, 540 U.S. 1012 (2003).

2        In this case, the District Court dismissed the City's RICO claims on the ground that the

3    City failed adequately to plead a RICO enterprise.  Defendants ask us to affirm that decision

4    arguing that the City failed to (1) allege a RICO violation under § 1962, and, in the alternative,

5    arguing that the City failed to (2) demonstrate the requisite injury to its "business or property," or

6    (3) allege an injury that was "by reason of" the alleged RICO violations, thus failing to allege

7    causation.  *See* 18 U.S.C. § 1964(c).  We address these issues in reverse order below.[19]

8    **A.    Causation**
9
10       The Supreme Court has addressed civil RICO's causation requirements in three key

11   cases.  *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457-61 (2006); *Holmes v. Sec.*

12   *Investor Prot. Corp.*, 503 U.S. 258, 265-70 (1992); *Sedima*, 473 U.S. at 496-97.  First, in *Sedima*,

13   the Supreme Court explained that the damages from any injury caused under RICO must "flow

14   from the commission of the predicate acts."  473 U.S. at 497.  Thus, "the plaintiff only has

15   standing if, and can only recover to the extent that, he has been injured in his business or property

16   by the conduct constituting the [RICO] violation."  *Id.* at 496.  As the Court explained, "the

17   compensable injury necessarily is the harm caused by [alleged] predicate acts . . . , for the

18   essence of the violation is the commission of those acts in connection with the conduct of an

19   enterprise."  *Id.* at 497.

---

[19]    We have described the three issues raised as elements of standing: "[t]o demonstrate standing [under RICO], a plaintiff must plead, at a minimum, '(1) the defendant's violation of § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation.'"  *Lerner*, 318 F.3d at 120 (quoting *Commercial Cleaning Servs., L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 380 (2d Cir. 2001)), *cert. denied*, 540 U.S. 1012 (2003).

1          Subsequently, in *Holmes*, the Court focused more particularly on § 1964(c)'s requirement

2     that the claimed injury be "by reason of" a defendant's RICO violation.  *See* 18 U.S.C. § 1964(c).

3     While recognizing that this language could be read to allow a plaintiff to recover simply upon a

4     showing that defendant's violation was the "but-for" cause of plaintiff's injury, the Court held

5     that the language was not intended to be read so broadly.  *Holmes*, 503 U.S. at 265-66 (noting the

6     "unlikelihood that Congress meant to allow all factually injured plaintiffs to recover" under

7     RICO).  Specifically, the Court held that a plaintiff must be able to show that the violation was

8     not only the "but-for" cause of the injury, but also the proximate cause, which "demand[s] for

9     some direct relation between the injury asserted and injurious conduct alleged." *Id.* at 268.  The

10    *Holmes* Court noted the following three policy reasons for requiring proximate causation in the

11    RICO context: (1) the factual difficulty of measuring indirect damages and distinguishing among

12    distinct independent causal factors; (2) the complexity of apportioning damages among plaintiffs

13    "to obviate the risk of multiple recoveries"; and (3) the fact that "the need to grapple with these

14    problems is simply unjustified by the general interest in deterring injurious conduct, since

15    directly injured victims can generally be counted on to vindicate the law." *Id.* at 269.  The Court

16    then held that the injury in *Holmes* was too remote to allow recovery because it was contingent

17    upon the harm to another.[20]  *Id.* at 271-74.

---

[20]        Similarly, in *Lerner*, we held that plaintiffs did not state a claim under RICO
because plaintiffs' allegations of causation—that defendant banks failed to report a fraudulent
attorney's overdrafts to disciplinary authorities which would have caused the attorney to be
suspended or disbarred and thereby led plaintiffs to discontinue their investments with him—
were too attenuated to meet the requirements of proximate causation.  318 F.3d at 122-24.
        In our analysis of the proximate cause requirement, we have also stated that a plaintiff
must be within the class the statute sought to protect, or the "zone of interests," when analyzing
standing under RICO.  *See Abrahams v. Young & Rubicam Inc.*, 79 F.3d 234, 239 (2d Cir.)
(analyzing whether the harms flowed from the alleged predicate acts and whether the laws

1    Third, and most recently in *Anza*, 547 U.S. 451, the Supreme Court found no proximate

2    cause where the plaintiff's injury was not derivative, as it was in *Holmes*, but was nevertheless

3    too remote to allow recovery. In *Anza*, a merchant sued its competitor under RICO alleging that

4    it was injured because the competitor failed to charge sales tax and submitted fraudulent tax

5    returns and, thus, was able to undercut plaintiff's price. *Id.* at 453-56. In finding that the

6    plaintiff had inadequately alleged proximate causation, the Court explained that "[t]he cause of

7    [the plaintiff's] asserted harms . . . is a set of actions (offering lower prices) entirely distinct from

8    the alleged RICO violation (defrauding the State)." *Id.* at 458. The alleged RICO violation

9    directly caused the State to be defrauded of taxes, not the plaintiff to lose money to its

10    competitor. *Id.*

11    The principles outlined in these decisions, as applied to the City's allegations, support a

12    finding that the City has standing. Comporting with *Sedima*, the City alleges that it has been

13    injured (the loss of tax revenues) by defendants' RICO violations (the predicate acts of mail and

14    wire fraud in furtherance of a scheme to defraud the City of taxes). *See Sedima*, 473 U.S. at 496.

15    Any recoverable damages occurring by reason of a violation of § 1962(c) (a specific dollar

---

against those predicate acts were intended to prevent those harms), *cert. denied*, 519 U.S. 816 (1996). However, we have since explained that the "zone of interests" standing analysis is merely a reformulation of our proximate cause analysis and not a separate and distinct standing requirement. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 284 & n.4 (2d Cir. 2006) (explaining that since *Abrahams* we "resolved to adhere to the 'proximate causation' terminology employed by the Supreme Court in *Holmes*"); *Baisch v. Gallina*, 346 F.3d 366, 373 (2d Cir. 2003) ("Statutory standing is included in our proximate cause analysis."); *Lerner*, 318 F.3d at 121 n.6 (noting that "the reasonably foreseeable victim of a RICO enterprise will often be, unsurprisingly, the type of victim the RICO statute seeks to protect"). Even if the zone of interests test is a separate test from the proximate cause test, the question would be whether the City is within the zone of interests of the mail and wire fraud statutes, not as our dissenting colleague suggests, within the zone of interests of the Jenkins Act.

1  amount for each pack of cigarettes sold without complying with the Jenkins Act) flow from the

2  scheme to defraud the City of use taxes at the heart of the alleged predicate acts of mail and wire

3  fraud. *See id.* at 497.

4      The City's claims are easily distinguishable from the ones found to be insufficient in

5  *Holmes*, 503 U.S. at 271. Specifically, unlike in *Holmes* where the plaintiff's injury was

6  derivative, the City's alleged injury of lost tax revenue is directly caused by defendants' alleged

7  schemes. That New York State may also have been injured by defendants' alleged schemes does

8  not make the City's injury any less direct; the City is owed a certain amount of taxes independent

9  of any amount owed to or collected by the State.

10      The fact that the failure to file Jenkins Act reports with the State leads directly to the

11  City's alleged harm, namely loss of tax revenues, also distinguishes this case from *Anza*, where

12  the injury was found to be too attenuated. *See Anza*, 547 U.S. at 459. Moreover, *Anza* is

13  distinguishable from this case in two important, related, respects. First, *Anza* involved a RICO

14  claim of a *competitor* complaining of another merchant's ability to offer lower prices, and the

15  Court's holding sought to limit RICO standing in that type of case. *See id.* at 460. As the Court

16  explained, "claims brought by economic competitors . . . if left unchecked, could blur the line

17  between RICO and the antitrust laws." *Id.* Second, because competition claims may involve a

18  host of market factors unrelated to the alleged RICO violation, following the causal chain and

19  measuring damages involve evidentiary complexities beyond what a factfinder should be

20  expected to reasonably or reliably parse through. The *Anza* Court, in describing "the speculative

21  nature of the proceedings that would follow if [plaintiff] were permitted to maintain its claim,"

22  explained:

21

1      A court considering the claim would need to begin by calculating the portion of
2      [defendant's] price drop attributable to the alleged pattern of racketeering activity.
3      It next would have to calculate the portion of [plaintiff's] lost sales attributable to
4      the relevant part of the price drop.  The element of proximate causation
5      recognized in *Holmes* is meant to prevent these types of intricate, uncertain
6      inquiries from overrunning RICO litigation.

7

8  *Id.* at 459-60; *see also id.* at 460 ("A RICO plaintiff cannot circumvent the proximate-cause

9  requirement simply by claiming that the defendant's aim was to increase market share at a

10  competitor's expense.").  Here, by contrast, the City's claim is not market based.  While the

11  City's case will not be free of evidentiary wrinkles, any potential wrinkles are nowhere near the

12  type or degree involved in *Anza.  See id.* at 460.

13      Our finding of proximate causation in this case also fully comports with the "underlying

14  premises" of that causation requirement, which the Supreme Court outlined in *Holmes*, 503 U.S.

15  at 269.[21]  *See Anza*, 547 U.S. at 458.  As set forth above, the first concern raised in *Holmes* is that

16  indirect claims present the factual difficulty of measuring indirect damages and distinguishing

17  among distinct independent causal factors.  *See Holmes*, 503 U.S. at 269.  Here, however,

18  measuring the damages is as simple as counting the number of cigarette packs sold by defendants

19  to New York City residents without complying with the Jenkins Act.  Moreover, the fact that the

20  cigarette purchasers may be partially to blame—either because they were not aware of their

21  reporting duties or because, as part of the alleged RICO conspiracy, they were intentionally

---

[21]     Contrary to our dissenting colleague's view, we do not hold that *Holmes* is distinguishable simply because the City's claims do not implicate the policy concerns *Holmes* highlighted.  Rather, we hold that *Holmes* is distinguishable because the City's alleged injury is *direct*.  The fact that the City's claims do not implicate the policy concerns highlighted by the *Holmes* court bolsters our finding that the City has alleged a direct injury.

22

1    hiding the fact of their purchases—does not defeat proximate causation.[22]  We have held that

2    defendants remain liable where their actions were a substantial factor that caused the loss.  *See*

3    *Lerner*, 318 F.3d at 123 ("Central to the notion of proximate cause [under RICO] is the idea that

4    a person is . . . liable . . . to those with respect to whom his acts were a substantial factor in the

5    sequence of responsible causation, and whose injury was reasonably foreseeable or anticipated as

6    a natural consequence." (internal quotation marks omitted)); *see also Williams v. Mohawk Indus.*,

7    465 F.3d 1277, 1288 n.5 (11th Cir. 2006) (noting that under RICO, "proximate cause is not . . .

8    the same thing as a sole cause, and it is enough for the plaintiff to plead and prove that the

9    defendant's tortious or injurious conduct was a substantial factor in the sequence of responsible

10   causation" (internal quotation marks omitted)), *cert. denied*, 127 S. Ct. 1381 (2007).[23]  A

11   contrary rule would effectively require that a plaintiff's injury be caused by only one source, and,

12   as this is often not the case, it would operate to insulate from liability defendants who scheme

13   with others in violation of RICO.  Here, defendants' actions are clearly alleged to be a substantial

14   factor in the City's loss.

15       The second potential problem highlighted by *Holmes*—namely, the complexity of

16   apportioning damages among plaintiffs "to obviate the risk of multiple recoveries," 503 U.S. at

17   269—is also not implicated here.  Only the City can claim loss of the City's use taxes.  To the

18   extent that the State of New York is also aggrieved by defendants' actions, it would have

---

[22]    The possibility that some customers might have moved, making it difficult to collect taxes from them, is not a causal factor that defeats standing.

[23]    Like the Eleventh Circuit in *Williams*, we do not read the Supreme Court's holding in *Anza* to disrupt the "substantial factor" doctrine.  *See Williams*, 465 F.3d at 1288 n.5. So long as a defendant's acts played a substantial part in causing the alleged injury, those acts may be said to have "directly" caused the injury, as *Anza* requires.

23

1    separate damages because it charges separate taxes.  *See* N.Y. Tax Law §§ 471, 471-a.

2         The third reason highlighted by *Holmes* for requiring a direct injury is the expectation that

3    those directly injured will litigate their claims in order to vindicate the law.  503 U.S. at 269.

4    Although the State may also seek to sue to vindicate the law, the City should not have to rely on

5    the State to enforce the RICO laws, where the City's injury in the form of lost taxes is no less

6    direct than any comparable injury of the State.

7         Finally, the City's claims are distinguishable from those our Court has found to be

8    inadequate, in cases on which defendants rely.  Specifically, as alleged, there are no speculative

9    steps in this chain of causation.  When defendants fail to comply with the Jenkins Act,

10   defendants deprive both the City and the State of information needed to collect taxes from the in-

11   State and in-City cigarette purchasers.  And the City has alleged that it "will be 'fully and

12   promptly' informed by the New York State Department of Taxation and Finance of any

13   information relevant to the collection of cigarette taxes, including Jenkins Act reports."  *Cf.*

14   *Lerner*, 318 F.3d at 124 ("Each of the assumptions upon which this theory [of causation] rests is

15   inherently speculative.").  In addition, the City's alleged injury is not derivative of the State's

16   injury.  *Cf. Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229 (2d

17   Cir. 1999), *cert. denied*, 528 U.S. 1080 (2000).  Though the City and State are injured by the

18   same activity, the City's injury does not depend on the State being injured.  *Cf. id.* at 239

19   (concluding that injuries alleged by labor union health and welfare trust funds against tobacco

20   companies and public relations firms, based on deception about the dangers of smoking and

21   resulting health care expenses by funds and plan participants, were derivative of injuries suffered

22   by the plan participants and thus too remote to confer standing on the funds).  And it is clear that

24

1    the City is alleged to be the target of the scheme because a large part of, if not the driving force

2    behind, defendants' business plans was to sell cigarettes in such a way as to allow consumers to

3    evade New York City's taxes. *Cf. Abrahams v. Young & Rubicam Inc.*, 79 F.3d 234, 239 (2d

4    Cir.) (holding that plaintiff lacked standing under RICO because the plaintiff was not a "target"

5    of the scheme, but rather was merely injured "by the fallout from the scheme's exposure"), *cert.*

6    *denied*, 519 U.S. 816 (1996).  The fact that the State may also have been targeted by defendants'

7    schemes does not change the result.  "No precedent suggests that a racketeering enterprise may

8    have only one 'target,' or that only a primary target has standing"; indeed, "there is a broad class

9    of plaintiffs under RICO."  *See Baisch*, 346 F.3d at 375.

10          Contrary to our colleague's dissenting view, the predicate racketeering acts in this case

11    are not Jenkins Act violations; rather, as discussed in Section C *infra*, the predicate acts are wire

12    and mail fraud violations.  Thus, whether or not the injury is direct must be determined by

13    looking at the nature and consequences of the alleged predicate acts of *mail and wire fraud*.  In

14    the City's allegations, the Jenkins Act violations form the basis of defendants' *scheme to*

15    *defraud*, an essential element of the alleged predicate acts of mail and wire fraud, which targeted

16    both the City and State in an effort to deprive both of the information needed to collect use taxes.

17     The fact that defendants have no statutory duty to the City under the Jenkins Act does not make

18    the City's alleged harm from the mail and wire fraud violations derivative, unforeseeable, or any

19    less direct.  As the dissent recognizes, the mail and wire fraud statutes extend to protect taxing

20    authorities from fraud.  *See, e.g., United States v. DeFiore*, 720 F.2d 757, 761-62 (2d Cir. 1983),

21    *cert. denied*, 467 U.S. 1241 (1984).  Moreover, we do not share our dissenting colleague's

22    concern that this case represents a "major expansion of mail fraud doctrine."  For the reasons we

25

1    have already explained, in this unique case, the City has alleged an injury in the form of lost

2    taxes that is independent from, even if parallel to, any injury suffered by the State.[24]  By

3    recognizing the City's right to proceed in this case, we are neither extending the scope of the mail

4    and wire fraud statutes, nor the scope of RICO, beyond their established reach.

5    **B.    Injury to "Business or Property"**

6        As noted above, one of the requirements for a civil RICO claim is that plaintiff be injured

7    in its "business or property."  18 U.S.C. § 1964(c).  Defendants argue that the City's allegations

8    of lost taxes do not allege an injury to the City's "business or property" because that injury was

9    not one the City incurred as a party to a commercial transaction.  This argument finds support in

10   *Town of West Hartford v. Operation Rescue*, 915 F.2d 92, 103-04 (2d Cir. 1990), where we

11   suggested that a municipality must have sustained its injury as a party to a commercial

12   transaction to have standing under RICO.  However, we have since explained that our statements

13   to that effect in *Town of West Hartford* were merely dicta.  *See Att'y Gen. of Can. v. R.J.*

---

[24]    The Supreme Court recently clarified that "a plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." *Bridge v. Phoenix Bond & Indem. Co.*, __ U.S. __, 128 S. Ct. 2131, 2145 (2008); *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1311 (2d Cir. 1990); *cf. McLaughlin v. Am. Tobacco Co.,* 522 F.3d 215, 222-23 (2d Cir. 2008) (decertifying a class under RICO, in part, because common questions did not predominate as to the required element of reliance). However, the Supreme Court noted that "it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation," and that there may be situations where the "complete absence of reliance may prevent the plaintiff from establishing proximate cause." *Phoenix Bond & Indem. Co.*, 128 S. Ct. at 2144.  Here, there is no question that the City has alleged third-party reliance on the part of the State by alleging that defendants' failure to comply with the Jenkins Act caused the State to be unable to collect taxes.  Thus, as we find that the City has adequately alleged proximate cause and third-party reliance, we need not address the question of whether an allegation of proximate cause fails where there are absolutely no allegations of reliance.

1  *Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 132 n.40 (2d Cir. 2001), *cert. denied*, 537 U.S.

2  1000 (2002).

3       We see no reason to import an additional standing requirement on municipalities for

4  RICO claims, and thus expressly reject our dicta to the contrary in *Town of West Hartford*. *See*

5  *Sedima*, 473 U.S. at 495, 497-500 (noting that "RICO is to be read broadly," and overruling our

6  Court's engrafting of a "racketeering injury" requirement which found no support in the statute

7  or legislative history). We have consistently held that tax losses from unpaid taxes are "property"

8  for purposes of the mail and wire fraud statutes. *See, e.g.*, *Fountain v. United States*, 357 F.3d

9  250, 255-60 (2d Cir. 2004), *cert. denied*, 544 U.S. 1017 (2005); *United States v. Porcelli*, 865

10  F.2d 1352, 1355 (2d Cir.) (affirming mail fraud and RICO convictions for fraudulent under-

11  reporting of taxes to State), *cert. denied*, 493 U.S. 810 (1989); *DeFiore*, 720 F.2d at 761.

12  Moreover, in *Anza*, the Supreme Court suggested that a State would have a recoverable injury

13  where the allegations are that the defendants defrauded the State out of tax revenues. *See* 547

14  U.S. at 460.  Thus, we hold that lost taxes can constitute injury to "business or property" for

15  purposes of RICO, and conclude that the City has adequately met this requirement

16  notwithstanding that its injury did not arise from its participation in a commercial transaction.

17  *See Illinois Dep't of Revenue v. Phillips*, 771 F.2d 312, 314-16 (7th Cir. 1985) (rejecting the

18  notion that a State government unit suing under RICO is limited to competitive or commercial

19  injuries); *but see Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 977-80 (9th Cir. 2008)

20  (endorsing the dicta in *Town of West Hartford*).

21       **C.    Section 1962(c) Violation**

22       As noted above, to state a claim for damages under § 1964(c) a plaintiff must first allege

27

1    a substantive RICO violation under § 1962(c).  *See Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17

2    (2d Cir. 1983), *cert. denied*, 465 U.S. 1025 (1984).  In turn, § 1962(c) makes it "unlawful for any

3    person employed by or associated with any enterprise engaged in, or the activities of which

4    affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the

5    conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."  18 U.S.C. §

6    1962(c).  We discuss the "racketeering activity" and "enterprise" elements of a substantive RICO

7    violation as they relate to these cases in turn.

8         **1.    Racketeering Activity**

9         "Mail fraud and wire fraud are forms of 'racketeering activity' for purposes of RICO."

10   *Anza*, 547 U.S. at 454; *see also* 18 U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud).  "To procure a

11   conviction for mail fraud, the government must prove three elements: (1) a scheme to defraud

12   victims of (2) money or property, through the (3) use of the mails."  *United States v. Walker*, 191

13   F.3d 326, 334 (2d Cir. 1999), *cert. denied*, 529 U.S. 1080 (2000).  Likewise, a defendant

14   commits wire fraud where he "was one of the participants in a fraudulent scheme which was

15   furthered by the use of interstate transmission facilities."  *United States v. Corey*, 566 F.2d 429,

16   431 n.2 (2d Cir. 1977).  "Allegations of mail [or wire] fraud must be made with the particularity

17   required by Federal Rule of Civil Procedure 9(b)."  *McLaughlin*, 962 F.2d at 191.

18        "To constitute a [mail or wire fraud] violation . . .  it is not necessary to show that

19   [defendants] actually mailed [or wired] . . . anything themselves; it is sufficient if they caused it

20   to be done."  *Pereira v. United States*, 347 U.S. 1, 8 (1954); *accord McLaughlin*, 962 F.2d at 191

21   (mail fraud); *United States v. Whiting*, 308 F.2d 537, 540 (2d Cir. 1962) (wire fraud), *cert.*

22   *denied*, 372 U.S. 909 (1963).  Moreover, "[i]t is sufficient for the mailing [or transmission] to be

28

1    incident to an essential part of the scheme, or a step in the plot." *Schmuck v. United States*, 489

2    U.S. 705, 710-11 (1989) (internal quotation marks omitted).

3        It is settled law in this Circuit that a Jenkins Act violation—assuming one occurred—may

4    form the basis of a wire or mail fraud conviction. *See DeFiore*, 720 F.2d at 761-62 (upholding

5    wire fraud conviction based on scheme to defraud New York of "substantial cigarette tax

6    revenues").[25]  Other circuits have also reached this conclusion. *See* United States v. Melvin, 544

7    F.2d 767, 773 (5th Cir. 1977) (same with respect to mail fraud); *United States v. Brewer*, 528

8    F.2d 492, 495 (4th Cir. 1975) (same).

9        Here, the City alleges that the named RICO persons directed the alleged enterprises to

10    "conceal cigarette sales from state tax authorities by failing to file Jenkins Act reports or directed

11    to effect sales by means of misrepresentations" while using the mails or wires to effect a sale of

12    cigarettes to New York City residents.  The City further alleges that this amounts to a "scheme to

13    defraud New York City" of its use taxes because defendants have deprived the City of the

14    information it needs to charge and collect those taxes.  We find that these allegations sufficiently

15    allege a scheme or artifice to defraud that was furthered by the use of mail or wires. *See*

16    *McLaughlin*, 962 F.2d at 191.

17        Even assuming *arguendo* that the District Court was correct to find that the individual

18    defendants acting in their official capacities could not be liable under the *Jenkins Act* for their

19    companies' failures to comply with the reporting laws, the individuals allegedly committed the

20    predicate acts of mail and wire fraud by *directing* the companies to use the mails and wires to sell

---

[25]    It is also settled that the Jenkins Act does not displace the mail and wire fraud statutes with respect to fraudulent schemes to deprive states of cigarette taxes. *See DeFiore*, 720 F.2d at 761-62.

1    cigarettes and to violate the Jenkins Act.  These allegations are sufficient to allege a pattern of

2    racketeering activity for purposes of RICO.  *See Pereira*, 347 U.S. at 8-9.

### 2.    The Enterprise Requirement

4        As to the enterprise requirement, the Supreme Court has explained that a plaintiff must

5    "allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that

6    is not simply the same 'person' referred to by a different name."  *Cedric Kushner Promotions,*

7    *Ltd. v. King*, 533 U.S. 158, 161-62 (2001); *Riverwoods Chappaqua Corp. v. Marine Midland*

8    *Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994) ("[B]y virtue of the distinctness requirement, a

9    corporate entity may not be both the RICO person and the RICO enterprise under section

10   1962(c).").  A "person" is defined as "any individual or entity capable of holding a legal or

11   beneficial interest in property." 18 U.S.C. § 1961(3).  An "enterprise" is defined as "any

12   individual, partnership, corporation, association, or other legal entity, and any union or group of

13   individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

14       A RICO enterprise based on an association-in-fact theory is "a group of persons

15   associated together for a common purpose of engaging in a course of conduct," the existence of

16   which is "proved by evidence of an ongoing organization, formal or informal, and by evidence

17   that the various associates function as a continuing unit."  *United States v. Turkette*, 452 U.S.

18   576, 583 (1981).  We look to the "hierarchy, organization and activities" to determine whether an

19   alleged association "functioned as a unit."  *United States v. Coonan*, 938 F.2d 1553, 1560-61 (2d

20   Cir. 1991) (noting that "proof of various racketeering acts may be relied on to establish the

21   existence" of an association-in-fact enterprise), *cert. denied*, 503 U.S. 941 (1992).  "[F]or an

22   association of individuals to constitute an enterprise, the individuals must share a common

30

1    purpose to engage in a particular fraudulent course of conduct and work together to achieve such

2    purposes." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004)

3    (internal quotation marks omitted).

4          In practice, the dual requirements of (1) distinctness and (2) the proof needed to

5    demonstrate an association-in-fact, work in tandem to weed out claims dressed up as RICO

6    violations but which are not in fact.  Specifically, the distinctness doctrine requires a plaintiff to

7    demonstrate that the RICO person is legally separate from the RICO enterprise, while the

8    association-in-fact requirements help ensure that distinctness is not achieved by simply tacking

9    on entities to the enterprise which do not in fact operate as a "continuing unit" or share a

10   "common purpose."  *See Turkette*, 452 U.S. at 583; *Satinwood*, 385 F.3d at 174.

11         As explained earlier, the alleged enterprises in the cases before us generally take on one

12   of two forms.  In the first, a defendant corporate entity is alleged to be a passive enterprise with

13   its defendant officers and/or directors acting as the RICO "person[s]."  (hereafter, the "primary

14   enterprises").  As laid out above, these alleged primary enterprises are as follows:

15   •      An enterprise consisting of defendant Smokes-Spirits.com, with defendant Michael Klee
16          as the alleged RICO person.
17
18   •      An enterprise entitled EZTobacco Enterprise consisting of Electronic Computer
19          Consulting, LLC, with defendant Theresa Trivett, doing business as EZ-Tobacco.com, as
20          the alleged RICO person.
21
22   •      An enterprise consisting of defendant Nexicon, with defendants Richard Urrea, Daniel
23          Urrea, and certain non-defendant individuals as the alleged RICO persons.
24
25   •      An enterprise consisting of defendant Hemi Group, with defendant Kai Gachupin as the
26          alleged RICO person.
27
28   •      An enterprise consisting of defendant NCCigarettes.com, with defendants XFire, Scott

1           Herring, and Jeff Reinhardt as the alleged RICO persons.[26]

3           The second set of enterprises are association-in-fact enterprises, where the association

4  consists of a defendant entity and a third-party, and the RICO "person[s]" consist of the

5  defendant entity and generally officers and/or directors of the entities comprising the enterprise.

6  The remaining alleged association-in-fact enterprises in these cases are as follows:

7    •      An enterprise consisting of defendant Nexicon and non-party American Indian CigCo,
8           with defendants Nexicon, Richard Urrea, Daniel Urrea, and certain non-parties, at least
9           one of which is an employee/officer of American Indian CigCo, as the RICO persons.

11   •      An enterprise consisting of defendant Hemi Group and non-defendant A1 Enterprises,
12          with defendants Hemi Group and Kai Gachupin as the RICO persons.[27]

14           We address each set of enterprises below.

16         **3.**      **The Primary Enterprises**

18           The City's allegations are sufficient to meet the distinctness requirement with respect to

19  all of the primary enterprises.  In *Cedric Kushner*, the Supreme Court explained that the RICO

20  "person" and alleged "enterprise" must be only legally, and not necessarily actually, distinct.  533

21  U.S. at 163, 166 (determining that Don King, the alleged "person," was distinct from Don King

22  Productions, the alleged RICO "enterprise," of which Don King was president and sole

23  shareholder).  The City has alleged with respect to the primary enterprises that the enterprise is an

24  innocent corporation, with its own legal basis for existing, and the persons are employees or

---

[26]     This alleged enterprise is a slight variant of the other alleged primary enterprises because two of the alleged RICO persons—Reinhardt and Xfire—are not officers and/or directors of the passive enterprise, NCCigarettes.  Herring, however, is the alleged principal of NCCigarettes.

[27]     Although it is not obvious from the pleadings, the District Court understood the City to be alleging a third association-in-fact enterprise, consisting of NCCigarettes.com, Xfire, Herring, and Reinhardt, with Herring, Reinhardt, and Xfire as the RICO persons.

1    officers of the organization unlawfully directing the enterprise's racketeering activities.  That is

2    sufficient under the distinctness standards articulated in *Cedric Kushner*.  We address below the

3    additional, case-specific challenges made by certain defendants.

4        **a.    NCCigarettes**

5        Defendants in *NCCigarettes* argue that NCCigarettes.com is a sole proprietorship run by

6    Scott Herring, not an enterprise, and that the additional persons—Jeff Reinhardt and

7    Xfire—committed no predicate acts under RICO and are not liable because Xfire was merely an

8    Internet service provider that provided services to the alleged "enterprise."

9        NCCigarettes.com's claim that it is a sole proprietorship is unavailing at this stage in the

10   pleadings.  Though we have not previously spoken on this, our sister circuits have allowed §

11   1962(c) claims to proceed when the enterprise is a sole proprietorship with a distinct and separate

12   identity from that of the individual defendant who owns it.  These circuits have held that a

13   defendant is distinct from the sole proprietorship enterprise, unless the sole proprietor is "strictly

14   a one-man show."  *McCullough v. Suter*, 757 F.2d 142, 144 (7th Cir. 1985) ("The only important

15   thing is that [the enterprise] be either formally (as when there is incorporation) or practically (as

16   when there are other people besides the proprietor working in the organization) separable from

17   the individual."); *United States v. Benny*, 786 F.2d 1410, 1415-16 (9th Cir.) (affirming RICO

18   conviction where defendant's "sole proprietorship was a troupe, not a one-man show"), *cert.*

19   *denied*, 479 U.S. 1017 (1986); *see also Guidry v. Bank of LaPlace*, 954 F.2d 278, 283 (5th Cir.

20   1992) (espousing the approach to sole proprietorships announced in *McCullough*, but holding

21   that the distinctness requirement was not met under the circumstances of the case).  Under this

22   approach, which we now join, we find that the City has adequately alleged distinctness as to the

33

1    NCCigarettes.com primary enterprise because the City has alleged that Herring's sole

2    proprietorship is not a one-man show.

3        However, we agree with defendants Xfire and Reinhardt that the allegations are

4    insufficient to state a claim against them as RICO persons.  As explained earlier, § 1962(c)

5    makes it "unlawful for any person employed by or associated with an enterprise . . . to conduct or

6    participate, directly or indirectly, in the conduct of such enterprise's affairs . . . ."  18 U.S.C. §

7    1962(c).  In *Reves v. Ernst & Young*, the Supreme Court explained that "[i]n order to 'participate,

8    directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in

9    directing those affairs."  507 U.S. 170, 179 (1993); *see also id.* at 184 ("[I]t is clear that Congress

10    did not intend to extend RICO liability under § 1962(c) beyond those who participate in the

11    operation or management of an enterprise through a pattern of racketeering activity.").

12        Although this is a low hurdle to clear at the pleading stage, *see Satinwood*, 385 F.3d at

13    176, the City's allegations—most generously construed—simply do not clear it with respect to

14    Xfire or Reinhardt.[28]  These defendants are not alleged to have violated the Jenkins Act, and,

---

[28]    The sum of the allegations concerning XFire and Reinhardt are as follows:

Jeff Reinhardt is the Manager, CEO and sole owner of Xfire Software LLC, which is a North Carolina limited liability company that provides Internet website hosting, website design, domain name registration and Internet support services. NCCigarettes.com operates through web servers, software, and services supplied by Jeff Reinhardt and Xfire Software LLC.  Without the services supplied by Jeff Reinhardt and Xfire Software LLC, the NCCigarettes.com could not sell cigarettes to residents of the City.

Jeff Reinhardt and Xfire Software LLC have actual knowledge that the NCCigarettes.com is engaging in mail and wire fraud and that NCCigarettes.com is using Xfire Software LLC's facilities, equipment and services for the purpose of defrauding the City of tax revenue.  Jeff Reinhardt and Xfire Software LLC each know that NCCigarettes.com sells cigarettes over the Internet to New York

34

1    unlike the named RICO person in the other primary enterprises, neither Xfire nor Reinhardt are

2    alleged to have directed or caused the enterprise to commit a Jenkins Act violation.  Simply

3    alleging that certain entities provide services which are helpful to an enterprise without any

4    allegations that those entities exert any control over the enterprise does not sufficiently allege a

5    claim under RICO against those entities.  *See Reves*, 507 U.S. at 179; *see also, e.g., Azrielli v.*

6    *Cohen Law Offices*, 21 F.3d 512, 521 (2d Cir. 1994); *Univ. of Md. at Baltimore v. Peat,*

7    *Marwick, Main & Co.*, 996 F.2d 1534, 1539-40 (3d Cir. 1993).

8            **b.    *Nexicon***

9            Nexicon argues that the City erroneously named it as a defendant because Cyco.net, Inc.

10   (Nevada) sold its Internet tobacco retail business, Cyco.net, Inc. (New Mexico), to American

11   Indian CigCo in 2003.  Cyco.net, Inc. (Nevada), then changed its name to Nexicon, which is a

12   publicly traded company engaged in network security and billing management.[29]  Moreover,

13   Richard Urrea claims to have terminated a consultancy agreement with American Indian Cigco

14   and ceased doing business with the company, and thus argues that Nexicon should not be held

15   liable.  Whatever the merits of these factual averments, we must accept the City's allegations as

---

City residents and also know that NCCigarettes.com does not file Jenkins Act reports in connection with those sales.

[29]    Richard Urrea claims that Cyco.net ceased selling cigarettes into New York City prior to the entry into enforcement of New York Public Health Law § 1399-ll (Unlawful shipment or transport of cigarettes).  The legislature passed the law in 2000, but a federal court enjoined it until 2003.  *See Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 219 (2d Cir. 2003) (holding that the statute did not violate the Commerce Clause and reversing a district court's order enjoining the law).  As further discussed below, the law makes it illegal to ship cigarettes to any person in New York "who is not: (a) a person licensed as a cigarette tax agent or wholesale dealer . . . ; (b) an export warehouse proprietor . . . or an operator of a customs bonded warehouse . . . ; or (c) a person who is an officer, employee or agent of the United States government . . . ."  N.Y. Public Health Law § 1399-ll.

1    true at this stage, and dismissal is not warranted on these bases.

2        *Nexicon* defendants also argue that the City failed to "make a showing" that Nexicon

3    exercised any control over American Indian CigCo's shipments of cigarettes.  The City is not

4    required to "make a showing" that Nexicon exercised any control over American Indian CigCo's

5    shipments of cigarettes at this stage.  As explained, to show the requisite level of management,

6    the City must "allege that the defendants 'conduct[ed] or participate[d], directly or indirectly, in

7    the conduct of such enterprise's affairs through a pattern of racketeering activity." *Satinwood*,

8    385 F.3d at 175-76 (quoting 18 U.S.C. § 1962(c)).  By alleging that Nexicon and American

9    Indian CigCo have entered profit sharing and employment agreements, the City has adequately

10    pled that Nexicon has "some part in directing the enterprise's affairs." *Reves*, 507 U.S. at 179.

11        **4.    Association-In-Fact Enterprises**

12        Defendants also argue that the District Court correctly dismissed the City's association-

13    in-fact enterprise allegations in *Nexicon* and *NCCigarettes*.  The District Court found that while

14    the City alleged technically legitimate enterprises based on the association-in-fact theory, the City

15    failed to (1) allege a configuration that has an "'ongoing organization, formal or informal,'" and

16    that its "'various associates function as a continuing unit'"; (2) allege a nexus between the RICO

17    predicate acts and the association-in-fact enterprises; and (3) "explain each participant's role in

18    the alleged course of fraudulent conduct."  *Nexicon*, 2006 U.S. Dist. LEXIS 10295, at *28-29

19    (quoting *Turkette*, 452 U.S. at 583).[30]

_____

[30]        As noted earlier, two distinct association-in-fact enterprises were alleged in
*Nexicon*: the Nexicon association-in-fact enterprise and the Hemi Group association-in-fact
enterprise.  In *NCCigarettes*, the District Court dismissed the apparent allegation of an
association-in-fact enterprise based on collateral estoppel.  2006 U.S. Dist. LEXIS 11922, at *3.

1             **a.      Nexicon Association-In-Fact Enterprise**

2         The District Court erred in holding that the City failed to adequately plead an enterprise

3    with respect to the Nexicon association-in-fact enterprise.  First, the City has sufficiently alleged

4    a functioning unit by alleging that Nexicon and American Indian CigCo entered profit sharing

5    and employment agreements and that they have "interlocking financial and management

6    agreements."  The City further alleged that American Indian CigCo transfers assets from Nexicon

7    to American Indian CigCo in order to hide assets and that American Indian CigCo regularly

8    transfers funds earned from illegal cigarette sales to Nexicon.

9         The "relatedness" requirement also was met with respect to this enterprise.  *See United*

10   *States v. Daidone*, 471 F.3d 371, 375 (2d Cir. 2006) (per curiam) (citing *United States v.*

11   *Minicone*, 960 F.2d 1099, 1106 (2d Cir.), *cert denied*, 503 U.S. 950 (1992)); *see also Satinwood*,

12   385 F.3d at 174.  In this regard, the City alleges that defendants' business plans depended on (1)

13   concealing their customers' purchases from state tax authorities; (2) informing their customers

14   that the purchases would be concealed; and (3) concealing purchasers' tax liability from the

15   purchasers themselves.  Thus, the relatedness requirement was met because the alleged acts of

16   mail and wire fraud were more than merely related to the activities of the online cigarette sellers;

17   they were essential to defendants' business.

18        Finally, the City also sufficiently alleges the roles that relevant defendants had in

19   operating or managing the Nexicon association-in-fact enterprise.  Defendants Nexicon, Richard

20   Urrea and Daniel Urrea are clearly alleged to have participated in management by virtue of their

37

1  roles in the organizations that make up the enterprise.[31]  As the Nexicon association-in-fact

2  enterprise is clearly alleged to be made up of several defendant persons who operated or managed

3  the affairs of the enterprise, the dismissal of this claim must be vacated.

**b.    Hemi Group Association-In-Fact Enterprise**

6  However, we affirm the District Court's finding that the City failed to sufficiently allege a

7  functioning unit with respect to the Hemi Group association-in-fact enterprise.  Although the

8  City alleges that the Hemi Group association-in-fact displays a "continuity of structure and

9  personnel, and has a consensual decision-making structure," the City alleges no facts tending to

10  support this stock allegation.  The bare allegations that "A1 Enterprises works with the Hemi

11  Group to conceal from New York City cigarette sales;" that Kai Gachupin "is believed" to be an

12  officer or employee of A1 Enterprises, as well as an owner or shareholder of the Hemi Group, are

13  insufficient to plead the type of continuity required for an association-in-fact enterprise.

**c.    NCCigarettes Association-In-Fact Enterprise**

16  To the extent the City's complaint can be construed as alleging an association-in-fact

17  enterprise consisting of NCCigarettes.com and the Internet service provider, Xfire, we agree with

18  the District Court that the City has failed to meet its pleading burden.  Perhaps because the City

19  never intended to plead an association-in-fact with respect to this group of defendants, it has not

20  provided "any solid information regarding the hierarchy, organization, and activities" of the

21  alleged enterprise, "from which we could fairly conclude that its members functioned as a unit."

---

[31]    While there is insufficient information to support the allegations that Chuck Arning and Brent Wolford direct the affairs of the enterprise along with the other alleged "persons," Arning and Wolford are not defendants and are thus not subject to liability.  *See Reves*, 507 U.S. at 184.

38

1   *See Satinwood*, 385 F.3d at 174 (internal quotation marks omitted).  Thus, to the extent that the

2   City has indeed attempted to allege an association-in-fact enterprise with respect to this group of

3   defendants, the District Court's dismissal of this claim is affirmed.

4   **D.    Leave to Replead**

6   With respect to those claims where we have found the City's enterprise allegations

7   insufficient, we do not foreclose the possibility that amendment could cure the shortcomings.  In

8   2006, when the complaints were finally dismissed, the City had not moved for leave to amend

9   the complaints, and the District Court did not grant it *sua sponte*.  "Rule 15(a) of the Federal

10  Rules of Civil Procedure instructs courts that leave to amend should be freely given.  Leave to

11  amend need not be granted, however, where the proposed amendment would be futile."

12  *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 18 (2d Cir. 1997) (citations

13  and internal quotation marks omitted).  Thus, on remand to the District Court, the court may

14  grant leave to amend if and as it deems appropriate.

15  **II.    The City's State Law Claims**

17  **A.    Jurisdiction**

19  As a preliminary matter to our discussion of the City's state law claims, we must

20  determine whether we have jurisdiction over them.  Defendants argue that we lack jurisdiction

21  over the appeals from the District Court's orders dismissing the state law claims because the

22  City's notices of appeal did not specifically indicate an appeal from those orders.  However, for

23  the reasons explained below, we agree with the City that its notices of appeal from the final

24  judgments encompass all prior interlocutory orders, including the earlier dismissals of the state

25  law claims.

1    Rule 3 of the Federal Rules of Appellate Procedure requires that the notice of appeal

2    "designate the judgment, order, or part thereof being appealed."  Fed. R. App. P. 3(c)(1)(B).

3    Rule 4 sets forth the time limits for filing a notice of appeal.  Fed. R. App. P. 4.  Rules 3 and 4

4    are a single jurisdictional threshold and may not be waived.  *See Torres v. Oakland Scavenger*

5    *Co.*, 487 U.S. 312,  317 (1988); *New Phone Co. v. City of New York*, 498 F.3d 127, 131 (2d Cir.

6    2007) (per curiam).  However, we have held that the requirements of the rules "should be

7    liberally construed."  *Marrero Pichardo v. Ashcroft*, 374 F.3d 46, 54-55 (2d Cir. 2004).

8    Unless the District Court directs entry of a final judgment, "any order or other decision,

9    however designated, that adjudicates fewer than all the claims or the rights and liabilities of

10    fewer than all the parties does not end the action" is, by definition, interlocutory.  Fed. R. Civ. P.

11    54(b); *see Sahu v. Union Carbide Corp.*, 475 F.3d 465, 467-68 (2d Cir. 2007) (per curiam)

12    (finding no jurisdiction as grant of partial summary judgment was not final order under 28 U.S.C.

13    § 1291, in part, because a separate claim remained unresolved); *Hanlin v. Mitchelson*, 794 F.2d

14    834, 838 (2d Cir. 1986) ("[A]n order disposing of only a portion of a case is ordinarily not

15    appealable absent a Rule 54(b) certification.").

16    In 2005, the District Court dismissed all of the City's claims, with leave to replead the

17    RICO claims only.  These dismissals were interlocutory because they did not end the actions.

18    The only case here where the District Court directed entry of a "judgment" in 2005 is *Smokes-*

19    *Spirits*.  That "judgment" stated as follows:

20    [T]he Court . . . having rendered its Order granting defendants' motions to dismiss with
21    leave to plaintiff to file a Second Amended Complaint within 45 days of the Order dated
22    February 8, 2005, it is, ORDERED, ADJUDGED AND DECREED: That for the reasons
23    stated in the Court's Order dated February 8, 2005, defendants' motions to dismiss are
24    granted.

25

1    Clerk's Judgment, *Smokes-Spirits*, No. 04 civ. 6616 (S.D.N.Y. April 8, 2005).  In light of the

2    District Court's grant of leave to replead, we do not view this "judgment" as a final judgment or

3    a certification by the District Court pursuant to Fed. R. Civ. P. 54(b).  Thus, it too was

4    interlocutory.

5          As the decisions dismissing the state law claims were interlocutory, the notices of appeal

6    specifying the final judgments incorporate those 2005 orders. We generally "interpret[] an appeal

7    from a specific order disposing of the case as an appeal from the final judgment, which

8    incorporates all previous interlocutory judgments in that case and permits their review on

9    appeal." *Anobile v. Pelligrino*, 303 F.3d 107, 115 (2d Cir. 2002); *see also Shannon v. Gen. Elec.*

10   *Co.*, 186 F.3d 186, 192 (2d Cir. 1999) ("When a district court enters a final judgment in a case,

11   interlocutory orders rendered in the case typically merge with the judgment for purposes of

12   appellate review."); 16A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal*

13   *Practice and Procedure* § 3949.4 at 72 (3d ed. 1999) ("[A] notice of appeal that names the final

14   judgment is sufficient to support review of all earlier orders that merge in the final judgment

15   under the general rule that appeal from a final judgment supports review of all earlier

16   interlocutory orders.").

17         Here, the City appealed from "each and every part" of the final judgment entered in each

18   case.  Thus, the earlier orders dismissing the state law claims, with leave to amend the RICO

19   claims, merge into the final judgments.  *See Phelps v. Kapnolas*, 123 F.3d 91, 93 (2d Cir. 1997)

20   (construing the notice of appeal to apply both to an earlier order dismissing the complaint as to

21   five out of six defendants, as well as to the final judgment order dismissing case against final

22   defendant).  Moreover, the City's intent to appeal from the entire judgment can be reasonably

23   inferred from the City's notices of appeal.

41

1    The cases defendants cite to the contrary, where we found certain District Court orders to

2    be outside of the scope of the appeal, are distinguishable.  In those cases, the notices of appeal

3    generally specified certain aspects of an order or judgment, or particular orders, but not others,

4    and intent to appeal from the *entire* final judgment could not be inferred.  *See New Phone Co.*,

5    498 F.3d at 131 (finding no jurisdiction to review separate order enjoining plaintiffs from filing

6    additional complaints without leave of court because "intent to appeal from it [could not] be

7    inferred"); *Johnson v. Smithsonian Inst.*, 189 F.3d 180, 185 n.2 (2d Cir. 1999) (finding no

8    jurisdiction to consider separate denials of motion for leave to amend or for reconsideration

9    "because the plaintiff's notice of appeal specifically state[d] that he [was] appealing only the

10   district court's June 25, 1998 decision dismissing the complaint"); *Kowsh v. Bd. of Elections*, 99

11   F.3d 78, 80 (2d Cir. 1996) (per curiam) (finding no jurisdiction over parts of judgment other than

12   discrete portion specifically mentioned); *Shrader v. CSX Transp.*, *Inc.*, 70 F.3d 255, 256 (2d Cir.

13   1995) (finding no jurisdiction to review the district court's earlier decision to dismiss the

14   plaintiff's Railway Labor Act challenge where notice of appeal referred solely to an order

15   dismissing the claims under the Federal Employers' Liability Act, and noting "in passing" that

16   the Railway Labor Act challenge "appear[ed] to be meritless").[32]  Accordingly, we have

17   jurisdiction to review the dismissals of the City's state law claims.

---

[32]    Defendants also rely on one unpublished summary order from 2003.  Pursuant to Second Circuit Rule 32.1, rulings by summary order do not have precedential effect, and "[c]itation to summary orders filed prior to January 1, 2007, is not permitted in this . . . court" except in certain circumstances not relevant here.  *See* Local Rules of the United States Court of Appeals for the Second Circuit § 32.1(b), (c)(2).  Thus, *Phlo Corp. v. Stevens*, 62 F. App'x. 377, 380 (2d Cir. 2003) (unpublished), cited by defendants, is nonprecedential and was cited in violation of this rule.  Nonetheless, we note that the case is distinguishable from the current cases as it involved a question clearly not present here of whether we had jurisdiction over post-judgment and post-notice of appeal contempt orders where no new notice of appeal was filed.

1       **B.    Common Law Fraud:** *Smokes-Spirits*, *EZTobacco*, *NCCigarettes*, **and** *Nexicon*

2

3       We affirm the District Court's dismissals of the City's common law fraud claims.  *See*

4 *Nexicon*, 383 F. Supp. 2d at 564-66.  Defendants argue that the City has not and cannot allege

5 reliance, that defendants made no affirmative misrepresentations, and that failing to file Jenkins

6 Act reports does not give rise to a cause of action for the City, in part because defendants have no

7 duty to file Jenkins Act reports with the City and no duty to provide tax advice to their

8 purchasers.

9       The elements of fraud under New York law are: (1) a misrepresentation or a material

10 omission of material fact which was false and known by defendant to be false, (2) made for the

11 purpose of inducing the plaintiff to rely on it, and (3) justifiably relied upon by the plaintiff, (4)

12 who then suffered an injury as a result of such reliance.  *Lama Holding Co. v. Smith Barney Inc.*,

13 88 N.Y.2d 413, 421, 668 N.E.2d 1370, 1373 (N.Y. 1996); *see also Crigger v. Fahnestock & Co.*,

14 443 F.3d 230, 234 (2d Cir. 2006).  "[A] fraud cause of action may be predicated on acts of

15 concealment where the defendant had a duty to disclose material information."  *Kaufman v.*

16 *Cohen*, 760 N.Y.S.2d 157, 165, 307 A.D.2d 113, 119-20 (N.Y. App. Div. 1st Dep't 2003); *see*

17 *also Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007).

18       In all four cases before us, the City failed to plead "reasonable reliance *on the part of the*

19 *plaintiff*."  *Crigger*, 443 F.3d at 234 (emphasis added).  Rather, under the City's theory, the

20 alleged intentional omissions or misrepresentations were either directed at the State or the

21 consumers, causing the City to be unable to collect its taxes.  Such allegations of third-party

22 reliance, however, are insufficient to make out a common law fraud claim under New York law.

23 *See Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*, 148 F.3d 194, 196 (2d Cir.

43

1  1998) (explaining "that a plaintiff does not establish the reliance element of fraud for purposes of

2  . . . New York law by showing only that a third party relied on a defendant's false statements").

3  　　　　The City's sole argument, located in part of a footnote of its brief, for why the common

4  law fraud claims should nevertheless proceed, is that it has an agreement with the State to

5  exchange information on cigarette sales transactions.  However, allegations that the City has an

6  agreement to exchange tax information with the State—which is the party that relied on the

7  omission of information required under the Jenkins Act—is simply another iteration of its third-

8  party reliance claim.  Therefore, we affirm the District Court's dismissals of the City's common

9  law fraud claims in all four cases.

10  **C.        The City's GBL § 349 Claims: *Nexicon*, *Smokes-Spirits*, and *EZTobacco***
11
12  　　　　The District Court dismissed the City's GBL § 349 claims in the three cases where it was

13  raised.  For the reasons below, we affirm the district court's holding in the *Smokes-Spirits* case,

14  and reserve judgment in the *Nexicon* and *EZTobacco* cases pending certification of a question

15  regarding standing to the New York Court of Appeals.

16  　　　　GBL § 349(a) declares that "[d]eceptive acts or practices in the conduct of any business,

17  trade or commerce or in the furnishing of any service in" New York are unlawful.  N.Y. Gen.

18  Bus. § 349(a).  The statute provides a private right of action.  *Id.* at § 349(h); *see Blue Cross &*

19  *Blue Shield of N.J., Inc. v. Philip Morris U.S.A. Inc.*, 3 N.Y.3d 200, 205, 818 N.E.2d 1140, 1143

20  (N.Y. 2004).  "To make out a prima facie case under Section 349, a plaintiff must demonstrate

21  that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in

22  a material way, and (3) the plaintiff has been injured as a result." *Maurizio v. Goldsmith*, 230

23  F.3d 518, 521 (2d Cir. 2000) (per curiam) (citing *Oswego Laborers' Local 214 Pension Fund v.*

1    *Marine Midland Bank*, 85 N.Y.2d 20, 25, 647 N.E.2d 741, 744 (N.Y. 1995)).  "[A]n action under

2    § 349 is not subject to the pleading-with-particularity requirements of Rule 9(b), Fed. R. Civ. P.,

3    but need only meet the bare-bones notice-pleading requirements of Rule 8(a) . . . ."  *Pelman ex*

4    *rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005).

5          We have explained that "the gravamen" of a GBL § 349 claim is "consumer injury or

6    harm to the public interest."  *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d

7    Cir. 1995) (internal quotation marks omitted), *cert. denied*, 516 U.S. 1114 (1996).  Thus, in

8    *Securitron*, we found that a plaintiff could sue its *competitor* under GBL § 349 as it had alleged

9    injury to the public interest.  *See id.*[33]

10         The City's allegations in *Smokes-Spirits* are that defendants intentionally failed to inform

11   their customers that they must pay taxes and omitted the amount of taxes owed to the City and

12   the State from the advertised prices.  *See Oswego*, 647 N.E.2d at 745 (holding that the definition

13   of deceptive acts and practices under GBL § 349 includes "representations or omissions").  But

14   the omission of the tax amount from the price of the cigarettes, where the vendor is not required

15   to collect that tax, is not, on its own, likely to mislead or assume significance in the deliberation

16   of a reasonable consumer acting reasonably under the circumstances.  *See id.*  Consumer

17   taxpayers are charged with some knowledge of the law.  *See Niedringhaus v. Comm'r*, 99 T.C.

---

[33]    The *Securitron* decision was cited approvingly by the New York Court of Appeals when we certified to it the question of whether a third-party payer, such as an insurer, has standing to bring an action under GBL § 349.  *See Blue Cross & Blue Shield of N.J.*, 818 N.E.2d at 1144; *see also Blue Cross & Blue Shield of N.J. Inc. v. Philip Morris, U.S.A., Inc.*, 344 F.3d 211, 218 (2d Cir. 2003) (finding that insurer had satisfied the requirement of an injury to the public interest by alleging that defendants' "deceptive practices involved serious harm to the public" in that they "induced consumers to smoke and discouraged them from quitting smoking, thus significantly increasing their risk of illness and even death").

1   202, 222 (1992) ("As a general rule, taxpayers are charged with knowledge of the law.").  In this

2   unique situation, an omission of information about a consumer's duty to pay taxes to that

3   consumer's home state and city cannot be tantamount to an affirmative misrepresentation that a

4   consumer does not need to pay taxes.  Therefore, we affirm the District Court's dismissal of the

5   GBL § 349 claim in *Smokes-Spirits*.

6           We reach a different conclusion, however, with respect to allegations in *Nexicon* and

7   *EZTobacco*, where the City alleges that defendants represented to customers that the cigarettes

8   are "tax free," that their customers do not have to pay taxes, and/or that defendants did not have

9   to file Jenkins Act reports.  Such statements are untrue and could mislead a reasonable consumer

10  into believing that those cigarettes are in fact tax free.[34]  *See Gaidon v. Guardian Life Ins. Co. of*

11  *Am.*, 94 N.Y.2d 330, 344, 725 N.E.2d 598, 604 (N.Y. 1999) (finding that plaintiffs adequately

12  alleged a claim under GBL § 349 where they alleged "that defendants lured them into purchasing

13  policies by using illustrations that created unrealistic expectations as to the prospects of premium

14  disappearance upon a strategically chosen 'vanishing date'").  Though taxpayers are charged with

15  general knowledge of the tax laws, they are not charged with knowing them to such an extent that

16  we expect them to discern an actual and intentional misrepresentation about the intricate tax laws

17  at issue in this case.  Thus, a misrepresentation that affirmatively assures a consumer that no

---

[34]     Despite the possibility that consumers might be using the websites in order to knowingly evade taxes, *see Nexicon*, 383 F. Supp. 2d at 563, the City alleges (and this allegation must be taken as true) that consumers were misled by the deceptive statements.  GBL § 349 was meant to take into account the impact of allegedly deceptive statements on the "vast multitude which the statutes were enacted to safeguard—including the ignorant, the unthinking and the credulous who, in making purchases, do not stop to analyze but are governed by appearances and general impressions."  *Guggenheimer v. Ginzburg*, 43 N.Y.2d 268, 273, 372 N.E.2d 17, 19 (N.Y. 1977); *see also Food Parade, Inc. v. Office of Consumer Affairs of County of Nassau*, 7 N.Y.3d 568, 575, 859 N.E.2d 473, 477 (N.Y. 2006) (Graffeo, J., dissenting).

46

1    taxes are due may be reasonably relied on, whereas, as discussed above, the failure to list, in the

2    price of a cigarette pack, the tax which the seller is not required to collect, may not.

3        A question nevertheless remains as to whether the City has standing to allege its GBL §

4    349 claims in *Nexicon* and *EZTobacco*.  Although we have held that GBL § 349 extends to

5    protect competitors as well as consumers, *see Securitron*, 65 F.3d at 264, we are aware of no case

6    extending protection under GBL § 349 to an entity that was neither harmed as a competitor nor a

7    consumer.

8        As a general matter, if the New York Court of Appeals has not ruled on an issue of state

9    law, "we are bound to apply the law as interpreted by New York's intermediate appellate courts

10   unless we find persuasive evidence that the New York Court of Appeals, which has not ruled on

11   this issue, would reach a different conclusion." *Blue Cross & Blue Shield of N.J.*, 344 F.3d at

12   221 (internal quotation marks and alterations omitted).  We may certify a question if "with

13   respect to the question asked . . . there is a statute implicated [and] its plain language does not

14   answer the question." *Id.* (internal quotation marks omitted) (certifying the question of whether

15   the claims of a "third party payer of health care costs seeking to recover costs of services

16   provided to subscribers as a result of those subscribers being harmed by a defendant's or

17   defendants' violation of [GBL] § 349 [are] too remote"); *see also Hamilton v. Beretta U.S.A.*

18   *Corp.*, 222 F.3d 36, 42 (2d Cir. 2000) (certifying the question of whether gun manufacturers owe

19   a duty to exercise reasonable care in marketing and distributing their products in New York

20   because the question of "[w]hether defendants owe a duty to the plaintiffs' victims is . . . a

21   particularly thorny inquiry, implicating questions of policy that cannot adequately be resolved by

22   reviewing New York state precedents").

47

1    Although the parties did not request certification, we are empowered to seek certification

2    *sua sponte*.  *See* Local Rules of the United States Court of Appeals for the Second Circuit § 0.27.

3    With respect to the unsettled question of whether the City has standing under New York law to

4    allege its GBL § 349 claims in *Nexicon* and *EZTobacco*, we believe that certification to the New

5    York Court of Appeals is the most prudent path.  *See City of New York v. Beretta U.S.A. Corp.*,

6    524 F.3d 384, 407 (2d Cir. 2008) (Katzmann, J., dissenting) (noting that the use of certification

7    for an unsettled area of state law is "[i]n keeping with our preference that states define the

8    meaning of their own laws in the first instance"); *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 150 (2d

9    Cir. 2001) (same).  We therefore sever the GBL § 349 claims in *Nexicon* and *EZTobacco*, and

10   certify them to the New York Court of Appeals, as set forth below.  *See Abrahams*, 79 F.3d at

11   239 (severing a claim and certifying it to the Connecticut Supreme Court).

12   **D.    Public Nuisance**: ***EZTobacco*** **and** ***NCCigarettes***
13
14           Under New York law, a public nuisance is "conduct or omissions which . . . endanger or

15   injure the property, health, safety or comfort of a considerable number of persons, and is

16   actionable by a governmental agency."  *Hoover v. Durkee*, 622 N.Y.S.2d 348, 349, 212 A.D.2d

17   839, 840 (N.Y. App. Div. 3d Dep't 1995) (citation and internal quotation marks omitted).  The

18   City's public nuisance claims before us are predicated on New York Public Health Law § 1399-

19   ll.  In enacting that law, the legislature found "that the shipment of cigarettes sold via the internet

20   or by telephone or by mail order to residents of this state poses a serious threat to public health,

21   safety, and welfare, to the funding of health care pursuant to the health care reform act of 2000,

22   and to the economy of the state."  N.Y. Pub. Health Law § 1399-ll, ch. 262, § 1.

23           While the legislature clearly believes that the internet sale of cigarettes into New York

48

1    poses a health risk to its residents, we have some reservation as to whether the legislature, in

2    passing § 1399-ll, intended to displace common law nuisance claims with respect to this subject

3    matter. *Cf. City of New York v. Milhelm Attea & Bros., Inc.*, 550 F. Supp.2d 332, 350-51

4    (E.D.N.Y. 2008). A violation of § 1399-ll is a crime and the law empowers the State

5    Commissioner of Health to impose a civil fine. *See id.* § 1399-ll(5). It does not, however,

6    provide for enforcement by another entity besides the State. Because this question implicates

7    both the State's particular interest in protecting the public's health, as well as the public policy

8    goals behind the Public Health Law, we find that certification of this question is also the most

9    prudent path. *See Sealed v. Sealed*, 332 F.3d 51, 59 (2d Cir. 2003). We therefore also sever the

10   public nuisance claims, and certify them to the New York Court of Appeals, as set forth here.

11                                          * * *

13            For the foregoing reasons, we respectfully certify to the New York Court of Appeals the

14   following questions:

15        1.    Does the City have standing to assert its claims under General Business Law §
16              349?

18        2.    May the City assert a common law public nuisance claim that is predicated on
19              N.Y. Public Health Law § 1399-ll?

21            In formulating these two questions as we have here, we do not mean to limit the Court of

22   Appeals's response. The certified questions may be deemed expanded to cover any further

23   pertinent question of New York law that the Court of Appeals finds appropriate to answer in

24   connection with these issues. This panel retains jurisdiction over the GBL § 349 claims in

25   *Nexicon* and *EZTobacco* and the public nuisance claims pending the New York Court of

26   Appeals's disposition of the certified questions.

                                             49

1    It is hereby ORDERED that the Clerk of this Court transmit to the Clerk of the New York

2    Court of Appeals a Certificate, as set forth below, together with a complete set of briefs and

3    appendices filed in this Court by the parties.

4                                    **CERTIFICATE**
5
6    The foregoing is hereby certified to the New York Court of Appeals, pursuant to 2d Cir.

7    R. § 0.27 and N.Y. Comp. Codes. R. & Regs. tit. 22, 500.27, as ordered by the United States

8    Court of Appeals for the Second Circuit.

9                                    **CONCLUSION**
10
11    We sever the GBL § 349 claims in *Nexicon* and *EZTobacco* and all the public nuisance

12    claims and certify two questions regarding those claims to the New York Court of Appeals.  We

13    retain jurisdiction over those claims pending the New York Court of Appeals's disposition.

14    Because we believe that the disposition of the certified questions will not affect the discovery

15    needed as to the RICO claims and that delay in remanding those claims awaiting that disposition

16    is therefore unnecessary, we VACATE and REMAND as to the City's primary RICO claims as

17    well as the alternative association-in-fact enterprise claim alleged against Nexicon.  *See*

18    *Abrahams*, 79 F.3d at 240 (remanding claims after severing a separate claim and certifying it to

19    the Connecticut Supreme Court, upon a finding that delay in remanding the reinstated claims was

20    unnecessary).  We AFFIRM the dismissal of the remaining RICO claims, the common law fraud

21    claims in all cases, and the GBL § 349 claim in *Smokes-Spirits*.  We have considered the parties'

22    remaining arguments and find them to be without merit.

23

24

1    WINTER, Circuit Judge, <u>dissenting</u> in part and concurring in part:

2

3        Respectfully, I dissent in part and concur in part.  In my view, the alleged RICO violation

4    by appellees was not the proximate cause of the City's injuries, and therefore the City has no

5    standing to bring the RICO action.[1]  I concur in my colleagues' disposition of the state law

6    claims, which are asserted on the basis of diversity jurisdiction and therefore must be addressed

7    even if no valid federal claim is asserted.

8        Where a civil RICO claim is based on fraud, not all injuries suffered by "but-for" victims

9    of the fraud are proximately caused by the fraud.  <u>Holmes v. Sec. Investor Prot. Corp.</u>, 503 U.S.

10    258, 268 (1992).  Only those injuries suffered by direct victims of the fraud are compensable.

11    <u>Anza v. Ideal Steel Supply Corp.</u>, 547 U.S. 451, 461 (2006).  In addition, we have held that, with

12    regard to RICO claims based on violations of a statute as predicate acts, "the plaintiff must show

13    both that he is within the class the statute sought to protect and that the harm done was one that

14    the statute was meant to prevent . . . . [T]he issue is . . . one of statutory intent: was the plaintiff

15    (even though foreseeably injured) in the category the statute meant to protect, and was the harm

16    that occurred (again, even if foreseeable), [one] the statute sought to avoid."  <u>Abrahams v. Young</u>

17    <u>& Rubicam, Inc.</u>, 79 F.3d 234, 237 (2d Cir. 1996).

18        Determining whether a "but-for" RICO victim may recover for injuries suffered from

19    fraudulent acts requires an analysis of the nature of the alleged fraud.  Here, the fraud is not

20    garden variety.  There has been no misrepresentation of a material fact or omission that renders a

21    material statement misleading.  <u>See</u> <u>United States v. Autuori</u>, 212 F.3d 105, 118 (2d Cir. 2000).

---

[1]    This is not to say that I agree with my colleagues' analysis of other objections raised by appellees with regard to the RICO claim.  I simply do not address them.

51

1    Instead, the alleged fraud is based on violations of a statute, the Jenkins Act, and, therefore, the

2    nature and consequences of the fraud are determined solely by the scope of that Act.

3         My colleagues and I may differ on the relevance of the Jenkins Act. They state,

4    "Contrary to our colleague's dissenting view, the predicate racketeering acts in this case are not

5    Jenkins Act violations; rather . . . they are wire and mail fraud violations." Maj. Op. at 25.

6    However, my colleagues describe the complaint's allegations of mail and wire fraud as "us[ing]

7    . . . the mails or wires to effect a sale of cigarettes to New York City residents without complying

8    with the Jenkins Act's reporting requirements to the State." Maj. Op. at 9. They also state that

9    "the failure to file Jenkins Act reports with the State leads directly to the City's alleged harm,"

10   Maj. Op. at 21, and that "measuring the damages is as simple as counting the [cigarettes sold] to

11   New York City residents without complying with the Jenkins Act," Maj. Op. at 22. The only

12   fraudulent acts alleged that sound in fraud, therefore, are the violations of the Jenkins Act.[2]

13        Taking my colleagues' own descriptions of the alleged fraud at face value, I look to the

---

[2]      My colleagues also note that the fact that the statutory reporting duty is owed to the State rather than the City does not render the "harm [to the City] from the mail and wire fraud violations . . . any less direct [because] [a]s the dissent recognizes, the mail and wire fraud statutes extend to protect taxing authorities from fraud." Maj. Op. at 25 (citing United States v. DeFiore, 720 F.2d 757, 761-62 (2d Cir. 1983)). This description of both the reach of the mail and wire fraud statutes and of this dissent are rather overbroad. Although the mail and wire fraud statutes have been used to prosecute cigarettes vendors and vindicate defrauded tax authorities in the past, no legal authority stands for the proposition that these statutes apply whenever a government is caused to suffer a loss of tax revenue with a but-for connection to a fraud, no matter how indirect. DeFiore itself involved the prosecution of the vendors who purchased cigarettes from out of state, that is, individuals who had an obligation to pay taxes. Id. at 760. And while these statutes have also been used to prosecute out of state sellers, that is, individuals who had an obligation to report sales to state taxing authorities, see United States v. Melvin, 544 F.2d 767, 772 (5th Cir. 1977); United States v. Brewer, 528 F.2d 492, 494 (4th Cir. 1975), there are no cases in which a failure to fulfill one's obligation to report sales to a state tax authority has been adjudged an act of fraud upon a municipal tax authority.

1   Jenkins Act to determine the nature and consequences of the fraud.  The Act is a regulatory

2   provision directing mandatory disclosure of certain facts in order to facilitate tax collection by

3   state taxing authorities.  The Act requires those who sell tobacco products to purchasers in other

4   states to report those sales and the identity of the purchasers to the state taxing authorities in the

5   respective states.  15 U.S.C. § 376.  The goal is solely to render evasion of state tobacco taxes by

6   purchasers in the respective states more difficult.  S. Rep. No. 84-1147 (1955), <u>reprinted in</u> 1955

7   U.S.C.C.A.N. 2883, 2883-84; S. Rep. No. 81-644 (1949), <u>reprinted in</u> 1949 U.S.C.C.A.N. 2158,

8   2158-60.

9        Absent the Jenkins Act, appellees would have owed no duty to disclose their sales to

10   anyone, and their failure to disclose could not conceivably be deemed fraud of any kind.

11   Appellees owe no taxes to the City.  The tax evasion is by the purchasers of the tobacco products.

12   Even with the Jenkins Act, which requires reporting only to state authorities, appellees have no

13   duty to disclose anything to the City.  Indeed, conspicuously absent from the City's pleadings is

14   any claim brought pursuant to the Jenkins Act itself, rather than RICO, seeking enforcement of

15   the Jenkins Act, effectively an admission that the Act does not protect the City.  <u>See</u> <u>Piper v.</u>

16   <u>Chris-Craft Indus.</u>, 430 U.S. 1, 37 (1977) (no private right of action where a party is not one for

17   whose benefit the statutory provision was enacted).  There is, moreover, a Supreme Court

18   decision in print.

19        In <u>Anza v. Ideal Steel Supply Corp.</u>, 547 U.S. 451 (2006), the Supreme Court held that

20   injuries suffered by a competitor of a company that had gained a cost advantage by evading New

21   York sales taxes were not proximately caused for RICO purposes by the tax evasion.  In the

22   Court's view, the only "direct victim" was the state taxing authority.  <u>Id.</u> at 458.

53

1    My colleagues seek to distinguish <u>Anza</u> in two ways.  First, they emphasize that the

2    plaintiff in <u>Anza</u> was a competitor of the defendant.  If anything, however, the plaintiff in <u>Anza</u>

3    had a stronger case with respect to proximate causation than the plaintiff here.  In <u>Anza</u>, the

4    defendant was the tax evader and had thereby lowered its costs and gained a competitive

5    advantage over the plaintiff.  In the present case, the City lost tax revenue because appellees sold

6    cigarettes to purchasers, but did not report these sales to the State, as required by the Jenkins Act;

7    because of this failure to report, the State was unable to pass on reports of such sales to the City

8    even if it had been inclined to do so; without reports from the State, the City was unable to

9    collect sales taxes from purchasers; concurrently, the purchasers individually opted not to fulfill

10   their tax obligations to the City's taxing authorities.  The City was at best an expectant gratuitous

11   donee of information from the State, and the suggestion that the City's harm is somehow less

12   attenuated than the plaintiff's in <u>Anza</u> seems to me unsustainable.

13   The mail and wire fraud statutes were probably aimed originally at mail-order sellers that

14   misrepresented goods or real estate to distant buyers.  They have been stretched to include a

15   failure to provide information to state taxing authorities even where the providers of the required

16   information owe no tax.  <u>United States v. Melvin</u>, 544 F.2d 767 (5th Cir. 1977); <u>United States v.</u>

17   <u>Brewer</u>, 528 F.2d 492 (4th Cir. 1975).  However, this case is a further major expansion of mail

18   fraud doctrine by allowing suits against defendants who owed no duty to provide information to

19   the plaintiffs.

20   The second ground on which my colleagues seek to distinguish <u>Anza</u> rests on what is, in

21   my view, a misreading of <u>Holmes v. Securities Investor Protection Corp.</u>, 503 U.S. 258 (1992).

22   In <u>Holmes</u>, the Supreme Court explained that plaintiffs cannot bring RICO actions to recover for

1    injuries caused indirectly by defendants because of: (i) the difficulty in ascertaining the amount

2    of damages attributable to remote defendants; (ii) the challenge in apportioning recoveries among

3    plaintiffs directly and indirectly harmed; and (iii) the notion that RICO violations will be most

4    effectively deterred by those best poised to bring an action, i.e., the parties who were directly

5    injured by the defendants.  Id. at 269-70.

6           The majority accurately summarizes these justifications but then treats them as a stringent

7    test that, if not met in other cases, overrides the direct causation requirement.  See Majority Op.

8    at 22-25.  In my view, even if the Holmes' rationale is not completely apt in a particular case, a

9    successful plaintiff must still show that it is a direct victim and, where a statutory violation is

10   alleged to have caused the plaintiff's injury, is a member of the class the particular "statute meant

11   to protect" and the harm was one "the statute sought to avoid."  Abrahams, 79 F.3d at 237.

12          Moreover, the Holmes rationale applies to the present case.  My colleagues' view that

13   information provided to the State under the Jenkins Act would in fact be passed along and would,

14   without any cost or friction whatsoever -- "as simple as counting the number of cigarette packs

15   sold by defendants to New York City residents," Maj. Op. at 22 -- translate into precisely

16   calculable tax revenue recovered from the various addressees is highly exaggerated.[3]   A concern

17   of taxing authorities everywhere is balancing the costs of collection against the recoverable

18   revenue, a matter of great significance where the taxpayers are, as here, anything but inclined

19   toward voluntary compliance.  Moreover, the state appears uninterested in enforcing the Jenkins

---

[3]      From the lack of any analytic discussion of the issue, I assume that my colleagues
are not asserting that the measure of recoverable damages is the tax multiplied by the number of
packs sold to City residents rather than the net revenue lost from the failure to file Jenkins Act
reports.

1    Act and may not collate or maintain accurate records of reports from out-of-state vendors or

2    reliably pass them along.  City customers, large numbers of individuals owing relatively small

3    amounts in taxes, may be hard to trace, may assert various defenses in cases based solely on

4    Jenkins Act reports, and may easily use non-City addresses.  Finally, as to Holmes factor (iii), the

5    City hardly has greater incentive to enforce the Jenkins Act through RICO than Anza-like

6    competitors who lose sales because of their rivals' sales tax evasion.

7          I therefore respectfully dissent in part and concur in part.